**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 1 1 2025

KEVIN P. WEIMER, Clerk
By:                Deputy Clerk

MICHAEL E. SULLIVAN, JR.,

    Plaintiff,

    v.

W. MICHAEL MALOOF, JR.,
d/b/a THE MALOOF LAW FIRM,

    Defendant.

Civil Action No.:

**<u>JURY TRIAL DEMANDED</u>**

**1:25-CV- 2006**

<u>**COMPLAINT FOR DAMAGES**</u>

    COMES NOW Plaintiff Michael E. Sullivan, Jr. ("Plaintiff" or "Sullivan")

and brings this Complaint against Defendant W. Michael Maloof, Jr., d/b/a The

Maloof Law Firm ("Defendant") for violations of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201, et seq., and related state law claims for non-payment

of wages earned. In support thereof, Sullivan respectfully shows the following:

<u>**PRELIMINARY STATEMENT**</u>

    Plaintiff brings this action against Defendant W. Michael Maloof, Jr., his

former attorney and employer, to recover wages wrongfully withheld in

violation of federal and state law. Defendant leveraged his knowledge from a

prior attorney-client relationship and Plaintiff's restrictive bond conditions to

secure Plaintiff's valuable services from March 2022 through April 2024

without providing any compensation. Plaintiff performed substantial legal and

administrative work that directly contributed to cases generating significant

fees for Defendant. Despite promising payment, repeatedly acknowledging the

1

value of Plaintiff's work, and ultimately admitting in writing that he was "guilty of taking advantage" (Ex. 31, Maloof Email, Dec. 15, 2023) and "did not follow the law" (Ex. 36, Maloof Email, Apr. 24, 2024), Defendant refused to compensate Plaintiff for his services. Defendant's settlement tactics—including improperly conditioning offers on Plaintiff waiving his right to file disciplinary complaints and proposing extended payment schedules designed to maintain leverage over Plaintiff—have left Plaintiff with no alternative but to seek judicial intervention. This action seeks to recover Plaintiff's earned wages, liquidated damages, and other appropriate relief for Defendant's willful violations of wage and hour laws.

## JURISDICTION AND VENUE

1.    This Court has original federal question jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

2.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as these claims arise from the same common nucleus of operative facts as the federal claims and form part of the same case or controversy.

3.    Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this district, operates his business within this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district. Defendant's

2

principal place of business is located in Decatur, Georgia, which is within the Atlanta Division of this District (NDGA LR 3.1).

## PARTIES

5.    Plaintiff Michael E. Sullivan, Jr. is a citizen of the United States and a resident of the State of Georgia. He submits to the jurisdiction of this Court.

6.    At all relevant times, Plaintiff Michael E. Sullivan, Jr. was an "employee" of Defendant W. Michael Maloof, Jr. within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

7.    Defendant W. Michael Maloof, Jr. is an individual residing in **Gwinnett County**, Georgia. He is an attorney licensed to practice law in the State of Georgia and conducts business as a sole proprietorship under the name The Maloof Law Firm.

8.    At all relevant times, Defendant W. Michael Maloof, Jr. was an "employer" of Plaintiff Michael E. Sullivan, Jr. within the meaning of the FLSA, 29 U.S.C. § 203(d). Defendant acted directly or indirectly in the interest of an employer in relation to Plaintiff.

9.    Defendant W. Michael Maloof, Jr. may be served with process at his principal place of business located at 215 N McDonough Street, Decatur, Georgia, 30030.

## FLSA COVERAGE

3

**A. Enterprise Coverage**

10.    Plaintiff alleges, on information and belief, that at all times relevant to this action, Defendant was an enterprise engaged in commerce or in the production of goods for commerce, as defined by Section 3(s)(1) of the Fair Labor Standards Act, 29 U.S.C. § 203(s)(1).

11.    On information and belief, Defendant's annual gross volume of sales made or business done met or exceeded $500,000.00, exclusive of excise taxes at the retail level that are separately stated. This is supported by high-value cases handled by Defendant, including a $1.87 million settlement that generated approximately $374,000 in attorney fees.

12.    Further, on information and belief, Defendant employed at least two individuals, including Plaintiff and others, who regularly engaged in commerce or in the production of goods for commerce, or who regularly handled, sold, or otherwise worked on goods or materials that have been moved in or produced for commerce by any person. Such activities included, among other things, processing client payments through interstate credit card transactions, communicating with out-of-state clients via telephone and email, and utilizing office equipment, supplies, and materials moved in or produced for interstate commerce.

13.    On information and belief, Defendant employs an individual referred to as a "law partner." Despite this title, that individual is properly

4

classified as an employee under the FLSA because he receives regular compensation, does not possess any equity ownership interest in Defendant's sole proprietorship, and performs his duties under Defendant's direction and control. As a matter of economic reality, this "law partner" appears misclassified because, in a sole proprietorship, a true partnership is legally impossible without formal registration as a separate legal entity. Together with Plaintiff, this "law partner" satisfies the FLSA's requirement of a second employee for enterprise coverage.

14.    Moreover, at all times relevant to this action, from August 2022 through August 2024, Defendant employed at least one other employee—and at certain times two others—in addition to Plaintiff and the "law partner" described above. These additional employees regularly engaged in interstate commerce or handled goods or materials that have moved in interstate commerce, including by processing payments, using office equipment manufactured out of state, and communicating with clients and vendors across state lines.

**B. Individual Coverage**

15.    Alternatively, Plaintiff alleges that at all times relevant to this action, Plaintiff Sullivan was individually engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§ 206–207.

5

16. Sullivan's work activities involved interstate commerce through his routine use of electronic platforms, communications, financial transactions, and information processing, as described below.

17. Sullivan regularly engaged in interstate commerce through electronic communications and platforms. He utilized Westlaw, a subscription-based interstate legal research platform, to prepare legal motions and conduct case research, and he used Dropbox and Google Drive cloud storage platforms for file sharing and case management. He was assigned tasks in MyCase, a cloud-based practice management software operating across state lines. Sullivan regularly used the Odyssey e-filing system for Georgia courts, an electronic filing platform relying on interstate networks. He engaged in frequent email and phone communications that crossed state lines with clients, opposing counsel, and courts. He established interstate business relationships by communicating with out-of-state clients and entities and accessed interstate telecommunications networks for research and communications.

18. Sullivan regularly conducted financial transactions through interstate banking and payment systems. These included procuring and processing airline tickets via interstate banking systems and making firm payments using out-of-state bank accounts. He covered firm expenses through out-of-state financial institutions and processed client payments through electronic payment systems operating across state lines, including credit card

transactions. He created, sent, and tracked electronic invoices through accounting software transmitting data across interstate servers and payment gateways, and he authorized and processed payments to legal service vendors, including payments for open records requests and court documents.

19.    Sullivan also regularly handled and processed information through interstate commerce channels. This included subpoenaing phone records from interstate carriers and using email services transmitting data across state lines through interstate servers and networks. He relied on phone services operating on national networks utilizing interstate infrastructure.

20.    These activities demonstrate that Sullivan was regularly engaged in interstate commerce as an integral part of his job duties, establishing individual coverage under the FLSA.

## STATEMENT OF FACTS

### A. Initial Attorney-Client Relationship (2015-2016)

21.    In 2014, Defendant W. Michael Maloof, Jr. ("Maloof") established a fiduciary attorney-client relationship with Plaintiff Michael E. Sullivan, Jr. ("Sullivan") regarding a criminal matter. This relationship provided Maloof access to Sullivan's confidential personal and financial information—information Maloof later used when employing Sullivan without compensation.

22.   On October 15, 2015, Maloof began representing Sullivan, characterizing the matter in his case notes as potentially "a big money case" (Ex. 1, Maloof Case Notes, Oct. 15, 2015), reflecting his awareness of Sullivan's financial resources.

23.   Maloof's case notes from November 2, 2015, documented his knowledge of Sullivan's qualifications: "He did undergraduate work at Emory University where he has two undergraduate degrees in economics. He has two Masters degrees from Georgia State University." (Ex. 3, Maloof Case Notes, Nov. 2, 2015). Sullivan had earned these degrees—including his Emory economics degree (2003) and Georgia State Master's degrees in Business Administration (2010) and Finance (2011)—prior to his representation by Maloof.

24.   Maloof further documented Sullivan's earning capacity, noting Sullivan had an "Earning capacity of $120,000 per year plus bonuses at the time of his arrest" (Ex. 3, Maloof Case Notes, Nov. 2, 2015). This awareness of Sullivan's earning capacity informed Maloof's later decision to employ Sullivan without compensation.

25.   During the representation, Maloof observed Sullivan's analytical capabilities. In late 2015, Sullivan identified an evidentiary risk in his case and researched and proposed the legal remedy—an Ex Parte Motion for Subpoena Power, Pre-Indictment—providing a sample motion. Maloof filed

8

this motion using Sullivan's research. This demonstrated to Maloof, years before the 2022 employment relationship, Sullivan's capacity for legal analysis and strategic planning.

26.    Maloof's case notes also documented Sullivan's work ethic, stating Sullivan "was working an average of about 100 hours a week prior to the events complained of in this case" (Ex. 3, Maloof Case Notes, Nov. 2, 2015). Maloof later leveraged this information when employing Sullivan without compensation.

27.    On September 30, 2016, the formal attorney-client relationship terminated. However, Maloof retained the confidential knowledge gained during the representation and later used this information when structuring the employment relationship with Sullivan.

## B. Employment Relationship Formation (2022)

28.    Prior to January 20, 2022, Sullivan was subject to restrictive bond conditions confining him to house arrest, requiring prior approval for departures. Over 285 days, Sullivan spent approximately 9.2 hours outside his home, excluding court obligations, creating personal and professional vulnerability. Maloof, with knowledge from the prior representation, was positioned to utilize this situation.

29.    Aware of Sullivan's confinement, qualifications, and financial background, Maloof contacted Sullivan on January 18, 2022, via text message.

Two days later, Maloof referenced Sullivan's situation, proposing "an idea that could maybe get you out of this solitary confinement" (Ex. 4, Maloof SMS, Jan. 20, 2022, 7:50 AM) and confirming his awareness of the bond conditions by asking, "What does your bond say?" (Ex. 4, Maloof SMS, Jan. 20, 2022, 3:32 PM).

30.    During conversations about Sullivan's bond conditions, Sullivan mentioned an "unpaid internship" as a potential permissible reason to leave his house. Maloof responded with a formal employment offer that would be "Paid but underpaid." (Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM). This promise established payment expectations. Maloof later referenced Sullivan's "unpaid internship" remark, suggesting Sullivan had volunteered to work without compensation, which contradicted Maloof's contemporaneous text message promising payment.

31.    Sullivan, seeking relief from confinement, responded gratefully to Maloof's offer. Maloof secured Sullivan's acceptance using knowledge of his vulnerability and the trust from their prior relationship.

32.    On February 4, 2022, at Maloof's request, Sullivan prepared a draft employment offer letter (Ex. 7, Sullivan Email, Feb. 4, 2022) to facilitate court approval of his bond modification. Sullivan used an internet template and inserted a minimum wage calculation ($14,500 annually) as a placeholder, not intending to set his own terms. Sullivan's transmittal email stated this was

"my first cut" with "numerous assumptions that are explicitly your call to make." (Ex. 7, Sullivan Email, Feb. 4, 2022).

33.    Maloof accepted the letter without discussing compensation terms: "I will send to Don on Monday. I am sure it is written better than anything I would put together." (Ex. 6, Maloof Email, Feb. 4, 2022). By submitting this letter (Ex. 7, Sullivan Email, Feb. 4, 2022) to the court and appearing at the bond hearing as employer, Maloof created a contractual obligation and made representations to the court establishing a duty to pay at least the stated amount. This contradicts his later statements that Sullivan refused payment or was offered "$10/hour"—narratives advanced only after Sullivan sought compensation.

34.    Confirming the compensable nature of the relationship, on February 15, 2022, Maloof instructed Sullivan to "Keep track of any hours you do some work," acknowledging Sullivan's time was to be compensated.

35.    On February 18, 2022, Sullivan's counsel filed a Motion to Modify Sullivan's Bond Conditions (Ex. 8, Motion to Modify Bond Conditions, Feb. 18, 2022), predicated on Maloof's employment offer letter. The motion stated, "Mr. Sullivan has obtained an offer of employment from a local law firm. Mr. Sullivan has provided an offer letter (Ex. 7, Sullivan Email, Feb. 4, 2022) to the State and to the Court."

11

36.    On February 22, 2022, Maloof appeared virtually at Sullivan's bond modification hearing and allowed himself to be presented as Sullivan's prospective employer. Sullivan's counsel told the Court: "that's why Mr. Maloof is here. Mr. Maloof also provided a letter in writing stating that he would be Mr. Sullivan's employer. He's aware of this case and his bond conditions and he said Mr. Sullivan would be coming to work in his office during the week." (Ex. 10, Transcript, Feb. 22, 2022). Based on these representations, the Court approved the modification permitting Sullivan to work at Maloof's law office (Ex. 9, Order Modifying Bond Conditions, Feb. 22, 2022). This judicial reliance on Maloof's promise of employment cemented the employment relationship and Maloof's obligation to compensate Sullivan.

## C. Initial Employment Period (March - August 2022)

37.    Sullivan commenced employment at The Maloof Law Firm on March 9, 2022. Maloof confirmed the start date: "We are looking forward to having you here." (Ex. 11, Maloof Email, Mar. 9, 2022).

38.    On Sullivan's first day, Maloof informed him his legal assistant was unexpectedly departing: "My legal assistant is out with some kind of medical issue they are trying to figure out. It is a little scary." (Ex. 11, Maloof Email, Mar. 9, 2022). The assistant resigned after that day. Maloof later claimed he knew of the departure since January 2022 (Ex. 39, Maloof Email,

12

Jun. 10, 2024), but did not hire a paid replacement until after Sullivan left, having Sullivan perform the assistant's duties without pay.

39.     Sullivan established a professional role. On March 10, 2022, he created a professional email address (msullivanjrlaw@gmail.com) with the signature "Law Clerk | The Maloof Law Firm." That day, Sullivan requested Westlaw access.

40.     Sullivan began providing legal work. On March 15, 2022, he emailed Maloof research findings.

41.     Between March 24–April 1, 2022, Sullivan contributed to the Cooley v. Ashita et al. case, assisting co-counsel Andrew Lynch with a summary judgment response. Sullivan researched, prepared exhibits, and drafted portions of the brief, finalizing it late March 31, 2022. Lynch acknowledged Sullivan's contribution: "You did good. Don't sweat the details. You were a real help." (Ex. 13, Lynch Email, Apr. 1, 2022). This case later settled for $1.87 million in June 2023, generating approximately $374,000 in attorney fees for Maloof. Sullivan received no compensation for his work.

42.     As Sullivan performed legal and administrative duties without pay, on May 18, 2022 (after 70 days filling the vacancy), he emailed Maloof Robert Half 2022 Legal Salary Guide information (Ex. 14, Sullivan Email, May 18, 2022), noting market rates for Legal Administrative Assistants ($41,750-$56,750). This reflects Sullivan's expectation of compensation.

43.    By August 8, 2022, Sullivan was entrusted with responsibilities including access to blank firm checks.

44.    That same day, despite providing no compensation, Maloof acknowledged Sullivan's contributions in writing: "I want you to know you are a great friend. Your actions here have been invaluable and are altruistic to me and my firm." Maloof later contradicted this, claiming Sullivan "missed a lot of days" and worked limited hours (Ex. 39, Maloof Email, Jun. 10, 2024).

45.    On August 14, 2022, after 159 days of uncompensated work, Sullivan emailed Maloof his departure notice: "W[ill] be out of the office for an indeterminate period starting Monday. I need to focus on other stuff, thanks." (Ex. 15, Sullivan Email, Aug. 14, 2022). Maloof responded via text urging Sullivan not to leave.

46.    Within 48 hours of Sullivan's departure notification, Maloof hired Sofia K. Barnett as a paid replacement, documented in a MyCase email notification on August 16, 2022 (Ex. 16, MyCase Email Notification, Aug. 16, 2022). Sofia was the daughter of Claudia Barnett, a paralegal working nearby Maloof.

47.    Throughout the summer, Claudia had visited Maloof's office and recommended her daughter. Despite these recommendations, the staffing need, and the available candidate, Maloof did not hire Sofia or anyone else for 5.2 months while Sullivan worked without pay. Only when Sullivan departed

did Maloof hire Sofia at an approximate $60,000 annual salary. This indicates Maloof's financial ability to pay for support and suggests a choice to use Sullivan's uncompensated labor instead. Maloof later stated he had "delayed hiring Ms. Barnett despite knowing her previously" (Ex. 39, Maloof Email, Jun. 10, 2024), inconsistent with his hiring action upon Sullivan's departure.

48.    Throughout this 159-day period, from March 9, 2022, through August 14, 2022, despite performing legal and administrative work Maloof described as "invaluable," Sullivan received no compensation.

## D. Post-Employment Communications (August – September 2022)

49.    Despite giving notice on August 14, 2022, Sullivan continued to provide services to Maloof and his firm, contrary to Maloof's later claims that Sullivan had "ghosted the firm" or "vanished" (Ex. 39, Maloof Email, Jun. 10, 2024).

50.    Between August 16-22, 2022, Sullivan used approximately 120,000 personal Delta SkyMiles (value ~$1,800) to book first-class airfare for Maloof and his fiancée, demonstrating continued assistance.

51.    On August 18, 2022, Sullivan emailed Maloof about Ford case work: "On the open records, I was able to negotiate this down to $40.28 from $123.33 and sent a check... Uploaded to MC. I haven't found anything useful yet." (Ex. 17, Sullivan Email, Aug. 18, 2022). Sullivan paid this client expense with personal funds and was not reimbursed. Maloof accepted this

15

contribution, replying: "Thank you Mike. Give me a call tomorrow. I miss having you around." (Ex. 18, Maloof Email, Aug. 18, 2022). This shows Sullivan's continued work and Maloof accepting financial contributions beyond uncompensated labor.

52.    On August 22, 2022, Maloof requested Sullivan book flights to Jackson Hole using personal SkyMiles. Sullivan fulfilled this request, despite flight confirmations showing Maloof had sufficient miles. This request contradicts Maloof's later claim Sullivan "vanished after the Ford case" (Ex. 39, Maloof Email, Jun. 10, 2024).

53.    That same day, Sullivan texted Maloof requesting access to subpoenaed records for the Ford case. Maloof replied, "sure but not today." Maloof never provided the records.

54.    On September 5, 2022, Maloof's fiancée contacted Sullivan about a planned getaway, further evidence of ongoing communication contradicting Maloof's claim Sullivan had "ghosted."

55.    On September 12, 2022, one month after Ford's immunity hearing, Sullivan corresponded with Henry County ADA paralegal Candice Matson regarding discovery in the Ford case. This communication refutes Maloof's claim that "The hire [of Sofia Barnett] was made when you ghosted the firm. Ford proceeded and we did not hear from you for a while." (Ex. 39, Maloof Email, Jun. 10, 2024).

56.    Throughout this period, Sullivan provided professional services and personal assistance to Maloof without compensation, while Maloof paid Sofia Barnett for similar work. Maloof later constructed a narrative about Sullivan "ghosting" to justify non-compensation and hiring a replacement.

## E. Continued Work and Case Developments (2023)

57.    On March 7, 2023, Sullivan emailed his attorneys confirming his decision to reject the State's plea offer: "I have received the State's offer to plea bargain, thoroughly considered it, and desire to promptly inform the State of my decision and proceed to trial." (Ex. 19, Sullivan Email, Mar. 7, 2023).

58.    That evening, Sullivan received a call from Maloof (not his attorney since 2016) regarding the plea. Sullivan's lead counsel, Don Samuel, had contacted Maloof after the plea rejection, leveraging Maloof's relationship to pressure Sullivan to accept the deal. Despite having no formal role for over seven years, and admitting he "did not review the discovery" and was "told bits and pieces" (Ex. 39, Maloof Email, Jun. 10, 2024), Maloof pressured Sullivan to accept a plea to false imprisonment, a potential felony. Maloof later described this intervention as not "unethical" despite his lack of familiarity with the case evidence.

59.    Six days later, on March 13, 2023, the State filed an Order for Nolle Prosequi in Sullivan's case, citing "severe evidentiary issues... loss of one of the victim's recorded statements" and insufficient evidence (Ex. 23, Order for

Nolle Prosequi, Mar. 13, 2023). Upon learning of the dismissal, Maloof texted Sullivan, "Really you were right" and "Unbelievable I guess I was wrong on taking the deal." (Ex. 20, Maloof SMS, Mar. 13, 2023, 9:38 AM; Ex. 20, Maloof SMS, Mar. 13, 2023, 9:46 AM).

60.    These messages acknowledge Maloof's advice to accept the plea was wrong. However, in his June 10, 2024 email (Ex. 39, Maloof Email, Jun. 10, 2024), Maloof claimed Sullivan told him afterward "given what I knew at the time it was the right recommendation"—a statement contradicted by Maloof's contemporaneous text messages. This pattern of shifting narratives inconsistent with his own statements suggests a willingness to alter facts when confronted.

61.    Despite Sullivan's departure months earlier, Maloof assigned him work. On June 20, 2023, Maloof emailed Sullivan and staff: "Mike, you are the guru at investigating all data. I want you to investigate the actual security measures used by the apartment complex." (Ex. 22, Maloof Email, Jun. 20, 2023), demonstrating reliance on Sullivan's skills.

62.    On June 21, 2023, Maloof secured a $1.87 million settlement in the Cooley case Sullivan contributed to in March-April 2022, generating ~$374,000 in attorney fees. Sullivan received no compensation.

63.    On July 11, 2023, Sullivan performed work, incurring personal expenses for certified records as instructed by Maloof (Ex. 24, Maloof Email, Jul. 11, 2023). Despite promising reimbursement, Maloof never provided it.

64.    On July 19, 2023, attorney Troy Hendrick, partnered with Maloof, emailed both regarding Sullivan's work: "I'm unaware of the pay structure between Mike S and MMJ. But I suggest that Mike S charge the case on an hourly basis plus expenses, and invoice HandH Law Firm." (Ex. 25, Hendrick Email, Jul. 19, 2023). This reflects an external attorney's expectation that Sullivan's work warranted compensation.

65.    Despite Hendrick's suggestion, Maloof instructed Sullivan not to report hours. On July 27, 2023, Maloof acknowledged Sullivan's contributions while framing the lack of payment: "I love having a brilliant law clerk that works for nachos and refuses to accept monetary payment, but you need something consistent with more opportunity." (Ex. 26, Maloof Email, Jul. 27, 2023). This statement is inconsistent with Maloof's later claim Sullivan never asked for compensation (Ex. 39, Maloof Email, Jun. 10, 2024) and shows Maloof's awareness that such services normally require payment.

66.    Instead of wages, Maloof proposed an alternative arrangement involving "a hefty technology and legal drafting fee for the proceeds to come from any settlement." (Ex. 27, Maloof Email, Nov. 16, 2023), potentially

constituting improper fee splitting under Georgia Rule of Professional Conduct 5.4.

67.    On November 19, 2023, Sullivan emailed Maloof expressing frustration about uncompensated work on the Banda/Fuster case.

68.    By December 2023, Sullivan demanded accountability. On December 5, 2023, Sullivan emailed: "I would like you to surrender your bar license so you cannot do this to anyone ever again."

69.    On December 6, 2023, Maloof's settlement offer violated Georgia Rule 9.2: "I will offer 15K. With two conditions payment will be made in two parts 10K next week and 5K when we get a release that the court approves. The release will prevent all future claims and any grievances filed with the bar, no wrongdoing will be admitted." (Ex. 28, Maloof Email, Dec. 6, 2023). Rule 9.2 prohibits conditioning settlements on agreements not to file disciplinary complaints.

70.    On December 8, 2023, Maloof reframed his approach: "a refund for 15K may be in order… and then I think 5K for work performed on Fuster and Banda as an independent contractor." (Ex. 30, Maloof Email, Dec. 8, 2023). Characterizing this as a "refund" of 2015 attorney fees rather than wages was an attempt to avoid employment taxes and obscure an employment dispute. This offer originated from Maloof.

71.    On December 8, 2023, Sullivan notified Maloof via email that the condition in his December 6 offer preventing bar grievances violated Rule 9.2, quoting the rule.

72.    On December 8, 2023, Maloof also promised: "Moving forward we can just work out an hourly or flatrate for projects." (Ex. 30, Maloof Email, Dec. 8, 2023). Sullivan believed, given the wage dispute, Maloof would not repeat non-payment for future work.

73.    On December 15, 2023, Maloof admitted: "This is where I am guilty of taking advantage of you. I was just giving you stuff to add value to my cases for free and not billing the client for it." (Ex. 31, Maloof Email, Dec. 15, 2023). This admission acknowledges exploitation and confirms Sullivan's work added value.

74.    That same day, Maloof proposed forming an LLC for discovery services instead of compensating Sullivan.

75.    On December 18, 2023, Maloof emailed Sullivan about discussing the LLC, stating, "I also want you to know I didn't mean to take advantage of you." This statement, three days after admitting "taking advantage," reflects attempts to minimize misconduct while avoiding wage payments.

76.    Throughout 2023, based on Maloof's emails, he valued Sullivan's Banda/Fuster and Sutton work at ~$15,000, stating "I think 5K for work performed on Fuster and Banda" (Ex. 30, Maloof Email, Dec. 8, 2023) and

acknowledging "I figured 10K more would be owed for the additional work you did this year [for Sutton]" (Ex. 36, Maloof Email, Apr. 24, 2024).

**F. Sutton Case Work (2024)**

77.    On February 26, 2024, Maloof requested Sullivan's assistance with the Sutton case: "Let me get Liban on it just to teach him but pay you as well." (Ex. 32, Maloof SMS, Feb. 26, 2024, 4:59 PM). This promise reinforced Sullivan's expectation of compensation.

78.    Between Feb 26–Apr 4, 2024, Sullivan performed ~50 documented hours analyzing call detail records (CDRs) and preparing a report for State v. Sutton. This work was time-sensitive, as Maloof represented Sutton for 1,303 days before Sullivan subpoenaed this evidence 25 days before trial.

79.    Sullivan kept Maloof informed of his progress (drafting/serving subpoenas, obtaining/analyzing records, preparing report) understanding he would be compensated.

80.    On Feb 28, 2024, Sullivan filed Requests to Charge and served subpoenas via facsimile from Maloof's office for phone records.

81.    That day, Maloof offered Sullivan payment intended for an unrelated matter. Sullivan declined payment for the unrelated case. Maloof later characterized this specific refusal as a general refusal of payment (Ex. 39, Maloof Email, Jun. 10, 2024), claiming "You have refused payment" without context.

82. On March 7, 2024, Sullivan outlined his Sutton case responsibilities to Maloof.

83. On March 21, 2024, Sullivan filed a "Notice of Intent to Introduce Business Records" in the Sutton case.

84. On April 4, 2024, Sullivan emailed Maloof a 26-page CDR analysis report with exculpatory findings (Ex. 33, Sullivan Email, Apr. 4, 2024). Maloof did not review the report.

85. After Maloof did not discuss payment, Sullivan submitted an invoice for ~50 hours on the Sutton case, leaving the hourly rate at zero expecting Maloof to propose a rate. Maloof ignored the invoice.

86. This failure to address the invoice coincided with Sullivan's renewed proposals for binding arbitration. Maloof appeared focused on steering Sullivan away from arbitration toward arrangements including waivers of bar grievances.

87. Maloof's non-compensation contrasts with his handling of other Sutton expenses. Maloof referred Sutton for a ~$3,000-$4,000 psychosexual evaluation, which Sutton paid. Maloof informed Sullivan the cell record request came from Sutton, yet Maloof never billed Sutton for Sullivan's work.

88. When Sullivan suggested billing Sutton (who requested the work and could pay), Maloof ignored it. Concerned his work might go unused, Sullivan contacted Sutton and discovered Maloof never mentioned billing him.

23

Sutton appreciated Sullivan's analysis and offered direct payment. Sullivan ethically declined, stating the business relationship was between him and Maloof. This indicates Maloof's pattern of using Sullivan's labor without pay and failing to bill clients for case expenses.

## G. FLSA Claims and Settlement Attempts (April - October 2024)

89.    On April 15, 2024, with Sutton work unpaid, Sullivan emailed Maloof noting the work "underscores the need for a clear understanding... and compensation." He again proposed "binding arbitration to settle the unpaid wages issue." (Ex. 34, Sullivan Email, Apr. 15, 2024).

90.    On April 15, 2024, Sullivan demanded Maloof honor the promised refund. Maloof refused, claiming "no consideration," while increasing his settlement offer by $5,000, still attaching releases/waivers.

91.    On April 22, 2024, after Sullivan noted the Rule 9.2 issue, Maloof proposed a 12-15 month payment plan: "I was thinking 40K 15 within 30 days, another 15 by the end of September and then 10 next year in the first quarter." (Ex. 35, Maloof Email, Apr. 22, 2024). This schedule could disincentivize Sullivan from filing bar complaints while payments were pending, achieving a similar effect to an explicit waiver.

92.    On April 24, 2024, Maloof made admissions via email (Ex. 36, Maloof Email, Apr. 24, 2024):

24

    a. "I figured 10K more would be owed for the additional work you did this year [for Sutton]"

    b. "I did not follow the law and had no idea I was breaking it"

    c. Justifying non-payment: "I assumed Mike has plenty of money and he likes doing this stuff so I don't need to pay him... he is a rich white guy"

93.    This April 24 email also claimed "a number much larger all at once could bankrupt me" (Ex. 36, Maloof Email, Apr. 24, 2024), inconsistent with his receipt of ~$374,000 from the Cooley settlement in June 2023.

94.    On April 30, 2024, Sullivan emailed Maloof an invoice for 50 hours on the Sutton case, proposing they "agree upon a reasonable hourly rate." (Ex. 37, Sullivan Email, Apr. 30, 2024). Maloof ignored it.

95.    On May 1, 2024, Sullivan and Maloof executed a Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), referencing the FLSA, to pause limitations periods during negotiations.

96.    On May 13, 2024, Maloof emailed Sullivan acknowledging his skills—"They don't hold a candle to what I think you are able to do"—while diverting to a potential business venture.

97.    On May 31, 2024, Sullivan sent Maloof a formal letter addressing "serious concerns regarding your conduct" and noting the tolling agreement deadline.

98.    On June 3, 2024, Maloof proposed "20K low 45k high binding arbitration with agreements on what can be used as evidence beforehand" alongside a $40,000 installment settlement alternative (Ex. 38, Maloof Email, Jun. 3, 2024). The arbitration cap matching the settlement amount, plus arbitration costs, made it an economically irrational choice, appearing to remove arbitration as a viable option.

99.    On June 10, 2024, Maloof sent an email with contradictory claims and narratives (Ex. 39, Maloof Email, Jun. 10, 2024), portraying his December refund offer positively despite refusing to honor it.

100.    After informing Maloof he intended to file a fee arbitration petition if the refund wasn't paid, Sullivan filed it. Sullivan had not contested fees; the "refund" concept originated with Maloof, who then refused his own proposal.

101.    On Sep 18, 2024, after Sullivan filed the fee petition, Maloof increased his settlement offer to $45K in installments, conditioned on Sullivan abandoning both fee arbitration and potential ethics complaints: "If you go forward with the fee arbitration then the offer is rescinded. If you don't accept… or go forward with any fee dispute or other action about my character with the bar then it is off." (Ex. 40, Maloof Email, Sep. 18, 2024). This combined a prohibition on reporting violations with a payment schedule maintaining leverage.

102. When Sullivan attempted acceptance while maintaining his right to proceed with fee arbitration, Maloof drafted a settlement agreement prohibiting Sullivan from presenting additional evidence at the hearing, attempting to control the process.

103. On Oct 1, 2024, Sullivan warned Maloof this structure violated Rule 9.2.

104. On Oct 7, 2024, Maloof's revised proposal still contained terms restricting Sullivan's ability to pursue claims, altering the form but not removing Rule 9.2 issues (Ex. 41, Proposed Settlement Agreement, Oct. 7, 2024).

105. On Oct 8, 2024, after Sullivan requested Maloof obtain legal representation for settlement talks, Maloof sent five emails in ~1 hour, accusing Sullivan of "regretting the offer," claiming it was a "typo," threatening to take the request as a "rejection," and insisting his offer was "More than fair." (Ex. 42, Maloof Emails, Oct. 8, 2024).

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE FAIR LABOR STANDARDS ACT – MINIMUM WAGE (29 U.S.C. § 206)

106. Plaintiff incorporates paragraphs 1 through 105 as if fully restated herein.

107.   The FLSA requires employers to pay employees at least the federal minimum wage. The statute of limitations is two years, or three years for willful violations (29 U.S.C. § 255(a)). Pursuant to a Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), the limitations period was tolled 31 days. This claim is timely.

108.   Defendant Maloof was Plaintiff Sullivan's "employer" and Sullivan was Maloof's "employee" under the FLSA. Maloof controlled Sullivan's work, Sullivan's work was integral to Maloof's practice, and economic realities establish an employment relationship.

109.   Defendant Maloof's law firm was subject to the FLSA under enterprise or individual coverage.

110.   Plaintiff Sullivan performed legal and administrative work for Defendant Maloof from approx. March 9, 2022 - August 14, 2022, and project-based work through April 2024.

111.   Defendant Maloof failed to pay Plaintiff Sullivan any wages, including minimum wage, for hours worked.

112.   Defendant Maloof's failure to pay minimum wages was willful under 29 U.S.C. § 255(a). Maloof, an attorney, knew Sullivan was his employee performing work, yet chose not to pay wages, demonstrating, at minimum, reckless disregard for whether his conduct was prohibited by the FLSA. Evidence of willfulness includes:

a. Admissions: Maloof admitted being "guilty of taking advantage" and failing to "follow the law" (Ex. 31, Maloof Email, Dec. 15, 2023; Ex. 36, Maloof Email, Apr. 24, 2024).

b. Avoidance Tactics: Maloof proposed a "refund" of old attorney fees instead of wages (Ex. 30, Maloof Email, Dec. 8, 2023), potentially to avoid payroll taxes and obscure the dispute.

c. Use of Fiduciary Knowledge & Vulnerability: Maloof used confidential information on Plaintiff's finances/capabilities (from prior representation, Ex. 1, Maloof Case Notes, Oct. 15, 2015; Ex. 3, Maloof Case Notes, Nov. 2, 2015) to justify non-payment ("rich white guy" assumption, Ex. 36, Maloof Email, Apr. 24, 2024), while using knowledge of Plaintiff's bond conditions to secure labor without pay.

d. Broken Promises & Payment Prevention: Maloof promised payment (Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM; Ex. 32, Maloof SMS, Feb. 26, 2024, 4:59 PM), then refused, ignored invoices (Ex. 37, Sullivan Email, Apr. 30, 2024), and directed Sullivan not to report hours despite co-counsel's suggestion (Ex. 25, Hendrick Email, Jul. 19, 2023; Ex. 26, Maloof Email, Jul. 27, 2023).

e. FLSA Terms & Replacement: Maloof accepted an offer letter (Ex. 7, Sullivan Email, Feb. 4, 2022) designating the low-salary position as "exempt," showing disregard for FLSA rules. His hiring of a paid replacement (Ex. 16, MyCase Email Notification, Aug. 16, 2022) upon Sullivan's departure shows ability to pay and highlights the exploitation.

f. Inconsistent Statements: Maloof praised Plaintiff's work as "invaluable" but later minimized contributions (Ex. 39, Maloof Email, Jun. 10, 2024), and provided shifting narratives about offers/refusals (Ex. 39, Maloof Email, Jun. 10, 2024).

g. Settlement Tactics: Maloof conditioned settlement offers on Plaintiff waiving rights to file bar grievances (Ex. 28, Maloof Email, Dec. 6, 2023; Ex. 40, Maloof Email, Sep. 18, 2024). These actions demonstrate Maloof knew or showed reckless disregard for whether his conduct was prohibited by the FLSA, justifying the three-year statute of limitations.

113. As a result of Defendant's willful violation, Plaintiff suffered damages in unpaid minimum wages.

## COUNT II: VIOLATION OF THE FAIR LABOR STANDARDS ACT – OVERTIME (29 U.S.C. § 207)

114.   Plaintiff incorporates paragraphs 1 through 113 as if fully restated herein.

115.   The FLSA requires overtime pay (1.5x regular rate) for non-exempt employees working over 40 hours/week. The statute of limitations is two years, or three years for willful violations (29 U.S.C. § 255(a)). Pursuant to a Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), the limitations period was tolled 31 days. This claim is timely.

116.   Defendant employed Plaintiff, and the relationship was covered by FLSA.

117.   Plaintiff Sullivan was a non-exempt employee. Titled "Legal Clerk," the Employment Offer Letter (Ex. 7, Sullivan Email, Feb. 4, 2022) Maloof accepted stated the position was "exempt" but set salary at $14,500, far below the 2022 threshold ($35,568), failing the salary basis test. Plaintiff also performed non-exempt administrative duties.

118.   On information and belief, Plaintiff worked over 40 hours in some workweeks.

119.   Defendant failed to pay Plaintiff overtime pay. Since Sullivan received $0, no premium was paid.

120.   Defendant Maloof's failure to pay overtime was willful under 29 U.S.C. § 255(a). Maloof, an attorney, knew or showed reckless disregard for overtime requirements. He knew Sullivan worked substantial hours. Maloof

31

knew or recklessly disregarded Sullivan's non-exempt status, given the Offer Letter (Ex. 7, Sullivan Email, Feb. 4, 2022) failed the salary test. This knowledge, combined with other evidence of willfulness (detailed in Paragraph 112 above and incorporated herein)—including admissions (Ex. 31, Maloof Email, Dec. 15, 2023; Ex. 36, Maloof Email, Apr. 24, 2024), avoidance tactics, use of fiduciary knowledge, broken promises, inconsistent statements, and settlement tactics—demonstrates Maloof knew or showed reckless disregard for whether failing to pay overtime violated FLSA, justifying the three-year limitations period.

121. As a result of Defendant's willful violation, Plaintiff suffered damages in unpaid overtime wages.

## COUNT III: VIOLATION OF THE FAIR LABOR STANDARDS ACT – RETALIATION (29 U.S.C. § 215(a)(3))

122. Plaintiff incorporates paragraphs 1 through 121 as if fully restated herein.

123. The FLSA prohibits discrimination against employees for asserting FLSA rights. The statute of limitations is two years, or three years for willful violations (29 U.S.C. § 255(a)). Pursuant to a Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), the limitations period was tolled 31 days. This claim is timely.

124. Plaintiff engaged in protected activity by asserting rights to payment:

      a. Sending salary guide info (Ex. 14, Sullivan Email, May 18, 2022), implicitly requesting market pay.

      b. Ceasing work Aug 14, 2022 (Ex. 15, Sullivan Email, Aug. 14, 2022), protesting non-payment.

      c. Proposing binding arbitration for unpaid wages Dec 7, 2023 (Ex. 29, Sullivan Email, Dec. 7, 2023).

      d. Proposing binding arbitration again Apr 15, 2024, referencing Sutton work/FLSA (Ex. 34, Sullivan Email, Apr. 15, 2024).

      e. Submitting Sutton work invoice Apr 30, 2024 (Ex. 37, Sullivan Email, Apr. 30, 2024).

      f. Executing FLSA-referencing Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024).

125. Defendant took adverse actions against Plaintiff after and because of protected activity, which would dissuade a reasonable worker from similar claims:

      a. Hiring paid replacement within 48 hours of Plaintiff quitting over non-payment (Ex. 16, MyCase Email Notification, Aug. 16, 2022), then failing to facilitate Plaintiff's office presence for ~5 months, revoking the benefit (release from house arrest) predicated on the

employment Maloof established (Ex. 8, Motion to Modify Bond Conditions, Feb. 18, 2022; Ex. 9, Order Modifying Bond Conditions, Feb. 22, 2022; Ex. 10, Transcript, Feb. 22, 2022), impacting Plaintiff's liberty.

b. Refusing payment for Sutton work after promising it (Ex. 32, Maloof SMS, Feb. 26, 2024, 4:59 PM) and acknowledging debt (Ex. 36, Maloof Email, Apr. 24, 2024), claiming he was "not a mind reader" (Ex. 39, Maloof Email, Jun. 10, 2024).

c. Threatening consequences if Sullivan pursued arbitration ("air out some dirty laundry") (Ex. 35, Maloof Email, Apr. 22, 2024).

d. Conditioning settlement offers on Plaintiff refraining from filing grievances/claims (Ex. 28, Maloof Email, Dec. 6, 2023; Ex. 40, Maloof Email, Sep. 18, 2024).

e. Providing shifting narratives about employment terms, performance, and payment refusals (Ex. 39, Maloof Email, Jun. 10, 2024) to undermine Plaintiff's claims.

126. A causal connection exists between Plaintiff's protected activity and Defendant's adverse actions. Hiring replacement (Ex. 16, MyCase Email Notification, Aug. 16, 2022) immediately after Plaintiff quit over non-payment (Ex. 15, Sullivan Email, Aug. 14, 2022), followed by impacting Plaintiff's liberty, links protest to adverse action. Temporal proximity between later wage

34

complaints/arbitration proposals (e.g., Ex. 34, Sullivan Email, Apr. 15, 2024) and Maloof's subsequent actions (e.g., Ex. 39, Maloof Email, Jun. 10, 2024) shows causation. Maloof linked settlement to dropping claims (Ex. 40, Maloof Email, Sep. 18, 2024). Shifting explanations for non-payment appear pretextual (Compare Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM; Ex. 39, Maloof Email, Jun. 10, 2024).

127.   As a result of Defendant's retaliation, Plaintiff suffered damages, including impact on liberty, unpaid Sutton wages, emotional distress, and other compensatory damages.

## COUNT IV: BREACH OF CONTRACT

128.   Plaintiff incorporates paragraphs 1 through 127 as if fully restated herein.

129.   Georgia law requires offer, acceptance, consideration, and meeting of minds for a contract. Limitations: 6 years written (O.C.G.A. § 9-3-24), 4 years oral (O.C.G.A. § 9-3-26). Pursuant to Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), limitations period tolled 31 days. This claim is timely.

130.   A valid employment contract existed. Defendant offered position, Plaintiff accepted, terms memorialized in Feb 4, 2022 Offer Letter (Ex. 7, Sullivan Email, Feb. 4, 2022) drafted by Plaintiff, accepted by Defendant (Ex. 6, Maloof Email, Feb. 4, 2022), specifying "Legal Clerk" role and $14,500

35

salary. Consideration was Plaintiff's services and Defendant's promise ("Paid but underpaid," Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM).

131.  Alternatively, a contract formed for Sutton work when Defendant promised payment ("pay you as well," Ex. 32, Maloof SMS, Feb. 26, 2024, 4:59 PM), Plaintiff performed ~50 hours relying on promise, and Defendant acknowledged debt ("figured 10K more would be owed," Ex. 36, Maloof Email, Apr. 24, 2024).

132.  Defendant breached by failing to pay agreed compensation for initial period and Sutton work.

133.  As a result of Defendant's breach, Plaintiff suffered damages in unpaid compensation.

## COUNT V: QUANTUM MERUIT

134.  Plaintiff incorporates paragraphs 1 through 133 as if fully restated herein.

135.  Under O.C.G.A. § 9-2-7, when one renders valuable services accepted by another, an implied promise to pay reasonable value arises. Limitations: 4 years (O.C.G.A. § 9-3-26). Pursuant to Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), limitations period tolled 31 days. This claim is timely.

136.  Plaintiff performed valuable legal/administrative services for Defendant (Mar 2022 - Apr 2024), including research, drafting, case

management, investigation, analysis. Value shown by Plaintiff's qualifications (Ex. 3, Maloof Case Notes, Nov. 2, 2015), task complexity, Defendant's acknowledgments ("invaluable", "guru" (Ex. 22, Maloof Email, Jun. 20, 2023), "brilliant" (Ex. 26, Maloof Email, Jul. 27, 2023)).

137.   Defendant accepted and benefited from these services (filling staff gap, case assistance generating fees, saving costs).

138. Plaintiff rendered services expecting payment, shown by Defendant's "Paid" offer (Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM), Offer Letter (Ex. 7, Sullivan Email, Feb. 4, 2022), Plaintiff sending salary info (Ex. 14, Sullivan Email, May 18, 2022), proposing arbitration (Ex. 29, Sullivan Email, Dec. 7, 2023; Ex. 34, Sullivan Email, Apr. 15, 2024), invoicing (Ex. 37, Sullivan Email, Apr. 30, 2024), and external attorney suggestion (Ex. 25, Hendrick Email, Jul. 19, 2023).

139. Defendant knew or should have known Plaintiff expected compensation, given work nature, formal context, Defendant's promises/admissions (Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM; Ex. 31, Maloof Email, Dec. 15, 2023; Ex. 36, Maloof Email, Apr. 24, 2024; Ex. 32, Maloof SMS, Feb. 26, 2024, 4:59 PM), Plaintiff's actions seeking payment (Ex. 14, Sullivan Email, May 18, 2022; Ex. 29, Sullivan Email, Dec. 7, 2023; Ex. 34, Sullivan Email, Apr. 15, 2024; Ex. 37, Sullivan Email, Apr. 30, 2024).

140.  Defendant accepted and benefited from Plaintiff's services rendered expecting payment, obligating Defendant under O.C.G.A. § 9-2-7 to pay reasonable value. Defendant failed to do so.

141.  As a result, Plaintiff suffered damages equal to reasonable value of uncompensated services.

## COUNT VI: UNJUST ENRICHMENT

142.  Plaintiff incorporates paragraphs 1 through 141 as if fully restated herein.

143.  Unjust enrichment occurs when a benefit is conferred where it's inequitable for recipient to retain without compensation. Limitations: 4 years (O.C.G.A. § 9-3-26). Pursuant to Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), limitations period tolled 31 days. This claim is timely.

144.  Plaintiff conferred benefit on Defendant via valuable unpaid services (Mar 2022 - Apr 2024).

145.  Defendant knew of and appreciated the benefit, shown by work assignments, acceptance, acknowledgments of value (e.g., Ex. 36, Maloof Email, Apr. 24, 2024; Ex. 31, Maloof Email, Dec. 15, 2023).

146.  Defendant accepted/retained benefit under circumstances making it inequitable without payment: use of Plaintiff's vulnerability, Defendant's promises (Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM; Ex. 32, Maloof SMS,

Feb. 26, 2024, 4:59 PM), financial gain from Plaintiff's work, admissions of fault/taking advantage (Ex. 31, Maloof Email, Dec. 15, 2023; Ex. 36, Maloof Email, Apr. 24, 2024).

147.    Defendant's retention constitutes unjust enrichment.

148.    As a result, Plaintiff suffered damages equal to value of benefit conferred.

## COUNT VII: PROMISSORY ESTOPPEL

149.    Plaintiff incorporates paragraphs 1 through 148 as if fully restated herein.

150.    Under O.C.G.A. § 13-3-44, a promise inducing reliance is binding if injustice avoided only by enforcement. Limitations: 4 years (O.C.G.A. § 9-3-26). Pursuant to Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), limitations period tolled 31 days. This claim is timely.

151.    Defendant promised payment: initially "Paid but underpaid" (Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM), specifically for Sutton work (Ex. 32, Maloof SMS, Feb. 26, 2024, 4:59 PM).

152.    Defendant should reasonably expect Plaintiff to rely on promises, given Plaintiff's gratitude, known vulnerability, professional context.

153.    Plaintiff reasonably relied by accepting position, modifying bond based on offer (Ex. 7, Sullivan Email, Feb. 4, 2022; Ex. 8, Motion to Modify Bond Conditions, Feb. 18, 2022; Ex. 9, Order Modifying Bond Conditions,

Feb. 22, 2022; Ex. 10, Transcript, Feb. 22, 2022), performing substantial work, incurring unreimbursed expenses, forbearing other employment.

154.  Plaintiff acted to detriment, suffering damages (uncompensated labor, expenses, lost wages).

155.  Injustice avoided only by enforcing promises, given Defendant's use of Plaintiff's reliance/vulnerability, benefit received, Plaintiff's detriment (Ex. 31, Maloof Email, Dec. 15, 2023; Ex. 36, Maloof Email, Apr. 24, 2024).

156.  As a result of detrimental reliance, Plaintiff suffered damages.

### COUNT VIII: BREACH OF FIDUCIARY DUTY

157.  Plaintiff incorporates paragraphs 1 through 156 as if fully restated herein.

158.  Fiduciary duty exists where trust reposed (e.g., attorney-client, O.C.G.A. § 23-2-58), requiring good faith/loyalty. Limitations: 4+ years (O.C.G.A. § 9-3-25/26). Pursuant to Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), limitations period tolled 31 days. This claim is timely.

159.  Fiduciary relationship arose from prior attorney-client relationship where Defendant gained confidential financial/personal info (Ex. 1, Maloof Case Notes, Oct. 15, 2015; Ex. 3, Maloof Case Notes, Nov. 2, 2015: assets, earning history, qualifications, capabilities). Duty survived termination (GRPC 1.6, 1.9).

160. Defendant breached fiduciary duties by:

    a. Using confidential info on Plaintiff's finances/earning capacity (from prior relationship) to structure employment anticipating non-payment tolerance, and later justify non-payment ("rich white guy" assumption, Ex. 36, Maloof Email, Apr. 24, 2024).

    b. Using knowledge of Plaintiff's bond restrictions/vulnerability (from prior relationship/inquiries, Ex. 4, Maloof SMS, Jan. 20, 2022, 7:50 AM; Ex. 4, Maloof SMS, Jan. 20, 2022, 3:32 PM), skills, financial background to induce Plaintiff into uncompensated employment.

    c. Leveraging trust from prior relationship to Plaintiff's detriment in employment context.

    d. Using knowledge of Plaintiff's proven capabilities (from prior representation) to assign complex legal work intending to benefit without required compensation.

    e. Acting contrary to purpose of court-approved employment by pressuring Plaintiff to accept felony plea. While employed (arrangement Maloof facilitated for release, Ex. 8, Motion to Modify Bond Conditions, Feb. 18, 2022; Ex. 9, Order Modifying Bond Conditions, Feb. 22, 2022; Ex. 10, Transcript, Feb. 22, 2022), Maloof sought felony conviction, negating employment benefit.

41

This pressure, despite Maloof not being counsel and admitting no discovery review (Ex. 39, Maloof Email, Jun. 10, 2024), showed indifference to Plaintiff's liberty/future.

161.    Defendant's breaches were willful, lacking good faith/loyalty.

162.    As a result of Defendant's breach, Plaintiff suffered damages (unpaid wages, emotional distress, financial losses).

### COUNT IX: EXPENSES OF LITIGATION (O.C.G.A. § 13-6-11)

163.    Plaintiff incorporates paragraphs 1 through 162 as if fully restated herein.

164.    Under O.C.G.A. § 13-6-11, litigation expenses (attorneys' fees) recoverable for bad faith, stubborn litigiousness, or causing unnecessary trouble/expense. Limitations follows underlying claim. Pursuant to Tolling Agreement (Ex. 43, Tolling Agreement, May 2, 2024), limitations period tolled 31 days. This claim is timely.

165.    Defendant acted in bad faith in underlying transactions. Bad faith shown by:

a. Using Plaintiff's vulnerability and confidential knowledge (from prior relationship, Ex. 1, Maloof Case Notes, Oct. 15, 2015; Ex. 3, Maloof Case Notes, Nov. 2, 2015; Ex. 4, Maloof SMS, Jan. 20, 2022, 7:50 AM; Ex. 4, Maloof SMS, Jan. 20, 2022, 3:32 PM) to induce unpaid labor assuming Plaintiff wouldn't demand payment.

42

b. Making payment promises (Ex. 5, Maloof SMS, Jan. 20, 2022, 8:16 AM; Ex. 32, Maloof SMS, Feb. 26, 2024, 4:59 PM) and settlement proposals (Dec 2023 refund, Ex. 30, Maloof Email, Dec. 8, 2023) with no apparent intent to fulfill, refusing own refund proposal.

c. Admissions of "taking advantage" and failing to "follow the law" (Ex. 31, Maloof Email, Dec. 15, 2023; Ex. 36, Maloof Email, Apr. 24, 2024), combined with exploiting prior knowledge/vulnerability.

d. Repeatedly conditioning settlement on Plaintiff refraining from bar grievances (Ex. 28, Maloof Email, Dec. 6, 2023; Ex. 40, Maloof Email, Sep. 18, 2024), potentially violating GRPC 9.2.

e. Retaliatory conduct after Plaintiff asserted FLSA rights.

f. Creating inconsistent statements/narratives on payment, work value, employment circumstances (Ex. 39, Maloof Email, Jun. 10, 2024).

166. Alternatively, Defendant has been stubbornly litigious, causing unnecessary trouble/expense by forcing lawsuit despite liability and admissions (Ex. 31, Maloof Email, Dec. 15, 2023; Ex. 36, Maloof Email, Apr. 24, 2024). Defendant refused reasonable arbitration proposals (Ex. 29, Sullivan Email, Dec. 7, 2023; Ex. 34, Sullivan Email, Apr. 15, 2024) and failed good faith

settlement discussions. No bona fide controversy exists regarding liability for unpaid wages, given admissions.

167. As a result of Defendant's bad faith, stubborn litigiousness, and causing unnecessary trouble/expense, Plaintiff incurred attorneys' fees/litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Michael E. Sullivan, Jr. respectfully prays for judgment against Defendant W. Michael Maloof, Jr. granting the following relief:

(1)   All unpaid minimum wages due under the FLSA;

(2)   All unpaid overtime wages due under the FLSA;

(3)   Liquidated damages equal to the amount of unpaid minimum and overtime wages pursuant to 29 U.S.C. § 216(b);

(4)   Compensatory damages for FLSA retaliation, including but not limited to damages for emotional distress;

(5)   Damages for breach of contract, quantum meruit, unjust enrichment, promissory estoppel, and breach of fiduciary duty under state law;

(6)   Punitive damages for breach of fiduciary duty, if applicable under O.C.G.A. § 51-12-5.1;

(7)   Pre-judgment and post-judgment interest at the applicable legal rates;

(8)   Reasonable attorneys' fees and litigation costs pursuant to 29 U.S.C. § 216(b);

(9)   Expenses of litigation, including attorneys' fees, pursuant to O.C.G.A. § 13-6-11;

(10)  Equitable relief as appropriate, including declaratory or injunctive relief; and

(11)  Such other and further relief as this Court deems just and proper, in a total amount not less than $114,784.00.

## JURY DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Plaintiff demands a trial by jury.

## EXHIBITS

Exhibit 1: Maloof Case Notes dated October 15, 2015

Exhibit 2: Maloof Case Notes dated October 21, 2015

Exhibit 3: Maloof Case Notes dated November 2, 2015

Exhibit 4: Maloof SMS to Sullivan dated January 20, 2022 (7:50 AM / 3:32 PM)

Exhibit 5: Maloof SMS to Sullivan dated January 20, 2022 (8:16 AM) [ATTACHED]

Exhibit 6: Maloof Email to Sullivan dated February 4, 2022 (3:14 PM)

Exhibit 7: Sullivan Email to Maloof dated February 4, 2022 (12:58 PM / 1:50 PM, attaching Offer Letter Draft) [ATTACHED]

Exhibit 8: Motion to Modify Bond Conditions filed February 18, 2022

Exhibit 9: Order Modifying Bond Conditions dated February 22, 2022

Exhibit 10: Transcript of Bond Modification Hearing dated February 22, 2022

Exhibit 11: Maloof Email to Sullivan dated March 9, 2022 (8:09 AM)

Exhibit 12: Lynch Email dated March 24, 2022

Exhibit 13: Lynch Email dated April 1, 2022

Exhibit 14: Sullivan Email to Maloof dated May 18, 2022 (attaching Salary Guide info)

Exhibit 15: Sullivan Email to Maloof dated August 14, 2022 (10:32 PM)

Exhibit 16: MyCase Email Notification dated August 16, 2022

Exhibit 17: Sullivan Email to Maloof dated August 18, 2022 (regarding Open Records)

Exhibit 18: Maloof Email to Sullivan dated August 18, 2022

Exhibit 19: Sullivan Email to Counsel dated March 7, 2023

Exhibit 20: Maloof SMS to Sullivan dated March 13, 2023 (9:38 AM / 9:46 AM)

Exhibit 22: Maloof Email dated June 20, 2023

Exhibit 23: Order for Nolle Prosequi dated March 13, 2023

Exhibit 24: Maloof Email dated July 11, 2023

Exhibit 25: Hendrick Email dated July 19, 2023

Exhibit 26: Maloof Email to Sullivan dated July 27, 2023

Exhibit 27: Maloof Email to Sullivan dated November 16, 2023

Exhibit 28: Maloof Email to Sullivan dated December 6, 2023

Exhibit 29: Sullivan Email to Maloof dated December 7, 2023

Exhibit 30: Maloof Email to Sullivan dated December 8, 2023

Exhibit 31: Maloof Email to Sullivan dated December 15, 2023 [ATTACHED]

Exhibit 32: Maloof SMS to Sullivan dated February 26, 2024 (4:59 PM)

Exhibit 33: Sullivan Email to Maloof dated April 4, 2024 (attaching Sutton CDR Analysis-DRAFT.pdf)

Exhibit 34: Sullivan Email to Maloof dated April 15, 2024

Exhibit 35: Maloof Email to Sullivan dated April 22, 2024

Exhibit 36: Maloof Email to Sullivan dated April 24, 2024 [ATTACHED]

Exhibit 37: Sullivan Email to Maloof dated April 30, 2024 (attaching Sutton Invoice)

Exhibit 38: Maloof Email to Sullivan dated June 3, 2024

Exhibit 39: Maloof Email to Sullivan dated June 10, 2024

Exhibit 40: Maloof Email to Sullivan dated September 18, 2024

Exhibit 41: Proposed Settlement Agreement emailed October 7, 2024

Exhibit 42: Maloof Emails to Sullivan dated October 8, 2024

Exhibit 43: Tolling Agreement effective May 2, 2024 [ATTACHED]

Respectfully submitted this 11th day of April 2025.

Michael E. Sullivan, Jr.,
Plaintiff *pro se*

3324 Peachtree Road NE Unit 1405
Atlanta, GA 30326
(678) 372-3000
msullivanjr@gmail.com

## FONT AND POINT CERTIFICATION

The undersigned Plaintiff hereby certifies that the within and foregoing

COMPLAINT FOR DAMAGES was prepared using Times New Roman, 14-

point font in accordance with LR 5.1(C).

## EXHIBIT 5

**Maloof SMS to Sullivan dated January 20, 2022 (8:16 AM)**



← (MM)  Mike Maloof  ⌄

1/20/22 ▾

Thursday, Jan 20, 2022 • 7:50 AM

Mike I apologize for not getting back to you. I had an idea that could maybe get you out of this solitary confinement. I will call after court probably around 10.

Mike, no worries AT ALL! ... unpaid internship at my fav place in Decatur? ;)

Thursday, Jan 20, 2022 • 8:16 AM

Paid but underpaid

Thursday, Jan 20, 2022 • 3:28 PM

Your offer is one of the kindest acts that I've ever received in my entire life. I'm still alive in large part to you. I don't even know how to express my thanks. It has nothing to do with money, as I would pay you to take out your trash.

I don't know if it could work but it is a thought. What does your bond say?

＋  Message Mike  ➤

## **EXHIBIT 7**

**Sullivan Email to Maloof dated February 4, 2022 (12:58 PM / 1:50 PM, attaching Offer Letter Draft)**

# THE MALOOF LAW FIRM

215 North McDonough Street • Decatur, Georgia 30030
Phone: (404) 492-5104

February 4, 2022

Mr. Michael E. Sullivan, Jr.
3324 Peachtree Road NE, Unit 1405
Atlanta, Georgia 30326

RE:  The Maloof Law Firm Employment Offer

Dear Michael,

I am pleased to formally extend in writing and confirm your verbal acceptance to the offer of employment with The Maloof Law Firm ("the Maloof Firm").

## Section 1. Employment and Duties

### 1.1 Employment

This letter will confirm the terms and conditions of the Maloof Firm's offer to employ you as *Legal Clerk* reporting directly to myself, but in a dotted-line relationship to my partner, Mr. Gunner Pak.

### 1.2 At-Will

Your employment relationship with the Maloof Firm will be at will. This means that you will not be employed for any specified term and that both you and the Maloof Firm may terminate the employment relationship at any time, with or without notice. Furthermore, this "at will" relationship cannot be changed by any person, statements, acts, series of events, or pattern of conduct, but only by an express individual written employment agreement signed by myself and you which expressly changes this "at will" relationship.

### 1.3 Start Date:

Your start date is anticipated to be as soon as practically possible and as legally allowed.

### 1.4 Full time.

The Legal Clerk shall devote full working time and attention to supporting the Maloof Firm's practice of law.

### 1.5 Duties.

The Maloof Firm shall determine the duties to by performed by the Legal Clerk and the means and manner by which those duties shall be performed.  Initially, those duties shall include, but not be limited to:

(1) The preparation of legal drafts;
(2) The assembly and organization of information of legal forms and documents;
(3) The diligent research and study of relevant law, statute, and court decisions;
(4) The preparation of legal memoranda;
(5) The collection and organization of case materials such as reports and evidence;
(6) The preparation of trial briefs, exhibits, and motions;
(7) The maintenance of court calendar dates and hearings;
(8) As well as administrative tasking answering the phones, managing office supplies, filing, and greeting guests.

**1.6** Performance of Duties.

As a Legal Clerk you shall perform your assigned duties and responsibilities in a professional manner, in good faith, and to the best of your skills, abilities talents, and experience.

## Section 2. Compensation

**2.1** Salary

Your annual salary will be $14,500, payable on a bi-weekly basis, less applicable payroll taxes and withholding, in accordance with the Maloof Firm's normal payroll practices. Additionally, this position is considered "exempt" according to the Fair Labor Standards Act (FLSA) and is therefore not eligible for overtime pay.

**2.2** Vacation

You will be entitled to two (2) weeks of unpaid leave per year; however, your vacation will be scheduled at such time as will least interfere with the business of the Firm.

## Section 3. Work Location

**3.1** Office

You will primarily perform your employment duties at the office of the Maloof Firm, located at 215 North McDonough Street, Decatur, Georgia 30030.

**3.2** Limited Travel to Perform

It is acknowledged and understood that the Maloof Law Firm will require you to travel within the Atlanta Metro area, during normal business hours, but only for purposes explicitly related to your duties supporting the Maloof Firm's practice of law.

**3.3** Reimbursement of Expenses

Where performance of your duties requires such limited travel, the Maloof Firm shall reimburse all reasonable and necessary expenses incurred, provided, however, that a detailed account of such expenses is provided to the Maloof Firm.

## Section 4. Miscellaneous

**4.1** Attending to Personal Matters

The Maloof Law Firm extends this offer of employment aware that, from time to time, personal matters of extreme importance and related to you your future will require your attention during business hours.

**3.3** Discretion

When the need arises to attend to such matters you may do so while at the Maloof Firm office, subject to the following conditions: (1) you ensure that another Maloof Firm employee is available to attend to your duties; (2) you attend to those personal matters behind closed doors in a vacant conference room or other area at the Maloof Firm Office; and (3) no resource of the Maloof Firm is utilized to attend to those matters, where those resources shall include, but not be limited to internet access, computing resources, or legal research tools such as Westlaw.

**3.4** Separation of Personal Matters

You are expected to erect a firewall between your personal matters and the Maloof Firm's practice of law and shall not breach that firewall under any circumstances.

## Section 5. Validity

The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the other provisions, and this Agreement shall be construed in all respects as if any invalid or unenforceable provisions were omitted.

**Section 6. Entirety of Agreement**
This offer letter, together with any agreements referenced herein, sets forth the entire agreement between you and the Maloof Firm with respect to its subject matter and supersedes all prior or contemporaneous oral or written promises, representations or understandings regarding your employment with the Maloof Firm.

By signing this offer letter, you represent and warrant that you know of no reason that you cannot legally accept this offer of employment and that you are not a party to any agreement with a former employer containing any post-employment restrictions on competition, disclosure of information or employment that would impair or limit your ability to become employed by the Maloof Firm or to perform the duties described in this offer.

Your signature below is your acceptance of our offer of employment and the terms of this letter agreement. No modification to this letter prior to your start date shall be valid unless in writing, addressed specifically to you and signed by the Maloof Firm. Your employment is contingent upon your signing this offer letter and returning it to the Maloof Firm.

I look forward to welcoming you to the Maloof Firm. Please let me know if you have any questions.

Sincerely,

/s/ Michael Maloof, Jr.
Mike Maloof, Jr.
The Maloof Law Firm, Managing Partner

ACCEPTED AND AGREED TO:

By: _____
        Michael E. Sullivan, Jr.

Date: _____

# EXHIBIT 31

**Maloof Email to Sullivan dated December 15, 2023**

 Gmail                                                    Michael Sullivan <msullivanjrlaw@gmail.com>

## Re: Will call after court manana
1 message

**Mike Maloof** <malooflawfirm@gmail.com>                                          Fri, Dec 15, 2023 at 8:08 AM
To: Michael Sullivan <msullivanjrlaw@gmail.com>

Mike it starts to after you get sleep deprived for a bit. Game plan on the LLC is have lunch with you sometime next week
to give you two different types of cases. A DUI run of the mill and Wooten if I have the data. I want to do the refund for
tax purposes for both of us this year as I think since the case resolved it would give no red flags. I also think some of your
writings and briefs should be part of the sale of the company. We can get client permission, and then you can post the
product. I think this is a service that could really work. I mean you get 10-15 clients that send you 10-15 cases on
average a year and your fee average per transaction is 1500.00 500-1000 on a DUI or misdemeanor and 5K on average
on the big cases with data. Then you are looking at 150K to 250k in revenue with very little capital input, and trust me if
the product and I know it will be is better work than what most attorneys are capable of doing will create an
automatic response from most attorneys to say "shit I would just rather charge the client and have Mike do it." This is
where I am guilty of taking advantage of you. I was just giving you stuff to add value to my cases for free and not billing
the client for it. People will pay more after they are happy with the work. I am going to get the Wooten family to come up
with an extra 3K to get started on big data analysis. I will pay that to you as soon as it comes in and I got a DUI for you. I
think I just got discovery will provide that as a test run. On Fuster and Banda put together some interrogatories and
motion for summary judgment since you started that one. I will pay whatever we negotiate for compensation on that
case. I think this is a really good idea. I will try and sell a couple of younger attorneys, Ben Githeya, and talk to Troy and
Steve. I can reach out to Christine in Gwinnett (top attorney out there who has a lot of control of the litigation in that area
and get her to tell me if she is interested or can give me a few people that are interested. I wish you hand't sued Bruce
Harvey, because some of the people that would be interested in this on the big data are not going to be reachable until
the product is established.

Sincerely,

Mike Maloof, Jr.

On Thu, Dec 14, 2023 at 10:58 PM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:
No worries at all!
**Jealous**. Making the State work would <u>never</u> get old to me.
Good luck.

Sincerely,

**Mike Sullivan**

 (678) 372-3000

On Thu, Dec 14, 2023 at 9:09 PM Mike Maloof <malooflawfirm@gmail.com> wrote:
I had the ADA call me and the client on the ride home for tomorrow's hearing. Crazy week last crazy one this year I
think.

The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm
and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client

communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

--

The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

## EXHIBIT 36

**Maloof Email to Sullivan dated April 24, 2024**

 **Gmail**

Michael Sullivan <msullivanjrlaw@gmail.com>

---

## Re: Lunch This Week to Discuss further LLC and how to get things started
1 message

---

**Mike Maloof** <malooflawfirm@gmail.com>                                            Wed, Apr 24, 2024 at 12:54 PM
To: Michael Sullivan <msullivanjrlaw@gmail.com>

If we collar it and make it confidential I am fine. My offer really was 40 in a structured type settlement. I know I can pay 15 in 30 days and 15 later this year and 10 before the middle of next year absent some type of financial collapse. My rational was as follows:

1) I know I can do it financially a number much larger all at once could bankrupt me because insurance doesn't cover labor disputes just malpractice;
2) 30 is what I would have paid a law clerk that worked part time for a year and 3 months (24 hours a week at 20 an hour) you started around the end February or beginning of March of 2022 worked for a year on and off and returned shortly after the trial that never happened for about 6 months. You vanished a few times in there for a bit so I calculated 15 months at 2K a month and we get to 30K and I figured 10K more would be owed for the additional work you did this year and costs you incurred helping me and my clients during that time;
3) I think given the change in circumstances from when you started and after your charges were dismissed made things different, but I did not follow the law and had no idea I was breaking it or that you felt the way you did until after you brought it to my attention. I wanted to pay you in the beginning and you refused. I did not offer again if my memory serves me correctly. Once your case was over I just took it for granted. I wish we had just paid at the beginning that way this would never have happened.
4) I want everything to be amicable. I think there is a lot of stuff I don't want to come out for both of us even at an arbitration. I am ashamed that I did not recognize you felt the way you did and it was not my intention to take advantage of you and abuse your help.
5) I did the same thing Ford did. I assumed Mike has plenty of money and he likes doing this stuff so I don't need to pay him. It is like a hobby and he is a rich white guy. I didn't think exactly like that when I was doing it but reflecting back on it I did see it that way (Mike is wealthy I am not and he likes having something to do). I think that was more unconscious than conscious. I don't like screwing people over, and I just never recalibrated or thought about what your thoughts were regarding the money. I can be selfish sometimes and I should have asked.
6) Anything more than 40 structured the way I laid out would affect other people in my life. I don't want them to pay for my mistake. So I thought this was fair under all circumstances.

Sincerely,

Mike Maloof, Jr.

On Wed, Apr 24, 2024 at 11:09 AM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:

Hi Mike,

I appreciate your thoughtful response and your commitment to maintaining our positive relationship throughout this challenging situation. Your willingness to engage in an open and honest dialogue is truly valued, and I believe it will be crucial in finding a fair resolution that works for both of us.

First, I want to clarify my rationale for proposing arbitration:

- **Impartial Resolution**: Arbitration provides a structured, legally recognized process for resolving disputes through an unbiased third party. This ensures that any outcome, whether it's $0, $15k, $40k, or somewhere in between, is determined fairly and equitably, considering our shared responsibility in creating this situation.
- **Acceptance of Outcome**: By having a neutral party make the decision following a formal process, I believe we would both be more likely to accept the outcome, even if it's not entirely favorable. This should help us avoid further contention and move forward on a positive note.

Second, I would like to propose solutions to each of your concerns regarding arbitration:

- **Outcome Predictability**: To address the risk of an unexpectedly high or low award, we could agree to a "collar" in the arbitration agreement, setting a minimum and maximum range for the potential outcome. This would

provide greater certainty for both of us, even though I have not consulted an employment attorney and am relying on your assessment of liability.

- **Arbitration Costs**: I understand the financial burden of the arbitration process, and I am willing to cover the entire cost to ensure that it does not pose an undue strain to you.
- **Confidentiality and Scope**: To mitigate the concern about airing unfavorable information, I will stipulate to the exclusion of all items you care to exclude without caveat, unless central to my position. I wouldn't require the same from you. I believe this can help limit the scope of information presented to the arbitrator and maintain the confidentiality of sensitive matters.

I have to unexpectedly travel to Amelia Island to be with my parents, which I hadn't anticipated at the beginning of the week. I'm currently working on arranging my travel on short notice. Given these circumstances, I suggest we connect informally during your ride home on either Wednesday or Thursday, instead of lunch. If this works for you, I propose the following agenda:

1. Discuss whether my proposed adjustments to arbitration address your concerns, and if not, explore alternative solutions that alleviate your reservations.
2. If arbitration remains a concern, I'd like to better understand the rationale behind your $15k and $40k offers, with the aim of finding common ground.
3. I will share my perspective on valuation, aiming to quantify our positions and their underlying reasoning to facilitate an agreement.
4. Address any other relevant items either of us would like to raise.

**Please let me know if connecting during your ride home on Wednesday or Thursday works for you, and if so, which day you prefer. Once you choose a specific day, I'll dedicate some time in advance to prepare for point #3 on our agenda.**

I'm confident that by approaching this conversation with empathy, respect, and a focus on our shared goals, we can find a mutually beneficial solution that strengthens our friendship and lays a foundation for a positive future. If you have any further questions or concerns, please don't hesitate to reach out. I genuinely value our relationship and am committed to working through this together.

Best Regards,
Mike

On Mon, Apr 22, 2024 at 7:06 AM Mike Maloof <malooflawfirm@gmail.com> wrote:
> Time for a call?

>> On Mon, Apr 22, 2024 at 7:01 AM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:
>> I will read this when I am in front of my laptop. I think my email may have been misunderstood ...

>>> On Mon, Apr 22, 2024, 6:54 AM Mike Maloof <malooflawfirm@gmail.com> wrote:
>>> Also I want you to know I was thinking 40K 15 within 30 days, another 15 by the end of September and then 10 next year in the first quarter. I just want to structure it so I don't go broke and I took a lot of thought into the number. I think I wanted to pay 10 an hour in the beginning. It was never my intention to abuse your efforts and I think in the beginning the alignment was the same. I then took advantage of becoming accustomed to the relationship. I just think binding arbitration could go really south for me or a slight chance for you. It would air out some dirty laundry on both sides and if it went bad for me and messed up my relationships with those close to me, you being one of those relationships it would really weigh hard on me and create resentment I could not see myself overcoming. I want to be fair and it was never my intention to take advantage of your work. Think it over and we can go get lunch Wednesday or Thursday. C-Note could be a trial so if that happens it could be Wednesday I am on two hour call I think the first three days this week.
>>> I am struggling with issues dealing with cash flow, but I am always struggling in that area. If I can get Liban on the right page or in another job then I got a machine moving in the right direction. Nanci is coming around, she is reading Dave Ramsey's book and Liban is starting to be forced to work which he is responding to positively. I just didn't want this to pop up right when I am unloading and dipping into my savings to pay the tax man. I was trying to get you some money last year when I was a little more flush, and I can get that amount to you within 30 days I just wanted you to know where I am so you don't think I am trying to take advantage of you. I wish I was a better promoter and had client's with more resources or I think the LLC would be a great win-win. If you want to try that out with those payments into it, let me know. It could be a win win plus a tax right off for us both if it doesn't work. I just don't know if I can give the effort you want or deserve right now for building that kind of work. I value you as a friend and enjoy our chats. The problem for me with binding arbitration is three fold. If the number is too high say 100k and I can't pay it or every dollar in my savings goes to covering it I will be a wreck. It would require me to bring up stuff and you would respond that would look bad for us both. It costs money that we both would rather not spend. That affects me way more than you on the reputation because it is part of the Cabal. If both parties come away unhappy then we probably will not ever chat again. I will do it if you want. I would ask to do it in August after Wooten and Sutton. I hope you had a good weekend. The timing is the big

issue right now. I want to get some money in your pocket and I think this year is looking really good for business. Let me know your thoughts.

Sincerely,

Mike Maloof, Jr.

On Fri, Apr 19, 2024 at 6:22 PM Mike Maloof <malooflawfirm@gmail.com> wrote:
Let me know we can set something up this week. I need to get this taken care of for peace of mind.

The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

On Fri, Apr 19, 2024 at 4:02 PM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:
Let me get this claim filed (20 min) - so I don't have to update all the dates in all the docs to some future date (also, i've been intending to file it since last year) - and I'll reply back.
I swear no rules in magistrate court are more complicated than the civil practice act.

Sincerely,

**Mike Sullivan**

📠 (678) 372-3000

On Fri, Apr 19, 2024 at 3:52 PM Mike Maloof <malooflawfirm@gmail.com> wrote:
All right if you want the arbitration we can set it up what are you asking for?

The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

On Fri, Apr 19, 2024 at 2:50 PM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:
Hi Mike:

I apologize for the abrupt end to our phone call this morning. I wanted to quickly address a couple of
points via email:

- **Regarding the Referral**: Since December, my perspective on continuing in a profession that
  drains significant time and resources has changed. While I appreciate your effort in referring
  your colleague to me, I must be transparent about my current stance. Should your colleague
  reach out, I will honor any commitments made to him—and to you—and will keep you informed
  immediately.

- **Follow-Up to Monday's Inquiry**: There seems to have been a misunderstanding regarding my
  previous email. I propose resolving the issue of unpaid wages through binding arbitration. I find
  this method appealing due to its efficiency and the finality it provides, involving a third party to
  ensure a fair resolution.

**Please let me know your thoughts on proceeding with binding arbitration.** If you agree, we will
need to discuss the details to ensure a fair and amicable outcome.

Sincerely,

**Mike Sullivan**

📱 (678) 372-3000 | 📞 (678) 744-6028 | ✉ msullivanjrlaw@gmail.com

On Mon, Apr 15, 2024 at 10:53 AM Mike Maloof <malooflawfirm@gmail.com> wrote:
Sounds good Mike I am pretty open.  Late Friday lunch work for you?

Sincerely,

Mike Maloof, Jr.

On Mon, Apr 15, 2024 at 6:42 AM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:
Hi Mike,

I hope this email finds you well. I wanted to touch base regarding the issue of unpaid wages for
work I performed at your law firm.

I've been looking for the opportune time to discuss resolving this matter, but unfortunately, our
schedules haven't aligned recently. We didn't have a chance to meet for lunch in March, and last
week's lunch was a bit hurried. Additionally, I understand that you have entrusted me with
confidential information about unrelated personal and business operating expense concerns. I
wanted to find the right time to discuss the unpaid wages separately to ensure that it doesn't affect
our ability to communicate openly about other important issues.

Given the complexity of our situation and the importance of finding a fair resolution, I would like to
propose that we consider binding arbitration to settle the unpaid wages issue. Binding arbitration is
often faster and less expensive than litigation, and it allows us to maintain control over the process.
By presenting our cases to a neutral third party, we can reach a final decision that we both agree to
abide by. This approach can help prevent misunderstandings or disagreements in the future and
provide a clear resolution.

Moreover, I believe it is crucial that we establish a framework to prevent similar issues from
occurring in the future. The substantial amount of work I have done on State v. Sutton in March and
April underscores the need for a clear understanding of our working arrangement going forward, if
any, and compensation. I submitted the report two weeks ago, hoping that we would schedule a
meeting to present my findings and answer any questions as well as determine how to equitably
manage compensation for this. Your busy schedule has required your attention elsewhere, and I
will follow up with you separately via email on this matter.

If you are open to the idea of binding arbitration, I would be happy to discuss the details further,
such as selecting an arbitrator and defining the terms of the process. Please let me know your
thoughts on this proposal.

I am committed to working with you to find a resolution that addresses both of our concerns and preserves our valuable friendship. I look forward to your response and to working together to resolve this matter amicably.

Sincerely,

**Mike Sullivan**

📱 (678) 372-3000 | 📞 (678) 744-6028 | ✉ msullivanjrlaw@gmail.com

On Tue, Dec 19, 2023 at 6:31 AM Mike Maloof <malooflawfirm@gmail.com> wrote:

Mike this is so much they are giving me a hard drive instead of their normal share.  Let me see if we get it today or tomorrow morning.

Sincerely,

Mike Maloof, Jr.

On Mon, Dec 18, 2023 at 3:48 PM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:
> Let me see if I can get the terabytes on Wooten and get the DUI testrun for you as well.

**[ one of us runs into the issue of needing 1TB+ local space - even to upload to a Cloud we can all access - I can take care of it if you can provide a link ]**

- **Did they share the disco via the Cloud with a secure download link (e.g. evidence.com link)?**
    - (I can do all of this)
    - The easiest way is to use a 1TB+ local, physical disk as an intermediary;
    - Download the disco and then upload it to a Cloud storage we can all access (I have plenty available on GDrive);
    - [a] Archive the unedited discovery, [b] Create a working copy, and [c] then share that back to you.

- **Or did they share the disco on a HDD?**
    - Depending on the size of the files, this could take some time to copy.

On Mon, Dec 18, 2023 at 7:12 AM Mike Maloof <malooflawfirm@gmail.com> wrote:
Mike I have two hearings today and have to go to the dealership so no dice on lunch. However, Tuesday, Wednesday, and Friday are wide open.  Let me see if I can get the terabytes on Wooten and get the DUI testrun for you as well.  I was going to write a check for a refund for the 15K because for both of us I think the tax purposes are advantageous (if this is unacceptable or you want to think about it let me. know).  Second I think this could work but just like any venture I don't know the market and I am unique in how I do things.  We can also figure out what is fair on Fuster and Banda.  I also want you to know I didn't mean to take advantage of you.  I know we have discussed this before.  I wish we had both handled that differently. It came to a boiling point for bad communication.  In the beginning we were in alignment and once your case ended I needed to recalibrate and that is on me.  I hope you are doing well and I will call on the ride home.  Scrambling to put together a constitutional challenge for this morning's bench trial.  I did not read the discovery text thoroughly but I was on fumes.  I had been on fumes the last two weeks getting ready for that immunity on Scott Jackson and two other pretty big hearings. Scott was a really good dude in a tough spot.  State started to agree with me and then ultimately nolle prossed it two hours before the scheduled hearing.  He was tearing up a bit in my office, because he knew how dangerous the case was for him and those are the types of cases that keep me going.

Sincerely,

Mike Maloof, Jr.

--

The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney–client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE:  This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE:  This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE:  This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

## EXHIBIT 43

Tolling Agreement effective May 2, 2024

# TOLLING AGREEMENT

This Tolling Agreement (the "Agreement") is entered into effective May 1, 2024, by and among Michael E. Sullivan, Jr., and W. Michael Maloof, Jr. (collectively, the "Parties").

**WHEREAS,** Michael E. Sullivan, Jr. and W. Michael Maloof, Jr. have maintained a professional relationship within the operations of Maloof's law firm, from approximately March 2022 to April 2024, during which unresolved issues related to compensation, claims of unjust enrichment, breach of fiduciary duty, and other related legal claims and remedies have arisen ("Potential Claims");

**WHEREAS,** the Parties are in the process of conducting good faith settlement discussions with respect to the Potential Claims;

**WHEREAS,** the Parties have agreed to restrict the assertion of time-related defenses with respect to any future lawsuit or administrative claim concerning the Potential Claims, and to toll the time accruing during this period for purposes of any statute of limitations, statute of repose, laches, filing deadline with any federal, state, or local court, agency, or commission, and/or any other time-related bar or objection which has not already run prior to the Effective Date (collectively, "Timing Defenses") as set forth in this Agreement; and

**NOW, THEREFORE,** in consideration of the mutual covenants hereinafter set forth, the Parties agree as follows:

1. The "Effective Date" of this Agreement shall mean the date on which the last Party signs the Agreement.

2. This Agreement shall terminate on the "Expiration Date," which shall mean the earliest of: (i) thirty (30) days after the Effective Date; or (ii) the first business day following five (5) days after the date of delivery of written termination notice, sent by overnight mail with a copy by email, return or read receipt requested, to the

1

undersigned counsel for the Parties. The period during which this Agreement is in force and effect shall be referred to as the Tolling Period.

3.  During the Tolling Period, the Parties shall not commence or institute any legal actions, including litigation, arbitration, or any other legal proceedings of any kind whatsoever, in law or equity, or assert any claim, demand, action, or cause of action concerning the Potential Claims.

4.  The Tolling Period shall be excluded from the calculation of time for purposes of any Timing Defense that may apply to any of the Potential Claims.

5.  Nothing in this Agreement shall affect any defense available to any Party as of the Effective Date of this Agreement. This Agreement shall not be deemed to revive any claim that is or was already barred on the Effective Date and shall not operate as an admission or acknowledgment by any Party that any applicable statute of limitations or other Timing Defense has expired or arisen as of the Effective Date. Nothing in this Agreement shall waive, diminish, shorten, or otherwise alter any other tolling and/or suspension of time that may be applicable to the filing of any claim by any Party.

6.  This Agreement shall not be construed as an admission of acknowledgment by any Party of any liability, fault, or wrongdoing, or as to the merits or lack thereof of any Potential Claims or otherwise.

7.  This Tolling Agreement constitutes the entire agreement between the Parties on the issues addressed herein and may not be modified, altered, or amended except by a writing signed by or on behalf of the Parties to this Tolling Agreement.

8.  This Tolling Agreement may be extended by further written agreement signed by or on behalf of the Parties.

9.  The provisions of this Agreement shall be binding upon the Parties, their successors, assigns and related or affiliated entities, and any entity claiming by or through the Parties.

10. If any provision of this Agreement is held illegal or unenforceable in any judicial or quasi-judicial proceeding, such provision shall be severed and shall be inoperative,

2

and the remainder of this Agreement shall remain operative and binding on the Parties.

11. Each of the Parties represents and warrants that he/she/it has full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and all action required to be taken for the due and proper authorization, execution, and delivery by it of this Agreement and the consummation by it of the transactions contemplated hereby has been duly and validly taken.

12. This Agreement is the product of negotiation among Michael E. Sullivan, Jr. and W. Michael Maloof, Jr. and shall be deemed as having been prepared jointly by them. The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly for or against any party, regardless of who drafted or was principally responsible for drafting the Agreement or any specific term or condition thereof.

13. This Agreement is without prejudice to any other right, remedy, claim, or defense that may be asserted by, between, or among the Parties.

14. This Agreement shall be governed, construed, and enforced in accordance with the laws of the State of Georgia and applicable federal laws, including but not limited to the Fair Labor Standards Act (FLSA). In the event of any conflict between state law and federal law, federal law shall prevail.

15. The parties agree that all communications, negotiations, and documents exchanged between them during the settlement discussions, as well as the existence and terms of this Agreement, shall be kept strictly confidential and shall not be disclosed to any third party, except as required by law, court order, or with the prior written consent of both parties. The parties further agree to take all necessary steps to maintain the confidentiality of the settlement discussions, including but not limited to instructing their respective attorneys, representatives, and agents to maintain confidentiality. The confidentiality obligations set forth in this paragraph shall survive the expiration or termination of this Agreement. Notwithstanding the confidentiality obligations set forth in this Agreement, either party may disclose the existence and terms of this

3

Agreement to a court of competent jurisdiction as necessary to establish the tolling of any applicable statutes of limitations or other time-related defenses.

16. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which will constitute one instrument. Facsimile, electronic, scanned, and photocopied signatures shall be deemed originals for purposes of this Agreement. The parties agree to exchange executed counterparts of this Agreement by email or other electronic means, and such exchange shall constitute effective delivery of the Agreement.

17. This Agreement constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, between the parties relating to the subject matter of this Agreement.

**WHEREFORE**, the Parties, execute this Agreement intending to be legally bound hereby.

**MICHAEL E. SULLIVAN, JR.**

Signature: _____

Printed: MICHAEL E. SULLIVAN JR.

Date: May 1, 2024

**W. MICHAEL MALOOF, JR.**

Signature: _____

Printed: Mike Maloof, Jr.

Date: 05/02/2024

4