FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 2 8 2025

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

MICHAEL E. SULLIVAN, JR.,

    Plaintiff,

       v.

W. MICHAEL MALOOF, JR.,
d/b/a THE MALOOF LAW FIRM,

    Defendant.

Civil Action No.:

**1:25-cv-02006-JPB**

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Michael E. Sullivan, Jr. ("Plaintiff" or "Sullivan")

and brings this Complaint against Defendant W. Michael Maloof, Jr., d/b/a The

Maloof Law Firm ("Defendant") for violations of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201, et seq., and related state law claims for non-payment

of wages earned. In support thereof, Sullivan respectfully shows the following:

## PRELIMINARY STATEMENT

Plaintiff brings this action against Defendant W. Michael Maloof, Jr., his

former attorney and employer, to recover wages wrongfully withheld in

violation of federal and state law. Defendant leveraged confidential knowledge

from a prior attorney-client relationship and Plaintiff's restrictive bond

conditions to secure Plaintiff's valuable services from March 2022 through

April 2024 without providing any compensation. Despite promising payment

and repeatedly acknowledging the value of Plaintiff's work, Defendant refused

to pay. When confronted, Defendant admitted in writing he was "guilty of

1

taking advantage of you" and was "just giving you stuff to add value to my cases for free." When Plaintiff sought his earned wages, Defendant engaged in a pattern of bad-faith tactics, including attempting to condition settlement on Plaintiff waiving his right to file disciplinary complaints, and later admitted he "did not follow the law." This action seeks to recover Plaintiff's earned wages, liquidated damages, and other appropriate relief for Defendant's willful violations of wage and hour laws.

## JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same common nucleus of operative facts and form part of the same case or controversy as the federal claims.

3. Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) because Defendant resides and operates his business in this district, a substantial part of the events giving rise to the claims occurred in this district, and Defendant's principal place of business is in Decatur, Georgia, which is within the Atlanta Division of this District.

## PARTIES

2

4.    Plaintiff Michael E. Sullivan, Jr. is a citizen of the United States and a resident of the State of Georgia.

5.    This Court has personal jurisdiction over Defendant because he resides and conducts business within this judicial district, and because the acts giving rise to this complaint occurred here.

6.    At all relevant times, Plaintiff was an "employee" of Defendant within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

7.    Defendant W. Michael Maloof, Jr. is an individual residing in Gwinnett County, Georgia.

8.    Defendant is an attorney licensed to practice law in the State of Georgia.

9.    Defendant conducts business as a sole proprietorship under the name The Maloof Law Firm.

10.    At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of the FLSA, 29 U.S.C. § 203(d).

11.    Defendant acted directly or indirectly in the interest of an employer in relation to Plaintiff.

12.    Defendant may be served with process at his principal place of business located at 215 N McDonough Street, Decatur, Georgia, 30030.

## FLSA COVERAGE

### I.    Enterprise Coverage

3

13.    On information and belief, at all relevant times, Defendant was an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 203(s)(1).

14.    On information and belief, Defendant's annual gross volume of sales made or business done met or exceeded $500,000.00, exclusive of certain excise taxes.

15.    On March 6, 2024, in a recorded phone conversation, Defendant stated: "we brought in 100k in January, which was without any civil shit, you know, just… So that's up there, right? Like, that's really up there. That, for me, is double… That's two times a good month. A good month is 50k." (Exhibit 54).

16.    On July 24, 2023, in a recorded phone conversation, Defendant stated: "I put $50,000 away in a savings account, you know, to figure out what I want to do with it for the firm. I put, you know, there's another … At the end of this month, if we have a decent week this week, we're going to have $200,000 in the operating account." (Exhibit 54).

17.    On October 22, 2023, in a recorded phone conversation, Defendant stated: "those two cases, let's see, one hundred and three eighty one twenty and three eighty. So it's brought in half a million dollars in extra revenue in the last. And that's all my savings and extra paid for my the majority of my wedding." (Exhibit 54).

4

18.    As one example of Defendant's business volume, Defendant handled a case that resulted in a $1.87 million settlement in or around June 2023. (Exhibit 1).

19.    This settlement generated approximately $374,000 in attorney fees for Defendant.

20.    On information and belief, at all relevant times, Defendant employed at least two individuals who regularly engaged in commerce or handled goods or materials that have been moved in commerce.

21.    On information and belief, Defendant employs an individual whom Defendant refers to as a "law partner."

22.    Defendant's business, The Maloof Law Firm, is registered as a sole proprietorship.

23.    In a sole proprietorship, a true partnership is legally impossible without registration as a separate legal entity.

24.    On information and belief, this individual does not possess any equity ownership interest in Defendant's sole proprietorship.

25.    On information and belief, this individual receives regular compensation from Defendant.

26.    On information and belief, this individual performs his duties under Defendant's direction and control.

5

27.     As a matter of economic reality, the individual referred to as a "law partner" is an employee under the FLSA.

28.     This individual, together with Plaintiff, satisfies the FLSA's requirement of having at least two employees for enterprise coverage from the outset of Plaintiff's employment.

29.     On information and belief, from approximately August 2022 through August 2024, Defendant employed at least one other employee in addition to Plaintiff and the individual referred to as a "law partner."

30.     On information and belief, at certain times during this period, Defendant employed two other employees in addition to Plaintiff and the individual referred to as a "law partner."

31.     The group of individuals satisfying the two-employee minimum at all relevant times included Plaintiff and these other employees.

32.     The work of these employees included processing client payments through interstate credit card transactions.

33.     The work of these employees included communicating with out-of-state clients, courts, and counsel via telephone and email.

34.     The work of these employees included utilizing office equipment, supplies, and software that were moved in or produced for interstate commerce.

35.    These additional employees regularly engaged in interstate commerce and/or handled goods or materials that have moved in interstate commerce.

## II.    Individual Coverage

36.    Alternatively, at all relevant times, Plaintiff was individually engaged in commerce or in the production of goods for commerce. 29 U.S.C. §§ 206–207.

37.    Plaintiff's engagement in interstate commerce was regular and recurrent. On a weekly basis, his work activities for Defendant involved the direct use of the instrumentalities of interstate commerce, including but not limited to the following:

38.    As part of his job duties, Plaintiff utilized Westlaw, a subscription-based legal research platform operating across state lines.

39.    As part of his job duties, Plaintiff utilized cloud storage platforms, including Dropbox and Google Drive, for file sharing and case management.

40.    As part of his job duties, Plaintiff was assigned tasks in MyCase, a cloud-based practice management software operating across state lines.

41.    As part of his job duties, Plaintiff used the Odyssey e-filing system for Georgia courts, an electronic filing platform that relies on interstate networks.

7

42.    As part of his job duties, Plaintiff engaged in email communications that crossed state lines with clients, opposing counsel, and courts.

43.    As part of his job duties, Plaintiff engaged in telephone communications that crossed state lines with clients, opposing counsel, and courts.

44.    As part of his job duties, Plaintiff communicated with out-of-state clients and entities.

45.    As part of his job duties, Plaintiff conducted financial transactions through interstate banking and payment systems.

46.    These transactions included procuring and processing airline tickets via interstate banking systems.

47.    These transactions included processing client payments through electronic payment systems, including credit card transactions, operating across state lines.

48.    These transactions included creating, sending, and tracking electronic invoices through accounting software that transmits data across interstate servers.

49.    These transactions included authorizing and processing payments to legal service vendors.

50.     As part of his job duties, Plaintiff handled and processed information through interstate commerce channels.

51.     This work included subpoenaing phone records from interstate telecommunication carriers.

52.     This work included using email services that transmit data across state lines through interstate servers and networks.

53.     This work included using telephone services that operate on national networks utilizing interstate infrastructure.

54.     Plaintiff's regular and recurrent engagement in these activities was an integral and indispensable part of his job duties, thereby establishing individual coverage under the FLSA.

## STATEMENT OF FACTS

55.     The following Statement of Facts describes Defendant's failure to pay wages and his subsequent, independent wrongful acts committed during pre-suit dispute resolution. Pursuant to Federal Rule of Evidence 408(b), these communications are not offered to prove the validity or amount of the underlying wage dispute. Instead, they are included for permissible, alternative purposes as they constitute the operative facts of Defendant's unlawful retaliation, establish his willful state of mind for FLSA purposes, demonstrate bad faith supporting claims for litigation expenses, and form the factual basis for separate state law torts.

### III.  Initial Attorney-Client Relationship and Defendant's Unique Knowledge

56.    In 2014, Defendant W. Michael Maloof, Jr. ("Maloof") established an attorney-client relationship with Plaintiff Michael E. Sullivan, Jr. ("Sullivan") regarding a criminal matter.

57.    Through this relationship, Defendant gained access to Plaintiff's confidential personal and financial information.

58.    On October 15, 2015, Defendant wrote in his case notes regarding Plaintiff's matter: "This could be a big money case."

59.    Through the representation, Defendant became aware of Plaintiff's educational qualifications.

60.    On November 2, 2015, Defendant wrote in his case notes that Plaintiff "did undergraduate work at Emory University where he has two undergraduate degrees in economics."

61.    On November 2, 2015, Defendant also wrote in his case notes that Plaintiff "has two Masters degrees from Georgia State University."

62.    Through the representation, Defendant became aware of Plaintiff's prior earning capacity.

63.    On November 2, 2015, Defendant wrote in his case notes: "At the time of his arrest he was making about $120,000 a year plus bonuses."

10

64.     Through the representation, Defendant became aware of Plaintiff's work ethic.

65.     On November 2, 2015, Defendant wrote in his case notes that Plaintiff "was working an average of about 100 hours a week prior to the events complained of in this case."

66.     On September 30, 2016, the formal attorney-client relationship between Defendant and Plaintiff terminated.

67.     Defendant retained the confidential information he had gained during the representation, including his knowledge of Plaintiff's qualifications and financial background.

68.     Defendant also possessed the unique, confidential knowledge that from approximately late 2015 through early 2022, Plaintiff had been unable to secure employment due to the nature of the pending criminal charges.

69.     As an attorney practicing in the same legal community, Defendant was also aware that during this period of unemployment, Plaintiff had retained and was paying for high-priced legal counsel.

70.     When Defendant re-initiated contact in January 2022, he observed that despite the dual financial pressures of protracted unemployment and significant legal fees, Plaintiff was not destitute.

71.     On information and belief, Defendant leveraged this unique combination of confidential knowledge—Plaintiff's high earning potential from

11

the past and his apparent financial solvency in the present—to form a calculated assumption that Plaintiff possessed sufficient personal wealth that he would not be dependent on a paycheck for his livelihood.

72.    On information and belief, this assumption formed the basis of Defendant's subsequent actions, as Defendant believed he could secure Plaintiff's valuable services without providing compensation, knowing Plaintiff would not be forced by financial desperation to demand it.

73.    Defendant later admitted to making this precise assumption as the justification for his non-payment, stating in an email: "I assumed Mike has plenty of money and he likes doing this stuff so I don't need to pay him. It is like a hobby and he is a rich white guy." (Exhibit 2).

## IV.    Employment Relationship Formation (2022)

74.    Prior to January 2022, Plaintiff was subject to restrictive bond conditions, which confined him to house arrest and required him to obtain prior court approval for any departures from his home.

75.    Defendant knew Plaintiff was subject to these bond conditions.

76.    On January 20, 2022, Defendant texted Plaintiff, "I had an idea that could maybe get you out of this solitary confinement." (Exhibit 3).

77.    In response, Plaintiff jokingly texted a suggestion of an "unpaid internship at my fav place in Decatur? ;)" (Exhibit 3). This suggestion was a sarcastic reference to the fact that his restrictive bond conditions already

permitted him to leave his home for meetings with his legal counsel, and Defendant was his former attorney.

78.   Defendant rejected the suggestion of an "unpaid internship." Instead, on January 20, 2022, Defendant texted Plaintiff that the proposed work arrangement would be "Paid but underpaid." (Exhibit 3).

79.   Plaintiff informed his legal counsel of the employment offer, and his counsel subsequently requested that Defendant provide a formal offer letter for the purpose of supporting a motion to modify Plaintiff's bond conditions.

80.   At Defendant's request, Plaintiff prepared a draft of this letter.

81.   In the draft letter, Plaintiff included a placeholder annual salary of $14,500. This figure was not a negotiated salary but a good-faith calculation based on the federal minimum wage ($7.25 per hour multiplied by 2,000 annual hours), inserted solely to provide a necessary baseline for the bond motion. (Exhibit 4).

82.   On February 4, 2022, Plaintiff emailed the draft letter to Defendant. In the transmittal email, Plaintiff explicitly communicated his uneasiness with drafting his own offer and put Defendant on notice that its terms were merely assumptions requiring Defendant's final input. Plaintiff wrote: "I think it is what he [Plaintiff's counsel] is looking for, but also was not a party to that discussion ... I made numerous assumptions that are explicitly

13

your call to make. Candidly, I feel as though I'm overstepping here ... I'm happy to assist with amending as you see fit, e.g. if you are driving and want to dictate amendments, that works for me." (Exhibit 4).

83.    Plaintiff reasonably expected this placeholder salary and other assumptions would be finalized after a good-faith discussion with Defendant to determine the actual "underpaid" compensation. Defendant never initiated this discussion.

84.    On February 15, 2022, Defendant emailed Plaintiff with the instruction to "Keep track of any hours you do some work." (Exhibit 5).

85.    On February 18, 2022, Plaintiff's counsel filed a Motion to Modify Bond Conditions in Plaintiff's criminal case, stating, "Mr. Sullivan has obtained an offer of employment from a local law firm."

86.    The Motion attached the draft letter prepared by Plaintiff as evidence of the employment offer.

87.    On February 22, 2022, the Court held a hearing on the Motion to Modify Bond Conditions.

88.    Defendant appeared virtually at this hearing.

89.    During the hearing, Plaintiff's counsel stated to the Court, "And that's why Mr. Maloof is here. Mr. Maloof also provided a letter in writing stating that he would be Mr. Sullivan's employer."

90.    Plaintiff's counsel further represented that Defendant "is aware of this case and his bond conditions and he said Mr. Sullivan would be coming to work in his office during the week."

91.    Defendant, having previously served as Plaintiff's counsel of record in the same matter, was uniquely aware of the case history and the significance of these representations to the Court.

92.    Defendant was present for these representations and did not object to or correct them.

93.    Following these representations, the Court entered an Order Modifying Bond Conditions, permitting Plaintiff to leave his home for the purpose of working at Defendant's law firm.

94.    More than a year later, Defendant made statements about the formation of the employment relationship that contradicted his initial "Paid but underpaid" promise.

95.    On November 27, 2023, Defendant stated in an email, "I thought this was an unpaid internship." (Exhibit 6).

96.    On June 10, 2024, Defendant stated in an email, "I offered a paid internship and you said you wouldn't take money." (Exhibit 7).

97.    On August 15, 2023, in a recorded phone conversation, Defendant stated: "I have hired you, you know, as a law clerk, you know, unpaid law clerk." (Exhibit 54).

15

98.   On that same date, Defendant also stated in an email, "I offered payment of 10 dollars an hour at the outset." (Exhibit 7).

## V.    Initial Employment Period (March – August 2022)

99.   Plaintiff commenced employment at The Maloof Law Firm on or about March 9, 2022.

100.   On Plaintiff's first day of work, Defendant informed Plaintiff via email that his legal assistant was unexpectedly unavailable, stating, "My legal assistant is out with some kind of medical issue they are trying to figure out. It is a little scary." (Exhibit 8).

101.   The legal assistant resigned after that day, leaving the position vacant.

102.   Over two years later, on June 10, 2024, Defendant claimed in an email that he had known his prior legal assistant was leaving as early as January 2022. (Exhibit 7).

103.   Defendant made this claim only after Plaintiff had demanded his unpaid wages.

104.   On March 10, 2022, Plaintiff created a professional email address, msullivanjrlaw@gmail.com, and the email signature for this address identified Plaintiff as "Law Clerk | The Maloof Law Firm." (Exhibit 9).

105.   On that same day, Plaintiff requested access to the firm's Westlaw account for legal research.

106. Between approximately March 24, 2022, and April 1, 2022, Plaintiff's work on the Cooley v. Ashita, et al. case included conducting legal research, preparing exhibits for a court filing, and drafting portions of a response to a motion for summary judgment.

107. On April 1, 2022, Defendant's co-counsel, Andrew Lynch, emailed Plaintiff regarding his work on the Cooley case, stating, "You did good. Don't sweat the details. You were a real help." (Exhibit 10).

108. In or around June 2023, the Cooley case settled for $1.87 million. (Exhibit 1).

109. Upon information and belief, this settlement generated approximately $374,000 in attorney's fees for Defendant's law firm, based on a 40% contingency fee shared between two attorneys.

110. Plaintiff received no compensation from Defendant for his work on the Cooley case.

111. On May 18, 2022, after performing work for Defendant for approximately 70 days without receiving any wages, Plaintiff emailed Defendant information from the Robert Half 2022 Legal Salary Guide identifying market salary rates for legal support staff. (Exhibit 11).

112. On August 8, 2022, Defendant sent Plaintiff a letter stating, "Your actions here have been invaluable and are altruistic to me and my firm." (Exhibit 12).

113. Defendant had not paid Plaintiff any wages at the time he described Plaintiff's actions as "invaluable."

114. On August 18, 2023, in a recorded phone conversation, Defendant stated: "I got a pretty good law clerk for free." (Exhibit 54).

115. Over two years later, on June 10, 2024, Defendant stated in an email that Plaintiff "missed a lot of days." (Exhibit 7).

116. On August 14, 2022, after working for Defendant for 159 days without pay, Plaintiff emailed Defendant a notice of departure: "W be out of the office for an indeterminate period starting Monday. I need to focus on other stuff, thanks." (Exhibit 13).

117. In response, Defendant sent Plaintiff a text message urging him not to leave.

118. On August 16, 2022, less than 48 hours after receiving Plaintiff's notice of departure, Defendant hired Sofia Barnett to work for the firm. (Exhibit 14).

119. Upon information and belief, Defendant hired Ms. Barnett as a paid employee at a starting salary of approximately $60,000 per year.

120. Prior to Plaintiff's departure, a paralegal working in a nearby office had recommended her daughter, Sofia Barnett, to Defendant for the vacant position.

121. For approximately 5.2 months, while Plaintiff worked for Defendant without pay, Defendant did not hire Ms. Barnett or any other employee to fill the vacant position.

122. Throughout the initial 159-day period of his employment, from March 9, 2022, through August 14, 2022, Plaintiff received no compensation from Defendant.

## VI. Defendant's False "Ghosting" Narrative and Immediate Retaliation

123. Years later, after Plaintiff demanded his earned wages, Defendant fabricated a narrative that Plaintiff had "vanished" or "ghosted" the firm immediately after giving his notice of departure on August 14, 2022.

124. On January 10, 2023, in a recorded phone conversation, Defendant stated: "I will lie. Um, that's a character defect." (Exhibit 54).

125. On April 24, 2024, Defendant emailed Plaintiff, stating, "You vanished a few times in there for a bit…" (Exhibit 2).

126. On June 10, 2024, Defendant emailed Plaintiff, stating, "The hire was made when you ghosted the firm." (Exhibit 7).

127. This post-hoc narrative, advanced only after Plaintiff demanded his earned wages, is contradicted by Defendant's own contemporaneous communications and actions.

128.  In stark contrast to Defendant's claims, Plaintiff continued to communicate with Defendant and provide services and financial assistance to Defendant and his firm immediately following his departure.

129.  On August 22, 2022, eight days after Plaintiff ceased working due to non-payment, Defendant requested that Plaintiff use his personal Delta SkyMiles to book first-class flights for Defendant and his fiancée. (Exhibit 15).

130.  On September 16, 2022, Plaintiff fulfilled this request, expending 118,000 of his personal miles for Defendant's benefit. (Exhibit 16).

131.  Defendant made this request despite possessing a sufficient SkyMiles balance (53,337) of his own at the time, as evidenced by a separate flight confirmation showing his account balance (SkyMiles # 9349039553). (Exhibit 17).

132.  On August 18, 2022, Plaintiff informed Defendant via email that he had personally paid a firm expense, a regular occurrence, "I was able to negotiate this down to $40.28 from $123.33 and sent a check." (Exhibit 18).

133.  Defendant replied, "Thank you Mike. Give me a call tomorrow. I miss having you around." (Exhibit 19).

134.  On August 22, 2022, Plaintiff sought to review the response to a third-party subpoena response he drafted and served, inquiring, "May I drop in and look at the response? I'm curious if business records contradict the victim's testimony." (Exhibit 20).

135. Defendant replied via text, "sure but not today," and never subsequently provided Plaintiff with access to the requested records, was unable to produce them in advance of Ford's trial, requiring Plaintiff to subpoena the records again. (Exhibits 20, 21, 22).

136. Defendant's refusal to facilitate Plaintiff's ongoing work effectively terminated the arrangement that served as the sole basis for Plaintiff's release from house arrest.

137. By creating this impasse, Defendant's retaliation for Plaintiff quitting over non-payment was to revoke the primary, non-monetary benefit of the employment relationship: Plaintiff's court-sanctioned liberty.

138. Despite being cut off from his work, Plaintiff continued to be available, corresponding with a paralegal in the Henry County District Attorney's Office regarding the Ford case as late as September 12, 2022. (Exhibit 22).

## VII. Continued Work and Case Developments (2023)

139. In early 2023, the State of Georgia offered Plaintiff a plea deal in his criminal matter that would have resulted in a felony conviction.

140. Plaintiff immediately rejected the offer.

141. On March 7, 2023, Plaintiff emailed his attorneys to confirm his rejection, stating: "I have received the State's offer to plea bargain, thoroughly

considered it, and desire to promptly inform the State of my decision and proceed to trial." (Exhibit 23).

142. That same evening, Plaintiff received a telephone call from Defendant regarding the State's plea offer.

143. At the time of this call, Defendant had not served as Plaintiff's attorney since 2016.

144. This call occurred seven months after Plaintiff had informed Defendant via an August 17, 2022 email that he would never accept such a plea deal, "even if Alford, 1-year probation, and time served." (Exhibit 24).

145. The State's plea offer was remarkably similar to the hypothetical terms Plaintiff had expressly rejected, as it included both probation and time served.

146. Defendant initiated the March 7, 2023 call at the request of Plaintiff's counsel to discuss the plea offer.

147. Despite his knowledge of Plaintiff's unequivocal position, Defendant advised Plaintiff to accept the plea.

148. Defendant later admitted in a June 10, 2024 email that at the time he gave this advice, he "did not review the discovery" and was only "told bits and pieces." (Exhibit 7).

149.   Plaintiff's trial was specially set for six days later, on March 13, 2023. Plaintiff appeared in court ready for voir dire, but instead the State of Georgia filed an Order for Nolle Prosequi, dismissing all charges against him.

150.   The State's order cited "severe evidentiary issues," the "loss of one of the victim's recorded statements," and insufficient evidence as the basis for the dismissal.

151.   Upon learning of the dismissal, Defendant sent Plaintiff a text message on March 13, 2023, stating, "Really you were right." (Exhibit 25).

152.   In a subsequent text message that day, Defendant stated, "Unbelievable I guess I was wrong on taking the deal." (Exhibit 25).

153.   In his June 10, 2024 email, Defendant later claimed that Plaintiff told him afterward that "You told me given what I knew at the time it was the right recommendation after it was over." (Exhibit 7).

154.   This claim is directly contradicted by Defendant's own contemporaneous text messages from March 13, 2023.

155.   On June 20, 2023, months after Plaintiff had formally departed, Defendant assigned Plaintiff new work investigating a new premises liability case, stating: "Mike you are the guru at investigating all data. I want you to investigate the actual security measures used by the apartment complex." (Exhibit 26).

23

156.   This new case was a partnership with attorney Troy Hendrick. On July 19, 2023, Mr. Hendrick, having observed Plaintiff's work, sent an email to both Defendant and Plaintiff stating: "I'm unaware of the pay structure between Mike S and MMJ. But I suggest that Mike S charge the case on an hourly basis plus expenses, and invoice HandH Law Firm." (Exhibit 27).

157.   Following Mr. Hendrick's suggestion, Defendant instructed Plaintiff not to report his hours and reiterated his appreciation for Plaintiff's uncompensated work in a July 27, 2023 email: "I love having a brilliant law clerk that works for nachos and refuses to accept monetary payment." (Exhibit 28).

158.   On August 18, 2023, in a recorded phone conversation, stated "I got, I got a pretty good law clerk for free." (Exhibit 54).

159.   On information and belief, on March 13, 2025, Defendant subsequently filed a lawsuit in this potentially lucrative premises liability matter for which Plaintiff had performed the initial, uncompensated investigation.

160.   On November 16, 2023, Defendant emailed Plaintiff proposing an alternative to direct payment: "I would propose a hefty technology and legal drafting fee for the proceeds to come from any settlement." (Exhibit 29).

24

161.  On November 19, 2023, Plaintiff emailed Defendant expressing his frustration regarding his uncompensated work on the Banda/Fuster case. (Exhibit 30).

162.  On December 5, 2023, Plaintiff emailed Defendant stating: "I would like you to surrender your bar license so you cannot do this to anyone ever again." (Exhibit 31).

163.  On December 6, 2023, Defendant made a settlement offer to Plaintiff via email.

164.  The offer was explicitly conditioned on Plaintiff forfeiting his right to file a disciplinary grievance with the State Bar of Georgia.

165.  Defendant wrote that the settlement release would "prevent all future claims and any grievances filed with the bar." (Exhibit 32).

166.  On December 8, 2023, in an attempt to obscure his FLSA obligations, Defendant sent another email to Plaintiff, reframing the payment not as wages but as a "refund" and payment for "independent contractor" work: "a refund for 15K may be in order... and then I think [a sum certain] for work performed on Fuster and Banda as an independent contractor." (Exhibit 33).

167.  On December 8, 2023, in a recorded phone conversation, Defendant stated: "Okay, but if I wrote you a refund, is that you pay taxes on a refund? A refund. You paid me, remember, you paid me $15,000 years ago on your case ... Because that way, you know, that was not, that was like buying a

25

service, right? You've gotten, you've refunded your service, right? ... and then I get to write off the $15,000 and then I get to pay, it's like, oh, I had to refund money. So, it's completely deductible and you get $15,000 back that you paid me that you'd already paid taxes on, right? And so, it's a refund to you and then you don't have to pay back." (Exhibit 54).

168.  On that same day, Plaintiff notified Defendant via email that conditioning a settlement on preventing a bar grievance violated Georgia Rule of Professional Conduct 9.2. (Exhibit 34).

169.  Also on December 8, 2023, Defendant emailed Plaintiff a promise regarding future work, stating: "Moving forward we can just work out an hourly or flat rate for projects." (Exhibit 33).

170.  On December 15, 2023, Defendant sent an email to Plaintiff stating: "This is where I am guilty of taking advantage of you. I was just giving you stuff to add value to my cases for free and not billing the client for it." (Exhibit 35).

171.  On October 22, 2023, in a recorded phone conversation, Defendant stated: "I don't go to other people and ask them to work for [expletive] free, except for you, for some [expletive] up reason. That's wrong." (Exhibit 54).

172.  On December 18, 2023, three days after admitting he was "guilty of taking advantage," Defendant emailed Plaintiff again, stating: "I also want you to know I didn't mean to take advantage of you." (Exhibit 36).

26

173.   On April 24, 2024, Defendant sent an email to Plaintiff placing a value on Plaintiff's work on the Sutton case: "I figured [a specific sum] more would be owed for the additional work you did this year" [for Sutton]. (Exhibit 2).

## VIII. Sutton Case Work and FLSA Claims (2024)

174.   On February 26, 2024, Defendant requested Plaintiff's assistance with the Sutton case via text message, stating: "Let me get Liban on it just to teach him but pay you as well." (Exhibit 37).

175.   Between February 26, 2024, and April 4, 2024, Plaintiff performed approximately 50 documented hours of work on the State v. Sutton case.

176.   This work included analyzing call detail records (CDRs) and preparing a report.

177.   At the time Plaintiff began this work, Defendant had represented Mr. Sutton for 1,303 days.

178.   Plaintiff drafted and served the subpoenas for the evidentiary records just 25 days before the scheduled trial.

179.   On February 28, 2024, Plaintiff filed Requests to Charge in the Sutton case. (Exhibit 38).

180.   On the same day, Plaintiff served subpoenas for phone records via facsimile from Defendant's office. The notice of this service was subsequently filed with the court on March 21, 2024. (Exhibit 39).

181.   Also on February 28, 2024, Defendant offered Plaintiff a payment via text message for an unrelated matter for which no work had been performed. (Exhibit 40).

182.   Plaintiff declined this payment for the unrelated matter.

183.   In a June 10, 2024 email, Defendant characterized this specific refusal as a general refusal of all payment, stating: "I have tried to write you checks for work performed since. You have refused payment." (Exhibit 7).

184.   On March 21, 2024, Plaintiff filed a "Notice of Intent to Introduce Business Records" in the Sutton case. (Exhibit 41).

185.   On April 4, 2024, Plaintiff emailed Defendant a 26-page report detailing his analysis of the CDRs and outlining exculpatory findings. (Exhibit 42).

186.   Plaintiff scheduled a meeting to debrief Defendant on the report's findings, but Defendant departed from the meeting early, and the report was never discussed.

187.   After receiving no payment or discussion of payment, Plaintiff submitted an invoice to Defendant on April 30, 2024 for his approximately 50 hours of work on the Sutton case. (Exhibit 43).

188.   The invoice left the hourly rate at $0.00, thereby inviting Defendant to propose a reasonable rate and fulfill his December 8, 2023 promise to "work out an hourly or flatrate for projects." (Exhibits 33, 43).

28

189. Defendant ignored the invoice and did not respond.

190. Defendant's non-payment for Plaintiff's work on the Sutton case contrasted with his handling of other case expenses, such as a client-paid psychosexual evaluation costing approximately $3,000 to $4,000.

191. Defendant had informed Plaintiff that the request for the cell phone record analysis came directly from the client, Mr. Sutton.

192. Defendant never billed Mr. Sutton for Plaintiff's work.

193. Plaintiff suggested to Defendant that he bill Mr. Sutton for the work.

194. Defendant ignored this suggestion.

195. Plaintiff subsequently contacted Mr. Sutton directly to ensure the client was aware of the exculpatory findings, as Defendant had failed to review the report.

196. Mr. Sutton confirmed to Plaintiff that Defendant had never mentioned billing him for the analysis work.

197. Mr. Sutton expressed his appreciation for Plaintiff's work and offered to pay Plaintiff directly.

198. Plaintiff declined Mr. Sutton's offer, stating that his business relationship was with Defendant, not the client.

## IX.    FLSA Claims and Settlement Attempts (April - October 2024)

29

199. On April 15, 2024, having received no payment for his work on the Sutton case, Plaintiff engaged in protected activity by emailing Defendant. (Exhibit 44).

200. In the email, Plaintiff stated the unpaid work "underscores the need for a clear understanding... and compensation" and again proposed "binding arbitration to settle the unpaid wages issue." (Exhibit 44).

201. On April 22, 2024, Defendant proposed a structurally coercive payment plan to resolve the dispute via email, designed to disincentivize Plaintiff from filing a bar complaint by spreading payments over a long period. The proposed structure was detailed as follows: "I was thinking [a sum certain] [with 37.5% paid] within 30 days, another [37.5% paid] by the end of September and then [the final 25%] next year in the first quarter." (Exhibit 45).

202. The plan proposed spreading payments over a 12- to 15-month period.

203. On April 24, 2024, Defendant sent an email to Plaintiff, admitting: "I did not follow the law and had no idea I was breaking it or that you felt the way you did until after you brought it to my attention." (Exhibit 2).

204. In the same email, Defendant provided a reason for his non-payment: "I assumed Mike has plenty of money and he likes doing this stuff so I don't need to pay him. It is like a hobby and he is a rich white guy." (Exhibit 2).

30

205. Defendant also claimed a lump-sum payment "a number much larger all at once could bankrupt me because insurance doesn't cover labor disputes just malpractice." (Exhibit 2).

206. This claim was made approximately ten months after Defendant's law firm received approximately $374,000 in fees from the Cooley settlement.

207. On April 30, 2024, Plaintiff again engaged in protected activity by emailing Defendant an invoice for his Sutton work and proposing they "agree upon a reasonable hourly rate." (Exhibit 43).

208. Defendant again took no action and ignored the invoice.

209. On May 2, 2024, the parties executed a Tolling Agreement to pause the statute of limitations on Plaintiff's claims during settlement negotiations. (Exhibit 46).

210. On May 13, 2024, Defendant sent an email to Plaintiff acknowledging the high quality of Plaintiff's skills, stating: "They don't hole a candle to what I thin you are able to do and it is starting to enter the market place." (Exhibit 47).

211. On May 31, 2024, Plaintiff sent Defendant a formal letter addressing his concerns and noting the upcoming expiration of the Tolling Agreement. (Exhibit 48).

212. On June 3, 2024, Defendant proposed resolving the dispute through an economically irrational "high-low" binding arbitration structure

31

and, on June 10, 2024, followed up with a formal offer: "I will make two different offers. We can do the binding arbitration with a high low or you can accept the [sum certain] in the three installments [37.5%] within 30 days of acceptance, [37.5%] by October 31, 2024, and [the final 25%] by the end of March of 2025." (Exhibit 7).

213. The proposed "low" amount was below the savings Defendant realized by using Plaintiff's uncompensated labor.

214. The proposed "high" amount was only marginally more than a separate cash settlement amount Defendant was offering.

215. In December 2023, Defendant had proposed a "refund" of prior legal fees as a way to resolve the dispute. (Exhibit 33).

216. After Plaintiff informed Defendant he intended to file a petition with the State Bar's fee arbitration program to recover this promised refund, Plaintiff filed the petition.

217. On September 18, 2024, after Plaintiff filed the fee arbitration petition, Defendant emailed Plaintiff a retaliatory offer with a payment plan and an explicit threat of rescission: "The offer would be [a sum certain] in total. I could pay [33.3%] next week ... [33.3%] by the end of October and [the final 33.3%] by the end of March 2025... If you go forward with the fee arbitration then the offer is rescinded. If you don't accept by the end of the month or go

forward with any fee dispute or other action about my character with the bar then it is off." (Exhibit 49).

218. Plaintiff attempted to accept the monetary portion of the offer while reserving his right to proceed with the fee arbitration.

219. In response, Defendant drafted a settlement agreement that included a clause prohibiting Plaintiff from presenting additional evidence at the fee arbitration hearing. (Exhibit 50).

220. On October 1, 2024, Plaintiff warned Defendant via email that this proposed agreement structure violated Rule 9.2. (Exhibit 51).

221. On October 7, 2024, Defendant sent a revised settlement proposal that continued to include terms restricting Plaintiff's ability to pursue his claims. (Exhibit 50).

222. On October 8, 2024, after Plaintiff requested that Defendant obtain legal representation to assist with the negotiations, Defendant sent Plaintiff a series of emails. (Exhibit 52).

223. In these emails, Defendant accused Plaintiff of "regretting the offer." (Exhibit 52).

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE FAIR LABOR STANDARDS ACT – MINIMUM WAGE (29 U.S.C. § 206)

224. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

225. The FLSA requires employers to pay employees not less than the federal minimum wage for all hours worked. 29 U.S.C. § 206.

226. The statute of limitations for an FLSA claim is two years, or three years if the violation was willful. 29 U.S.C. § 255(a).

227. Pursuant to a Tolling Agreement executed by the parties, the limitations period was tolled for 30 days. (Exhibit 46).

228. This claim is timely filed.

229. At all relevant times, Plaintiff was Defendant's "employee" within the meaning of the FLSA.

230. The economic realities of the relationship establish that Plaintiff was an employee of Defendant.

231. Defendant controlled the means and manner of Plaintiff's work.

232. Plaintiff's work was an integral part of Defendant's business.

233. At all relevant times, Defendant was subject to the FLSA under either enterprise coverage or individual coverage.

234. Plaintiff performed compensable work for Defendant from approximately March 9, 2022, through April 2024.

235. Defendant failed to pay Plaintiff any wages for the hours he worked.

34

236. Defendant's failure to pay Plaintiff the required minimum wage was willful.

237. Defendant, an attorney, knew or showed reckless disregard for the matter of whether his conduct was prohibited by the FLSA.

238. Defendant's willfulness is established by his own admissions, including that he was "guilty of taking advantage of you," was "just giving you stuff to add value to my cases for free," and that he "did not follow the law." (Exhibits 2, 35).

239. Defendant acted willfully by leveraging confidential knowledge from a prior attorney-client relationship to assume Plaintiff did not need to be paid—an assumption Defendant later admitted in writing was the basis for his non-payment. (¶¶ 70-72; Exhibit 2).

240. Defendant's willfulness is further demonstrated by his pattern of making explicit promises of payment to induce Plaintiff to perform work and then breaking those promises. (Exhibits 3, 37).

241. Defendant's knowledge of his wrongdoing is evidenced by his providing shifting and contradictory narratives regarding the employment terms, alternately claiming it was an "unpaid internship" or that Plaintiff had "refused payment," directly contradicting his initial written offer. (Exhibits 3, 6, 7).

242. Defendant demonstrated further willfulness by instructing Plaintiff not to report his hours immediately after a third-party attorney suggested Plaintiff should be paid on an hourly basis. (Exhibit 27).

243. Further evidence of willfulness includes Defendant's attempt to disguise the owed compensation by proposing to structure it as a tax-advantaged "refund" of prior legal fees rather than as wages. (Exhibits 33, 54).

244. Finally, Defendant's reckless disregard for his legal obligations is established by his repeated attempts to condition settlement on Plaintiff waiving his right to file disciplinary complaints, a tactic he continued even after being notified it violated professional conduct rules. (Exhibits 32, 34, 50).

245. As a direct and proximate result of Defendant's willful violation of the FLSA, Plaintiff has suffered damages in the form of unpaid minimum wages.

## COUNT II: VIOLATION OF THE FAIR LABOR STANDARDS ACT – OVERTIME (29 U.S.C. § 207)

246. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

247. The FLSA requires employers to pay non-exempt employees compensation at a rate of one and one-half times their regular rate for all hours worked over 40 in a workweek. 29 U.S.C. § 207.

248. This claim is timely filed for the reasons stated in paragraphs 225-227.

249. At all relevant times, Plaintiff was a non-exempt employee under the FLSA.

250. Plaintiff's duties included non-exempt administrative tasks.

251. The Employment Offer Letter accepted by Defendant set Plaintiff's salary at $14,500 annually. (Exhibit 4).

252. The $14,500 salary was below the 2022 minimum salary threshold of $35,568 required for an employee to be classified as exempt.

253. Because Plaintiff was not paid on a salary basis meeting the FLSA's requirements, he could not qualify for an "exempt" status.

254. Upon information and belief, Plaintiff worked more than 40 hours in one or more workweeks during his employment, including but not limited to workweeks involving intensive efforts on the Cooley v. Ashita case (¶¶ 105-106) and the multi-week, time-sensitive analysis of call detail records in the State v. Sutton case (¶¶ 174-175, 184).

255. Defendant failed to pay Plaintiff any overtime premium for hours worked in excess of 40 in a workweek.

256. Defendant's failure to pay Plaintiff required overtime wages was willful.

257. Defendant, an attorney, knew or showed reckless disregard for the matter of whether his failure to pay overtime was prohibited by the FLSA.

258. Defendant knew that Plaintiff worked substantial hours.

259. Defendant knew or recklessly disregarded that Plaintiff was a non-exempt employee, as the salary specified in the Offer Letter he accepted was facially insufficient to meet the FLSA's salary basis test for exemption. (Exhibit 4).

260. Defendant's willfulness is further established by the facts alleged in paragraphs 237 through 243 of this Complaint, which are incorporated herein by reference.

261. As a direct and proximate result of Defendant's willful violation of the FLSA, Plaintiff has suffered damages in the form of unpaid overtime wages.

## COUNT III: VIOLATION OF THE FAIR LABOR STANDARDS ACT – RETALIATION (29 U.S.C. § 215(a)(3))

262. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

263. The FLSA prohibits employers from discharging or in any other manner discriminating against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. 29 U.S.C. § 215(a)(3).

264. This claim is timely filed for the reasons stated in paragraphs 225-227.

265. Plaintiff engaged in protected activity under the FLSA by complaining about Defendant's failure to pay him lawful wages.

266. Plaintiff's protected activities include, but are not a limited to, the following:

267. On May 18, 2022, Plaintiff emailed Defendant legal salary guide information, constituting an informal complaint for market-rate wages. (Exhibit 11).

268. On August 14, 2022, Plaintiff ceased working for Defendant as a protest against the non-payment of his wages. (Exhibit 13).

269. On December 7, 2023, Plaintiff emailed Defendant formally proposing binding arbitration to resolve the dispute over nonpayment of his wages.

270. On April 15, 2024, Plaintiff again emailed Defendant proposing binding arbitration, expressly referencing his unpaid work on the Sutton case and the need for compensation. (Exhibit 44).

271. On April 30, 2024, Plaintiff submitted an invoice to Defendant for work performed on the Sutton case and proposed they agree on a reasonable hourly rate. (Exhibit 43).

272. In response to and because of Plaintiff's protected activities, Defendant took adverse employment actions against Plaintiff.

273. Defendant's adverse actions were such that they would dissuade a reasonable worker from making or supporting a charge of discrimination.

274. Defendant's adverse actions include, but are not limited to, the following:

275. After sponsoring an employment relationship that served as the sole basis for Plaintiff's court-ordered release from house arrest, Defendant retaliated against Plaintiff for quitting in protest of non-payment by immediately obstructing his ability to continue work, thereby revoking the primary benefit of the employment and effectively returning Plaintiff to a state of confinement. (Exhibit 20).

276. Within 48 hours of Plaintiff quitting in protest of non-payment, Defendant hired a paid replacement, an action he had failed to take for the preceding five months while Plaintiff worked for free. (Exhibits 13, 14).

277. Defendant refused to pay Plaintiff for his significant work on the Sutton case after explicitly promising he would be paid. (Exhibit 37).

278. Long after the events in question, Defendant fabricated and advanced a false narrative that Plaintiff had "ghosted" the firm, a pretext designed to undermine Plaintiff's credibility and his wage claims. (Exhibits 2, 7).

279. In retaliation for Plaintiff's protected activities, Defendant leveraged his position of trust as Plaintiff's former attorney to pressure Plaintiff to accept a felony plea deal in his unrelated criminal case.

280. Defendant's action was retaliatory because a felony conviction would have severely undermined Plaintiff's credibility as a witness, destroyed his future earning capacity, and reasonably dissuaded or chilled him from pursuing his wage claims against Defendant. (See supra ¶¶ 146-153).

281. Defendant repeatedly conditioned settlement offers on Plaintiff's agreement to waive his right to file disciplinary or fee dispute complaints with the State Bar of Georgia. (Exhibits 32, 50).

282. A causal connection exists between Plaintiff's protected activity and Defendant's adverse actions.

283. Causation is established by the close temporal proximity between Plaintiff's complaints and Defendant's adverse actions.

284. Causation is further established by Defendant's own statements explicitly linking settlement offers to the cessation of Plaintiff's protected activities. (Exhibit 49).

285. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered damages.

286. These damages include, but are not limited to, lost wages for the Sutton case.

287.  These damages also include the loss of personal liberty resulting from Defendant's obstruction of the court-sanctioned work arrangement that was the basis for Plaintiff's release from house arrest.

288.  Plaintiff also suffered significant emotional distress arising from Defendant's actions, including the stress of unwarranted confinement and the humiliation caused by Defendant's false narratives and coercive tactics.

## PLEADING IN THE ALTERNATIVE

289.  Plaintiff realleges the preceding paragraphs. Counts IV through IX are pleaded in the alternative to Plaintiff's FLSA claims in Counts I–III. To the extent Plaintiff is determined not to be an "employee" entitled to relief under the FLSA, he is entitled to relief under the following state law theories.

## COUNT IV: BREACH OF CONTRACT

290.  Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

291.  A valid and enforceable contract was formed between Plaintiff and Defendant for the initial employment period ("Initial Contract").

292.  On or about January 20, 2022, Defendant offered to employ Plaintiff. (Exhibit 3).

293.  Defendant's offer specified that the employment would be "Paid but underpaid." (Exhibit 3).

294.  Plaintiff accepted Defendant's offer of employment.

42

295.   The terms of the Initial Contract were further memorialized in an offer letter dated February 4, 2022. (Exhibit 4).

296.   The offer letter specified the role of "Legal Clerk" and an annual salary of $14,500. (Exhibit 4).

297.   Defendant reviewed and accepted the terms set forth in the offer letter. (Exhibit 53).

298.   Consideration for the Initial Contract consisted of Plaintiff's promise to perform services and Defendant's promise to provide compensation.

299.   Plaintiff fully performed his obligations under the Initial Contract by rendering services to Defendant from March 2022 through August 2022.

300.   Alternatively, a separate, valid, and enforceable contract was formed between Plaintiff and Defendant for work on the Sutton case ("Sutton Contract").

301.   On February 26, 2024, Defendant promised to pay Plaintiff for work on the Sutton case, stating in a text message, "pay you as well." (Exhibit 37).

302.   In reliance on Defendant's promise of payment, Plaintiff performed approximately 50 hours of work on the Sutton case.

303.   Plaintiff fully performed his obligations under the Sutton Contract.

43

304. Defendant breached both the Initial Contract and the Sutton Contract.

305. Defendant breached the contracts by failing to pay Plaintiff any of the promised compensation for his services.

306. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages in the form of unpaid compensation.

## COUNT V: QUANTUM MERUIT

307. In the alternative to Count IV (Breach of Contract), and only if no enforceable express contract is found to govern Plaintiff's services, Plaintiff is entitled to recover the reasonable value of his services under the theory of quantum meruit as follows.

308. From March 2022 through April 2024, Plaintiff performed services for Defendant.

309. These services included, but were not limited to, legal research, drafting legal documents, case management, factual investigation, and data analysis.

310. These services were valuable.

311. The value of these services is evidenced by Plaintiff's advanced degrees and professional background.

312. The value of these services is further evidenced by Defendant's own characterizations of Plaintiff's work.

313.   On August 8, 2022, Defendant described Plaintiff's actions as "invaluable." (Exhibit 12).

314.   On June 20, 2023, Defendant described Plaintiff as "the guru at investigating all data." (Exhibit 26).

315.   On July 27, 2023, Defendant described Plaintiff as a "brilliant law clerk." (Exhibit 28).

316.   Defendant accepted Plaintiff's services.

317.   Defendant received a substantial benefit from Plaintiff's services.

318.   Defendant benefited by having Plaintiff fill a vacant legal assistant/clerk position for over five months without cost.

319.   Defendant benefited from Plaintiff's work on cases that generated significant legal fees for his firm. (Exhibit 1).

320.   Defendant benefited by avoiding the expense of hiring a paid employee to perform the work done by Plaintiff.

321.   Plaintiff performed these services with the reasonable expectation of being compensated for their value.

322.   Defendant knew or should have known that Plaintiff expected compensation for his professional services.

323.   This knowledge is evidenced by Defendant's own promises to pay Plaintiff. (Exhibits 4, 37).

45

324.  This knowledge is further evidenced by Plaintiff's inquiries and actions related to compensation. (Exhibits 11, 43, 44).

325.  In equity and good conscience, Plaintiff is entitled to recover the reasonable value of the services rendered to Defendant.

326.  As a direct result of Defendant's failure to pay, Plaintiff has been damaged in an amount equal to the reasonable value of his uncompensated services.

## COUNT VI: UNJUST ENRICHMENT

327.  In the alternative to Count IV (Breach of Contract), and only if no enforceable express contract is found, Plaintiff asserts this claim for unjust enrichment.

328.  Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

329.  Plaintiff conferred a substantial financial benefit upon Defendant by providing valuable professional services from March 2022 through April 2024 without receiving any compensation.

330.  Defendant appreciated the benefit conferred by Plaintiff.

331.  Defendant's appreciation of the benefit is evidenced by his assigning Plaintiff important work on firm cases.

46

332.  Defendant's appreciation of the benefit is further evidenced by his express statements regarding the high quality and value of Plaintiff's work. (Exhibits 12, 26, 28).

333.  Defendant accepted and retained this benefit.

334.  It is inequitable for Defendant to retain this benefit without paying for its value.

335.  The inequity of Defendant's retention of the benefit arises from his use of confidential knowledge of Plaintiff's finances and background to secure the services. (¶¶ 66-72).

336.  The inequity of Defendant's retention of the benefit arises from his use of Plaintiff's vulnerability due to restrictive bond conditions to secure the services. (Exhibit 3).

337.  The inequity of Defendant's retention of the benefit arises from Defendant's own promises to pay Plaintiff for his services. (Exhibits 4, 37).

338.  The inequity of Defendant's retention of the benefit arises from Defendant's own admissions of wrongdoing.

339.  On December 15, 2023, Defendant admitted in an email, "This is where I am guilty of taking advantage of you." (Exhibit 35).

340.  On April 24, 2024, Defendant admitted in an email, "I did not follow the law." (Exhibit 2).

341.  Defendant has been unjustly enriched at Plaintiff's expense.

47

342.   As a direct and proximate result of Defendant's unjust enrichment, Plaintiff has suffered damages in an amount equal to the value of the benefit conferred upon Defendant.

## COUNT VII: PROMISSORY ESTOPPEL

343.   In the alternative to Count IV (Breach of Contract), and only if no enforceable express contract is found, Plaintiff asserts this claim for promissory estoppel.

344.   Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

345.   Under O.C.G.A. § 13-3-44(a), a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

346.   The statute of limitations for this claim is four years. O.C.G.A. § 9-3-26.

347.   Pursuant to a Tolling Agreement between the parties, the limitations period was tolled for 30 days (Exhibit 46).

348.   This claim is timely.

349.   Defendant made a promise of payment to Plaintiff to induce Plaintiff to work for him.

350. Specifically, on January 20, 2022, Defendant promised Plaintiff's employment would be "Paid but underpaid." (Exhibit 3).

351. Defendant made another promise of payment to Plaintiff to induce Plaintiff to perform work on the Sutton case.

352. Specifically, on February 26, 2024, Defendant promised to "pay you as well" for work on the Sutton case (Exhibit 37).

353. Defendant knew or should have reasonably expected that Plaintiff would rely on these promises of payment.

354. Plaintiff did, in fact, reasonably rely on Defendant's promises.

355. In reliance on Defendant's initial promise of payment, Plaintiff accepted the employment position.

356. In reliance on Defendant's employment offer, Plaintiff sought and obtained a modification of his bond conditions, which was predicated on his employment with Defendant.

357. In reliance on Defendant's promises of payment, Plaintiff performed substantial legal and administrative work for Defendant from March 2022 through April 2024.

358. In reliance on Defendant's promises, Plaintiff incurred personal, unreimbursed expenses for the benefit of Defendant's law firm.

359. In reliance on Defendant's promises, Plaintiff forewent other opportunities for paid employment.

49

360. Plaintiff's reliance on Defendant's promises was to his detriment.

361. As a result of his reliance, Plaintiff suffered damages, including the value of his uncompensated labor, unreimbursed expenses, and lost wages from other opportunities.

362. Injustice can be avoided only by enforcement of Defendant's promises.

363. Enforcement is necessary due to the significant benefit Defendant received from Plaintiff's labor.

364. Enforcement is necessary due to the significant detriment Plaintiff suffered in reliance on Defendant's promises.

365. Enforcement is necessary given Defendant's own admissions that he was "guilty of taking advantage" of Plaintiff (Exhibit 35).

366. Enforcement is necessary given Defendant's admission that he "did not follow the law" (Exhibit 2).

367. As a direct and proximate result of his detrimental reliance on Defendant's promises, Plaintiff has suffered damages.

### COUNT VIII: BREACH OF FIDUCIARY DUTY

368. In the alternative to Counts IV-VII, and only if no enforceable contract is found to govern Plaintiff's services, Plaintiff asserts this claim for breach of fiduciary duty.

369. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

370. A fiduciary or confidential relationship exists where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith. O.C.G.A. § 23-2-58.

371. A fiduciary relationship existed between Plaintiff and Defendant arising from their prior attorney-client relationship (2015-2016).

372. During this prior relationship, Defendant gained access to Plaintiff's confidential personal, professional, and financial information.

373. This confidential information included Plaintiff's educational qualifications, professional skills, and earning history.

374. This confidential information included Defendant's unique knowledge of Plaintiff's financial circumstances, including his multi-year unemployment and his ability to sustain significant legal expenses during that time (¶¶ 67-69).

375. An attorney's fiduciary duties to a former client regarding confidential information survive the termination of the attorney-client relationship. See Georgia Rules of Professional Conduct 1.6, 1.9.

51

376. Defendant owed Plaintiff a continuing fiduciary duty of loyalty and utmost good faith with respect to the confidential information gained during the prior representation.

377. Defendant breached this fiduciary duty.

378. Defendant breached his duty by using confidential knowledge of Plaintiff's financial background to form a calculated belief that Plaintiff would not demand payment for his labor, an assumption Defendant later confirmed in writing. (¶¶ 70-72).

379. Defendant breached his duty by using confidential knowledge of Plaintiff's skills, work ethic, and qualifications to solicit and benefit from Plaintiff's high-value labor without compensation.

380. Defendant breached his duty by using knowledge of Plaintiff's restrictive bond conditions—knowledge gained in his capacity as a former and prospective legal counselor—to induce Plaintiff into an uncompensated employment relationship (Exhibit 3).

381. Defendant breached his duty by exploiting the residual trust and confidence from the prior attorney-client relationship to induce and maintain a subsequent, uncompensated employment relationship, thereby securing a financial benefit for himself at Plaintiff's direct financial detriment.

382. Defendant further breached his fiduciary duties by acting contrary to the interests of the person who had placed trust in him.

52

383. Specifically, after facilitating an employment relationship that was the basis for Plaintiff's release from house arrest, Defendant pressured Plaintiff to accept a felony plea deal.

384. A felony conviction would have destroyed Plaintiff's future earning capacity and negated the entire benefit of the court-approved employment that Defendant himself had sponsored.

385. Defendant applied this pressure despite admitting he had not reviewed the evidence in Plaintiff's criminal case (Exhibit 7).

386. Defendant's breaches were willful and demonstrated a profound lack of good faith and loyalty. This willfulness is established by the same pre-litigation pattern of conduct demonstrating his reckless disregard for his legal and ethical obligations as alleged in paragraphs 237 through 243.

387. As a direct and proximate result of Defendant's breaches of his fiduciary duties, Plaintiff has suffered damages.

388. These damages include the value of his unpaid labor, financial losses, and emotional distress.

389. Defendant's conduct showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, thereby entitling Plaintiff to punitive damages under O.C.G.A. § 51-12-5.1.

## COUNT IX: EXPENSES OF LITIGATION (O.C.G.A. § 13-6-11)

390. Plaintiff incorporates by reference all preceding paragraphs as if fully stated herein.

391. Pursuant to O.C.G.A. § 13-6-11, Plaintiff is entitled to recover the expenses of this litigation, including attorneys' fees, from Defendant.

392. This claim is timely.

393. Defendant Has Acted in Bad Faith and Caused Unnecessary Trouble: Plaintiff is entitled to recover litigation expenses pursuant to O.C.G.A. § 13-6-11 because Defendant has acted in bad faith, has been stubbornly litigious, and has caused Plaintiff unnecessary trouble and expense.

394. Defendant has acted in bad faith.

395. Defendant's bad faith is established by his conduct in the formation of the employment relationship, where he exploited confidential information from a prior attorney-client relationship to induce Plaintiff into performing uncompensated labor.

396. Defendant's bad faith is further established by his pattern of making and then breaking promises of payment.

397. Defendant's bad faith is also established by his fabricating false narratives after the dispute arose to undermine Plaintiff's claims.

398. Defendant has also been stubbornly litigious.

399.  Defendant's stubborn litigiousness is established by his refusal to resolve this matter despite his own written admissions regarding the employment relationship, the value of Plaintiff's work, and his own wrongdoing, leaving no genuine factual or legal dispute as to his underlying liability and thereby forcing this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael E. Sullivan, Jr. respectfully prays for judgment against Defendant W. Michael Maloof, Jr. granting the following relief:

(1)    All unpaid minimum wages due under the FLSA;

(2)    All unpaid overtime wages due under the FLSA;

(3)    Liquidated damages equal to the amount of unpaid minimum and overtime wages pursuant to 29 U.S.C. § 216(b);

(4)    Compensatory damages for FLSA retaliation, including but not limited to damages for emotional distress;

(5)    Damages for breach of contract, quantum meruit, unjust enrichment, promissory estoppel, and breach of fiduciary duty under state law;

(6)    Punitive damages for breach of fiduciary duty, if applicable under O.C.G.A. § 51-12-5.1;

(7)    Pre-judgment and post-judgment interest at the applicable legal rates;

(8)    Reasonable attorneys' fees and expenses of litigation pursuant to 29 U.S.C. § 216(b);

(9)    Expenses of litigation, including attorneys' fees where permitted, pursuant to O.C.G.A. § 13-6-11;

(10)  Equitable relief as appropriate, including but not limited to an accounting of profits derived from Plaintiff's uncompensated labor, a constructive trust over such funds, and any necessary declaratory or injunctive relief; and

(11)  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

## EXHIBIT LIST

Exhibit 1: $1.87M Settlement (Jun. 21, 2023)

Exhibit 2: Maloof Email (Apr. 24, 2024)

Exhibit 3: Maloof SMS (Jan. 20, 2022)

Exhibit 4: Sullivan Email (Feb. 4, 2022)

Exhibit 5: Maloof Email (Feb. 15, 2022)

Exhibit 6: Maloof Email (Nov. 27, 2023)

Exhibit 7: Maloof Email (Jun. 10, 2024)

Exhibit 8: Maloof Email (Mar. 9, 2022)

Exhibit 9: Sullivan Email (Mar. 10, 2022)

Exhibit 10: Lynch Email (Apr. 1, 2022)

Exhibit 11: Sullivan Email (May 18, 2022)

Exhibit 12: Maloof Letter (Aug. 8, 2022)

Exhibit 13: Sullivan Email (Aug. 14, 2022)

Exhibit 14: MyCase Email (Aug. 16, 2022)

Exhibit 15: Maloof Email (Aug. 22, 2022)

Exhibit 16: Delta Email (Sep. 16, 2022)

Exhibit 17: Delta Email (Oct. 3, 2022)

Exhibit 18: Sullivan Email (Aug. 18, 2022)

Exhibit 19: Maloof Email (Aug. 18, 2022)

Exhibit 20: Maloof SMS (Aug. 22, 2022)

Exhibit 21: Sullivan Email (Jun. 6, 2023)

Exhibit 22: Matson Email (Sep. 12, 2022)

Exhibit 23: Sullivan Email (Mar. 7, 2023)

Exhibit 24: Sullivan Email (Aug. 17, 2022)

Exhibit 25: Maloof SMS (Mar. 13, 2023, 9:46 AM)

Exhibit 26: Maloof Email (Jun. 20, 2023)

Exhibit 27: Hendrick Email (Jul. 19, 2023)

Exhibit 28: Maloof Email (Jul. 27, 2023)

Exhibit 29: Maloof Email (Nov. 16, 2023)

Exhibit 30: Sullivan Email (Nov. 19, 2023)

Exhibit 31: Sullivan Email (Dec. 5, 2023)

Exhibit 32: Maloof Email (Dec. 6, 2023)

Exhibit 33: Maloof Email (Dec. 8, 2023)

Exhibit 34: Sullivan Email (Dec. 8, 2023)

Exhibit 35: Maloof Email (Dec. 15, 2023)

Exhibit 36: Maloof Email (Dec. 18, 2023)

Exhibit 37: Maloof SMS (Feb. 26, 2024, 4:59 PM)

Exhibit 38: Odyssey (Feb. 28, 2024)

Exhibit 39: Odyssey Email, Subpoena (Mar. 21, 2024)

Exhibit 40: Maloof SMS (Feb. 28, 2024, 7:39 AM)

Exhibit 41: Odyssey Email, Notice of Intent (Mar. 21, 2024)

Exhibit 42: Sullivan Email (Apr. 4, 2024)

Exhibit 43: Sullivan Email (Apr. 30, 2024)

Exhibit 44: Sullivan Email (Apr. 15, 2024)

Exhibit 45: Maloof Email (Apr. 22, 2024)

Exhibit 46: Tolling Agreement (May 2, 2024)

Exhibit 47: Maloof Email (May 13, 2024)

Exhibit 48: Sullivan Email & Letter (May 31, 2024)

Exhibit 49: Maloof Email (Sep. 18, 2024)

Exhibit 50: Proposed Settlement Agreement (Oct. 7, 2024)

Exhibit 51: Sullivan Email (Oct. 1, 2024)

Exhibit 52: Maloof Email (Oct. 8, 2024)

Exhibit 53: Maloof Email (Feb. 4, 2022)

Exhibit 54: Recorded Call Excerpts

Respectfully submitted this 28th day of August, 2025.

Michael E. Sullivan, Jr.,
Plaintiff *pro se*

3324 Peachtree Road NE, Unit 1405
Atlanta, GA 30326
(678) 372-3000
msullivanjr@gmail.com

## FONT AND POINT CERTIFICATION

The undersigned Plaintiff hereby certifies that the within and foregoing

**FIRST AMENDED COMPLAINT FOR DAMAGES** was prepared using

Century Schoolbook, 13-point font in accordance with LR 5.1(C).

# Exhibit 1

## $1.87M Settlement (Jun. 21, 2023)

 ALM | LAW.COM

**Page Printed From:**

**https://www.law.com/dailyreportonline/2023/06/21/how-dekalb-attorneys-leveraged-criminal-defense-connections-in-1-87m-premises-liability-settlement/**

f in 🖶 ✉ ©    **NOT FOR REPRINT**

## How DeKalb Attorneys Leveraged Criminal Defense Connections in $1.87M Premises Liability Settlement

Andrew Lynch was familiar with the area from his early days as a criminal defense attorney. Co-counsel Mike Maloof described it as "a war zone."

June 21, 2023 at 05:57 PM

Premises Liability



**Alex Anteau**

 f in 🖶 ✉ ©

- Plaintiff's counsel said the case was tricky because the shooting in question took place between two properties, across an intersection.
- The area had been a problem for local law enforcement for years and police eventually provided testimony on the case.
- The case settled before trial, after defense counsel withdrew.

Personal injury lawyer Andrew Lynch and criminal defense attorney Mike Maloof recently secured a $1.87 million settlement in a DeKalb County State Court premises liability case.

Maloof said the plaintiff, a mother whose son was killed during a turf war between two gang members that spanned two gas stations in Stone Mountain, Georgia, "had just about given up on trying to find an attorney" when she brought her case to him.

The case was tricky because the deceased, a bystander, was killed in the crossfire between two gas stations on opposite sides of an intersection. However, Maloof said the family left a good impression on him and he was familiar with the area through his criminal defense work.

"I thought there may or may not be something there, but given what had happened and what [the family] described, it was definitely worth looking into," Maloof said. Lynch echoed this sentiment, and after the two did some digging Maloof came to describe the area as "a war zone."

In short, Maloof's instincts were right on the money. "The further we looked into it, really truthfully the case got better and better," Maloof said. "In premises cases, there are so many different grounds that can prevent any type of recovery, and as we went further and further into the case, it became more and more apparent that the typical outs in a premises case for a defendant were less, less than less available."

"The incident reports literally read like a novel," Lynch said.

With institutional knowledge of the county and their past experiences, the duo knew exactly where to look for the materials they needed to bring their case. "The interesting thing about criminal defense is that you know where all the information is," Lynch said.

"We went down and just knocked on the front door of the Tucker precinct, and a sergeant came out and he was a guy that we've known from the criminal court years before and, and he pretty quickly put us in touch with the officers who had first-hand information of telling the gas station that they had issues with gangs," Lynch said. "[They] eventually sat for depositions in the case and really helped us build the actual knowledge of the defendants' criminal activity at their premises."

John Blair of Levy, Sibley, Foreman & Speir represented the defense. According to his motion to withdraw, continued representation of the client would have violated the Georgia Rules of Professional Responsibility. Blair said, "The case settled—there isn't much more to it really."

The plaintiffs say they are happy with the outcome.

"[Our client is] a wonderful lady that never really had much of an interest in financial gain. Frankly, she wanted to settle the case without having to go to court but also was willing to let us go to trial," Lynch said. "She wanted the gas station closed and the gas station is now underground."

"[The family] was so delightful to [work] with," Maloof said. "If every client was like them, this would be the greatest job on the face of the earth."

The case is *Thornton v. Quick Stop Enterprises*, No. 20A78801, in the state court of DeKalb County.

Read an affidavit from the case below.



Copyright © 2023 ALM Global, LLC. All Rights Reserved.

# Exhibit 2

Maloof Email (Apr. 24, 2024)

 Gmail

Michael Sullivan <msullivanjrlaw@gmail.com>

## Re: Lunch This Week to Discuss further LLC and how to get things started
1 message

**Mike Maloof** <malooflawfirm@gmail.com>                                        Wed, Apr 24, 2024 at 12:54 PM
To: Michael Sullivan <msullivanjrlaw@gmail.com>

If we collar it and make it confidential I am fine. My offer really was ▉ in a structured type settlement. I know I can pay
▉ in 30 days and ▉ later this year and ▉ before the middle of next year absent some type of financial collapse. My
rational was as follows:

1) I know I can do it financially a number much larger all at once could bankrupt me because insurance doesn't cover
labor disputes just malpractice;
2) 30 is what I would have paid a law clerk that worked part time for a year and 3 months (24 hours a week at 20 an hour)
you started around the end February or beginning of March of 2022 worked for a year on and off and returned
shortly after the trial that never happened for about 6 months. You vanished a few times in there for a bit so I calculated
15 months at 2K a month and we get to 30K and I figured 10K more would be owed for the additional work you did this
year and costs you incurred helping me and my clients during that time;
3) I think given the change in circumstances from when you started and after your charges were dismissed made things
different, but I did not follow the law and had no idea I was breaking it or that you felt the way you did until after you
brought it to my attention. I wanted to pay you in the beginning and you refused. I did not offer again if my memory
serves me correctly. Once your case was over I just took it for granted. I wish we had just paid at the beginning that way
this would never have happened.
4) I want everything to be amicable. I think there is a lot of stuff I don't want to come out for both of us even at an
arbitration. I am ashamed that I did not recognize you felt the way you did and it was not my intention to take advantage
of you and abuse your help.
5) I did the same thing Ford did. I assumed Mike has plenty of money and he likes doing this stuff so I don't need to pay
him. It is like a hobby and he is a rich white guy. I didn't think exactly like that when I was doing it but reflecting back on it
I did see it that way (Mike is wealthy I am not and he likes having something to do). I think that was more unconscious
than conscious. I don't like screwing people over, and I just never recalibrated or thought about what your thoughts were
regarding the money. I can be selfish sometimes and I should have asked.
6) Anything more than ▉ structured the way I laid out would affect other people in my life. I don't want them to pay for my
mistake. So I thought this was fair under all circumstances.

Sincerely,

Mike Maloof, Jr.

# Exhibit 3

Maloof SMS (Jan. 20, 2022)



← (MM)  Mike Maloof                    ⌄

1/20/22 ▾

Thursday, Jan 20, 2022 • 7:50 AM

Mike I apologize for not getting
back to you.  I had an idea that
could maybe get you out of this
solitary confinement.  I will call
after court probably around 10.

Mike, no worries AT ALL! ...
unpaid internship at my fav
place in Decatur? ;)

Thursday, Jan 20, 2022 • 8:16 AM

Paid but underpaid

Thursday, Jan 20, 2022 • 3:28 PM

Your offer is one of the kindest
acts that I've ever received in
my entire life. I'm still alive in
large part to you. I don't even
know how to express my
thanks. It has nothing to do
with money, as I would pay you
to take out your trash.

I don't know if it could work but
it is a thought.  What does your
bond say?

Sorry for the delayed reply but

＋  Message Mike                        ➤

# Exhibit 4

## Sullivan Email (Feb. 4, 2022)

 Gmail

Mike Sullivan <msullivanjr@gmail.com>

## Re: Mike Sullivan OL.docx
1 message

**Mike Sullivan** <msullivanjr@gmail.com>
To: malooflawfirm@gmail.com

Fri, Feb 4, 2022 at 1:50 PM

Mike,

**Please discard the first version and use the attached instead ("rev2")**.  I found several immaterial errors that warranted correction.  My apologies for the multiple emails.

Best Regards,

**Mike Sullivan**

(678) 372-3000 |  (678) 744-6028 |  msullivanjr@gmail.com


On Fri, Feb 4, 2022 at 12:58 PM Mike Sullivan <msullivanjr@gmail.com> wrote:
Mike,

Here is my **first cut** at creating an offer letter (I *assume* this is the "draft of the letter [Mike Maloof] will write to document his agreement to have you work in his office" **mentioned by Don in his SMS to me this morning**).

I think it is what he is looking for, but also was not a party to that discussion.  I started drafting this earlier this week assuming it may be needed – it is decent – but also warrants your professional review.  I made numerous assumptions that are explicitly your call to make. Candidly, I feel as though I'm overstepping here, but I doubt you see me "lending a hand" as such.  That being said, I'm happy to assist with amending as you see fit, e.g. if you are driving and want to dictate amendments, that works for me.

**Thank you so very much.**

NB:  Metadata wiped as discussed.



Best Regards,

**Mike Sullivan**

(678) 372-3000 | (678) 744-6028 | msullivanjr@gmail.com

---

📄 **Mike Sullivan OL 020422 clean rev2.docx**
109K

# THE MALOOF LAW FIRM

215 North McDonough Street • Decatur, Georgia 30030
Phone: (404) 492-5104

February 4, 2022

Mr. Michael E. Sullivan, Jr.
3324 Peachtree Road NE, Unit 1405
Atlanta, Georgia 30326

RE: The Maloof Law Firm Employment Offer

Dear Michael,

I am pleased to formally extend in writing and confirm your verbal acceptance to the offer of employment with The Maloof Law Firm ("the Maloof Firm").

## Section 1. Employment and Duties

### 1.1 Employment
This letter will confirm the terms and conditions of the Maloof Firm's offer to employ you as *Legal Clerk* reporting directly to myself, but in a dotted-line relationship to my partner, Mr. Gunner Pak.

### 1.2 At-Will
Your employment relationship with the Maloof Firm will be at will. This means that you will not be employed for any specified term and that both you and the Maloof Firm may terminate the employment relationship at any time, with or without notice. Furthermore, this "at will" relationship cannot be changed by any person, statements, acts, series of events, or pattern of conduct, but only by an express individual written employment agreement signed by myself and you which expressly changes this "at will" relationship.

### 1.3 Start Date:
Your start date is anticipated to be as soon as practically possible and as legally allowed.

### 1.4 Full time.
The Legal Clerk shall devote full working time and attention to supporting the Maloof Firm's practice of law.

### 1.5 Duties.
The Maloof Firm shall determine the duties to by performed by the Legal Clerk and the means and manner by which those duties shall be performed.  Initially, those duties shall include, but not be limited to:

(1) The preparation of legal drafts;
(2) The assembly and organization of information of legal forms and documents;
(3) The diligent research and study of relevant law, statute, and court decisions;
(4) The preparation of legal memoranda;
(5) The collection and organization of case materials such as reports and evidence;
(6) The preparation of trial briefs, exhibits, and motions;
(7) The maintenance of court calendar dates and hearings;
(8) As well as administrative tasking answering the phones, managing office supplies, filing, and greeting guests.

## 1.6 Performance of Duties.

As a Legal Clerk you shall perform your assigned duties and responsibilities in a professional manner, in good faith, and to the best of your skills, abilities talents, and experience.

## Section 2. Compensation

### 2.1 Salary

Your annual salary will be $14,500, payable on a bi-weekly basis, less applicable payroll taxes and withholding, in accordance with the Maloof Firm's normal payroll practices. Additionally, this position is considered "exempt" according to the Fair Labor Standards Act (FLSA) and is therefore not eligible for overtime pay.

### 2.2 Vacation

You will be entitled to two (2) weeks of unpaid leave per year; however, your vacation will be scheduled at such time as will least interfere with the business of the Firm.

## Section 3. Work Location

### 3.1 Office

You will primarily perform your employment duties at the office of the Maloof Firm, located at 215 North McDonough Street, Decatur, Georgia 30030.

### 3.2 Limited Travel to Perform

It is acknowledged and understood that the Maloof Law Firm will require you to travel within the Atlanta Metro area, during normal business hours, but only for purposes explicitly related to your duties supporting the Maloof Firm's practice of law.

### 3.3 Reimbursement of Expenses

Where performance of your duties requires such limited travel, the Maloof Firm shall reimburse all reasonable and necessary expenses incurred, provided, however, that a detailed account of such expenses is provided to the Maloof Firm.

## Section 4. Miscellaneous

### 4.1 Attending to Personal Matters

The Maloof Law Firm extends this offer of employment aware that, from time to time, personal matters of extreme importance and related to you your future will require your attention during business hours.

### 3.3 Discretion

When the need arises to attend to such matters you may do so while at the Maloof Firm office, subject to the following conditions: (1) you ensure that another Maloof Firm employee is available to attend to your duties; (2) you attend to those personal matters behind closed doors in a vacant conference room or other area at the Maloof Firm Office; and (3) no resource of the Maloof Firm is utilized to attend to those matters, where those resources shall include, but not be limited to internet access, computing resources, or legal research tools such as Westlaw.

### 3.4 Separation of Personal Matters

You are expected to erect a firewall between your personal matters and the Maloof Firm's practice of law and shall not breach that firewall under any circumstances.

## Section 5. Validity

The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the other provisions, and this Agreement shall be construed in all respects as if any invalid or unenforceable provisions were omitted.

Case 1:25-cv-02006-JPB    Document 29-1    Filed 08/28/25    Page 71 of 99

### Section 6. Entirety of Agreement

This offer letter, together with any agreements referenced herein, sets forth the entire agreement between you and the Maloof Firm with respect to its subject matter and supersedes all prior or contemporaneous oral or written promises, representations or understandings regarding your employment with the Maloof Firm.

By signing this offer letter, you represent and warrant that you know of no reason that you cannot legally accept this offer of employment and that you are not a party to any agreement with a former employer containing any post-employment restrictions on competition, disclosure of information or employment that would impair or limit your ability to become employed by the Maloof Firm or to perform the duties described in this offer.

Your signature below is your acceptance of our offer of employment and the terms of this letter agreement. No modification to this letter prior to your start date shall be valid unless in writing, addressed specifically to you and signed by the Maloof Firm. Your employment is contingent upon your signing this offer letter and returning it to the Maloof Firm.

I look forward to welcoming you to the Maloof Firm. Please let me know if you have any questions.

Sincerely,

/s/ Michael Maloof, Jr.
Mike Maloof, Jr.
The Maloof Law Firm, Managing Partner

ACCEPTED AND AGREED TO:

By: _____

        Michael E. Sullivan, Jr.

Date: _____

Mike Sullivan OL.docx                    **[ 3 ]**                    April 11, 2025

# Exhibit 5

Maloof Email (Feb. 15, 2022)

 Gmail

Mike Sullivan <msullivanjr@gmail.com>

## Re: Welcome To Our Blog
1 message

**Mike Maloof** <malooflawfirm@gmail.com>
To: Mike Sullivan <msullivanjr@gmail.com>

Tue, Feb 15, 2022 at 8:36 AM

Mike, Valentine's Day was great. I was more romantic than usual. That sounds like a great topic. If you drafted something then I think we can post it. Keep track of any hours you do some work. I have an interesting motion to perform on a civil case. If you want the details I can get them to you. Looking forward to getting you in her. We got a lot going on at the moment.

Sincerely,

Mike Maloof, Jr.

On Mon, Feb 14, 2022 at 8:01 AM Mike Sullivan <msullivanjr@gmail.com> wrote:
> How often do you come across failure to disclose Brady material (other than every case)? Where you could meet "your" burden for relief?
> https://www.malooflawfirm.com/blog/ I think it might be a fun blog entry.
>
> Hope you had a good weekend and don't forget today is Valentine's Day so you need to send your gal (Nancy, right?) some flowers ;)
>
> Best Regards,
>
> **Mike Sullivan**
>
> 📱 (678) 372-3000 | 📞 (678) 744-6028 | ✉ msullivanjr@gmail.com
>
>
> ---
> The Maloof Law Firm
> 215 N. McDonough Street
> Decatur, GA 30030
>
> Tel 404-373-8000
> Fax 404-378-3656
> malooflawfirm.com
>
>
> CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

# Exhibit 6

Maloof Email (Nov. 27, 2023)

 **Gmail**

**Michael Sullivan <msullivanjrlaw@gmail.com>**

## Call me this afternoon at 5 we will file the dismissal
1 message

**Mike Maloof** <malooflawfirm@gmail.com>
To: Mike Sullivan <msullivanjrlaw@gmail.com>

Mon, Nov 27, 2023 at 6:53 AM

Mike I am sorry you feel the way you do. Upon reflection I can see where you are coming from, I became very thoughtless with my requests of you. I don't like to abuse or use my friends for my own profit. It really was my thought process to have you help with civil cases in the idea that someday you would want to make this a career and to discuss options moving forward. I know how smart you are and I thought you enjoyed doing the work.

I was simply giving you some work I thought you would take an interest in performing. If you want me to proceed on the diminished value case, then I am happy to do it. If not, I will file the dismissal today. I will pay the expenses you incurred in performing the work for my clients. I will here you out on the basis for your claim of unjust enrichment. I thought this was an unpaid internship and I valued our time talking together about a myriad of topics. I wish you had just told me that you felt the way you did in your more recent emails and the specific text you sent last Wednesday. I hate it, but I can't always read what others are thinking and your emails made me think about my requests. I don't think they were numerous or anything crazy, but I didn't express much appreciation when you performed the work. Some of this is just where we both are in our lives. I am playing fireman and you are putting your life back together.
I try my best and juggle a bunch of balls in the air and sometimes I take the easy road and ask others to help me on projects I am not familiar with and don't have a bunch of time to dedicate to doing.
I thought you wanted me to supervise your diminished value case and kept you posted on the activity of the case. I was the attorney of record and handling calls and conveying the messages sent from the two other attorneys and adjuster involved. You knew your case like the back of your hand and I thought you wanted to run point and me to simply make sure an attorney with some level of competence was overseeing the filings.
If you feel the way you do about the recent developments in our relationship then I will do what I think is fair and what I am capable of doing. I am here early this morning if you want to call and chat. The situation appears so soured that I think the best option is for us to part ways. If I am so off in my perceptions of what is going on in our relationship, I need to learn this civil stuff on my own anyway.
Just let me know if you are up and reading this now is a good time for a call. I have to go answer a calendar call in FUlton at 9:00 and I have another virtual hearing this afternoon. If you want it filed this morning then call and tell me or send a text.

Sincerely,

Mike Maloof, Jr.

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

# Exhibit 7

Maloof Email (Jun. 10, 2024)

 Gmail                                                    Michael Sullivan <msullivanjrlaw@gmail.com>

## Re: Letter Regarding Unpaid Wages, Ethical Concerns, and Impending Litigation
1 message

**Mike Maloof** <malooflawfirm@gmail.com>                                     Mon, Jun 10, 2024 at 7:39 AM
To: Michael Sullivan <msullivanjrlaw@gmail.com>

Mike,

I hope you enjoyed your birthday.  I will make two different offers.  We can do the binding arbitration with a high low or you can accept the ▮ in the three installments ▮ within 30 days of acceptance, ▮ by October 31, 2024, and ▮ by the end of March of 2025.  Your allegations in your letter are your perception of the events and you are entitled to them.

For Clarification from my perspective:  I was not trying to take advantage of you from my perception.  I was asked by your mother to reach out and check on you early in 2022.  She was worried about you being in your home under house arrest and your mental health.  I cannot remember if we even discussed you working for me (I am pretty sure the thought came up but I just can't remember). I called you and discussed your circumstances and we made arrangements to help you get out of your home, and work with me.  I offered payment of 10 dollars an hour at the outset to prevent this kind of rift and animosity.  It was not brought to my attention the way you felt until right before Thanksgiving of last year 2023.  I have tried to write you checks for work performed since.  You have refused payment.

The painting of me as unethical towards you and a selfish human being is not something I take lightly or am in agreement.

I was asked by a mother to help her son who was struggling being stuck in his home on house arrest.  She was concerned about your well being.  I had always liked you and I truly wanted to help.  I told your mother I would give you a call and we decided to see if we could get you out of that house via employment.  I offered a paid internship and you said you wouldn't take money. I believe I said I prefer to pay people in order to prevent resentments, and truly it makes people feel a greater level of responsibility.  You were not interested and seemed happy to just get out of the house.

As to the greed aspect i.e. free labor I pocketed profits from your hard work, that you believe was the motive for me employing you: I offered to pay what I have done on other internships (while I have had only two)10 dollars an hour. It was turned down by you not because you were asking for more but because you would not take the money.  You went out of plan to the tune of around 4K on the Westlaw. It happened on two or three occasions and the amount is an estimate not 4K each time.  You offered to pay and I refused.  While I was frustrated I let it go and said just stop doing it.  I believe I said there is no way I can take your money if I am not paying you.

You offered me over a million at one point to take your case.  This is when you were in a particularly vulnerable position and the trust in me was something I did not take lightly, in your darkest hour in a desperate spot it would have been wrong to have taken it for a myriad of reasons,  This is not what a greedy lawyer would do.  Plus if I lost the case I would have been devastated.  I refused it on two occasions, and said truthfully I could not take the emotional blow if I lost.

I did offer when I thought you had fired Don which I never advocated for you to do, and discouraged you from doing it.  I was bombarded again by family members.  I certainly did not ask for a million dollars, but I did not want you to go it alone.  Also this is contrary to what Julia believed (she was not nasty but very unhappy with me for a minute).  Her belief was based on a phone call I made asking if she felt Don was on top of the case, and doing a good job.  This call was made to her after you were extremely frustrated with his performance and vented to me.  You had then sent a joking communication firing him.  I offered to reach out to your ex to see if I could help get her to work with your attorneys on your case.  I was told not to do so.  I fielded calls with your mom about concerns regarding you on several occasions.  These were not easy.  She loves you and cares about you.  The same is true from Julia (only on a few occasions).  I took calls from Don and Amanda.  I was really trying to help you stay sane in a difficult time.

Ethics Concern:

I was asked by your mother; your attorney who is considered the best in the business, and a few other people (Julia, I think Amanda) to speak to you to encourage you to take the probation offer and I was not privy to the asymmetric information you possessed.  You told me given what I knew at the time it was the right recommendation after it was over.  I did not review the discovery.  I was told bits and pieces about it from multiple points.  Specifically, you on many occasions.  I told you to stick with the attorney you had at the time of the trial who had gotten the discovery.  I just don't see this as unethical.  I was not thinking of my wallet, but of your possible incarceration.  It was a risk reward assessment and a fear you could go to prison.  How would I have known the State was going to dump the case for

certain and you were not happy with the defense that was going to be put forward. You told me you were not going to testify and I thought if she shows it will be tough. I have heard from many Defendants the other party isn't coming and then they do and it is a game changer.

As to Sutton I had read the hard copy and again your invoice didn't ask for money just gave me hours. I had not read the invoice, but if you had asked for compensation we were at the point I would have given it. I am not a mind reader.

If you want to take one of the proposed offers then let me know but don't contact me for reasons other than the proposals. No one has ever made allegations like this against me. So I promised I would respond to your letter I have now. As far as Sutton, if you had asked for payment I would have paid you for it. I had you in my office on one occasion earlier in the year and I was trying to write you a check for the Wooten Case and I believe another.

I have tried to pay you and turn this around since I found out your feelings which happened right after my return from my honeymoon. I have told you my mistake in this arrangement, but you had never communicated your frustrations to me until then. I found out your feelings with accusatory text messages right before Thanksgiving. I thought about your position and told you to not talk to me via accusatory texts. Once you simmered down I again tried to pay 15K at the end of 2023, not as full and final settlement but as an attempt to show I took it seriously and had some money to pay and it would have made good sense for both our tax purposes.

Your timeline fails to indicate the 4 years after you left our services you went with Ken Hodges and Jay Tom Morgan. They did not do a good job according to you (Not much argument from me). You asked what I would do if I found myself in your situation and I gave you what I thought were the best attorneys to handle the case. You took my advice and hired two of the best by reputation. I did not hear much until after your mother called me very concerned about your well being. It also makes it sound as if the employment was continuous and consistent. You vanished after the Ford case. You left to focus on your trial as you should have done so. You could not come to the office after certain comments were made to Sofia by your own choice not mine.

I did have a gap in an assistant. It truly started at the beginning of 2022. Gunner's father was sick in the hospital, my paralegal began to call in every week for over half her work days with fibromyalgia starting in January of 2022. I needed a secretary mainly to answer the phones and do the filings. I was reluctant to hire a secretary not out of greed but for fear I would make another bad hire. I had just gone through two individuals and didn't want to make another mistake. Sofia was hired part time in the middle or end of August 2022 her hiring was done for a couple of reasons. I knew her mother and she had worked for us before. The hire was made when you ghosted the firm. Ford proceeded and we did not hear from you for a while. I think the number of hours worked, especially on secretary matters, was not a huge amount. You did file documents and occasionally answered the phone, but I never called you my secretary but my law clerk.

I was not asking you to be a secretary. I believed you were better analytically. When you did this work it was very good, but you weren't coming in early to answer a phone and to be a secretary. You also were struggling with depression and having a hard time getting out of bed. You missed a lot of days. I spoke to help family concerns with several members. I also would not tell them information you did not want disseminated. I made it easier for your mother because I would say things that let her know you were just processing information, and physically alive and ok. When your dog Bow passed I tried my best to say what I knew to say in that kind of situation. There are no words that can fix this. It is just a process you must go through. When you wanted Gunner to throw me a bachelor party, you didn't show, but not only did you not show, you didn't answer the phone. I had to apologize to the guys that planned the party for me.

If you want to take one of the proposed offers then let me know but don't contact me for reasons other than the proposals. No one has ever made allegations like this against me. So I promised I would respond to your letter I have now. As far as Sutton, if you had asked for payment I would have paid you for it. I had you in my office on one occasion earlier in the year and I was trying to write you a check for the Wooten Case and I believe another. You have never asked instead you send me things like would you consider your representation of him as abandonment. Why did you not try and withdraw for payment? One of the reasons is that every time we try to withdraw for lack of payment, clients come in and beg for a payment plan, and the courts, because they are overwhelmed, don't sign the orders quickly. I knew Sutton's behavior was typical of many defendants. He wanted it to go away. He pulled the old ostrich defense as I knew he had money to pay he just couldn't believe this was happening. He then showed up to my office heavily intoxicated to go over his case. I had to give him water and get him an Uber or he got it I can't remember. His case is not on a pretrial calendar. We have gotten notice and I have plans on how to move forward. I have to work on two other pressing matters this week.

Since the outset of your frustration I have tried to figure something out. You just weren't sure how you wanted to do it. The high low was instigated by you and was a smart option when the business venture lost relevance. I just don't know this law and I should have been more engaging in creating a high low. I am struggling. If it makes you feel better this has put a strain on my relationship with Nanci. I don't want you to think I take this lightly and if it makes you feel better it has bothered me to my core. I know you feel betrayed, but I also feel betrayed. I did my best and I never asked you to work for free. I now get those weekend texts and texts right after my honeymoon that are very accusatory and your opinion. I never talked to you like that. When you made mistakes I communicated them to you and let it go.

As to taking advantage of you when you were in a bad place. I was just trying to help you get your head together. We talked at length about your case, and I gave you feedback. We laughed about a lot of different cases and the craziest world we have ever seen. I am sorry it got to this but a phone call saying hey can you pay for Sutton or lets determine a high low may have fixed the problem. I did say that resolution would create animosity.

I did think the business idea we had was a good idea. I am sorry you are pissed, but I can't read your mind and quite frankly the allegations have hurt me and I feel like I can't trust you. I didn't refuse to review discovery and I didn't cause the delay in your case. When I worked for you, I filed what you asked to preserve evidence and I tried to do what you asked of me before you went in a different direction. I hope you can put this behind you and resolve it amicably. You told me I would have to distance myself from you one day well before you were angry at me and threatening litigation. I guess I should have listened then. I hope you are in good health, and I am sorry you feel the way you do. Enjoy your week, and if you want to chat I would request two things first no jabs they don't do anyone any good. Second I have never recorded our conversations and ask for your assurances you are not going to do the same moving forward. We need to keep this to email only unless you ask for a call via email. Good luck moving forward in your life and I hope we can resolve this soon.

As to settlement, the terms would need to be binding. There were substantial gaps in your employment. Especially after the Ford immunity hearing.

Sincerely,

Mike Maloof, Jr.

# Exhibit 8

## Maloof Email (Mar. 9, 2022)

 Gmail

**Mike Sullivan <msullivanjr@gmail.com>**

## Re: Good Morning
1 message

**Mike Maloof** <malooflawfirm@gmail.com>                                    Wed, Mar 9, 2022 at 8:09 AM
To: Mike Sullivan <msullivanjr@gmail.com>

Mike don't worry about the donuts very nice gesture by the way. There are few places in Decatur. We are looking forward to having you here. My legal assistant is out with some kind of medical issue they are trying to figure out. It is a little scary. Gunner will be here. It is going to be fun. We got a lot going on, and a lot of pretty interesting work stuff. I have a plea at 1:00 today and I think I have to go to Cobb late this afternoon, but I should be here most of the day. Look forward to seeing you. When you arrive just shot me a text and I will let you in the back. We are not open like normally yet so the front is locked. I will see you this morning.

Sincerely,

Mike Maloof, Jr.

On Wed, Mar 9, 2022 at 7:27 AM Mike Sullivan <msullivanjr@gmail.com> wrote:
> Is there somewhere I can grab donuts (or breakfast) + coffee for your team on the way in?
>
> So excited to work for the first time since '15. Thanks, Mike! :)
>
> Best Regards,
>
> **Mike Sullivan**
>
> 📱 (678) 372-3000 | 📞 (678) 744-6028 | ✉ msullivanjr@gmail.com

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

# Exhibit 9

## Sullivan Email (Mar. 10, 2022)

 **Gmail**

Michael Sullivan <msullivanjrlaw@gmail.com>

---

## Email Address / Cooley Motion
1 message

---

**Michael Sullivan** <msullivanjrlaw@gmail.com>                                      Thu, Mar 10, 2022 at 3:01 PM
To: malooflawfirm@gmail.com

Mike,

I thought it would be prudent to set up a new gmail address to "firewall" communications related to your law practice from those that are personal:

- msullivanjrlaw@gmail.com is the best my creatively-challenged brain could come up with, but ...
- Obviously I want to steer clear of § 15-19-51, so if you have a better email address I might use, please let me know.

More pertinently, can you please share the DRAFT of the Cooley Motion with me please so I may (1) redline; or (2) create a separate working iteration (at your preference).

NB: Make sure you call Gunner "Numba One Gunna" next time you bump into him. It is a play off this old school song https://youtu.be/HBOUdDaBtGw

--

Sincerely,

**Mike Sullivan** | Law Clerk | The Maloof Law Firm

(404) 373-8000 | (678) 372-3000 | msullivanjrlaw@gmail.com

CONFIDENTIALITY NOTICE: This email and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this email or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the email, any attachment, and all copies thereof and destroy any printouts.

# Exhibit 10

## Lynch Email (Apr. 1, 2022)

 Gmail

Michael Sullivan <msullivanjrlaw@gmail.com>

## Re: Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J [Mar 31 22 @ 742 PM]
1 message

**Andrew Lynch** <andrew@attorneyandrew.com>
To: Michael Sullivan <msullivanjrlaw@gmail.com>
Cc: "Mike Maloof Jr." <malooflawfirm@gmail.com>

Fri, Apr 1, 2022 at 1:00 PM

You did good.   Don't sweat the details.  You were a real help.

Thank you,
Andrew "Drew" Lynch

Andrew R. Lynch

The Lynch Law Group
125 Clairemont Avenue, Suite 470
Decatur, Georgia 30030

Office 404-373-7735
Fax 404-377-0106

# Exhibit 11

## Sullivan Email (May 18, 2022)

 Gmail

Michael Sullivan <msullivanjrlaw@gmail.com>

## [LEGAL] 2022 Salary Guide from Robert Half
1 message

**Michael Sullivan** <msullivanjrlaw@gmail.com>
To: Mike Maloof <malooflawfirm@gmail.com>

Wed, May 18, 2022 at 2:46 PM

https://www.roberthalf.com/salary-guide/home?utm_campaign=Client-Candidate-SalaryGuide-NonRec-Auto-Email1-NA&utm_medium=Email&utm_source=RH_Operational&utm_content=access_salary_guide&sfi=

I dropped this guide into Excel ... was curious what the market looked like. I think this might be the most appropriate title, but I'm guessing.

| Administrative Assistant – Legal | 41,750 | 50,500 | 56,750 |

--

Sincerely,

**Mike Sullivan** | Law Clerk | The Maloof Law Firm

(678) 372-3000 |  (404) 373-8000 |  msullivanjrlaw@gmail.com

---

📄 **LEGAL 2022 SALARIES.xlsx**
13K

| Title | 25th percentile | 50th percentile | 75th percentile |
|---|---|---|---|
| Lawyer, 10+ Years' Experience | 123,750 | 152,500 | 178,500 |
| Lawyer, 4-9 Years' Experience | 98,000 | 125,750 | 153,250 |
| Lawyer, 2-3 Years' Experience | 85,500 | 104,750 | 133,750 |
| First-Year Lawyer | 69,500 | 85,250 | 109,000 |
| General Counsel | 155,750 | 194,250 | 242,000 |
| In-House Counsel/Associate General Counsel, 10+ Years' Experience | 134,250 | 163,000 | 199,250 |
| In-House Counsel, 4-9 Years' Experience | 93,000 | 128,750 | 154,250 |
| In-House Counsel, Up to 3 Years' Experience | 76,000 | 102,000 | 127,500 |
| Legal Administrator | 68,000 | 81,250 | 104,000 |
| Office Manager – Legal | 56,250 | 59,500 | 68,750 |
| Paralegal Manager | 85,250 | 92,750 | 101,250 |
| Senior/Supervising Paralegal, 7+ Years' Experience | 66,750 | 74,500 | 93,250 |
| Midlevel Paralegal, 4-6 Years' Experience | 57,500 | 65,750 | 77,000 |
| Paralegal, 2-3 Years' Experience | 45,250 | 50,000 | 60,750 |
| Case Clerk, 0-2 Years' Experience | 42,750 | 46,500 | 51,000 |
| Senior Legal Assistant (Hybrid) | 68,250 | 74,750 | 81,250 |
| Legal Assistant (Hybrid) | 47,250 | 56,000 | 64,500 |
| Senior/Executive Legal Secretary, 12+ Years' Experience | 62,500 | 71,000 | 76,750 |
| Legal Secretary, 7-11 Years' Experience | 54,750 | 64,500 | 72,250 |
| Legal Secretary, 3-6 Years' Experience | 48,250 | 54,250 | 62,750 |
| Legal Secretary, 1-2 Years' Experience | 37,500 | 42,250 | 48,000 |
| Administrative Assistant – Legal | 41,750 | 50,500 | 56,750 |
| Patent Agent | 72,750 | 86,500 | 101,500 |
| Records Manager | 68,500 | 79,250 | 90,750 |
| Records Clerk | 36,000 | 41,500 | 46,250 |
| Calendar/Docket Clerk | 42,500 | 48,750 | 61,250 |
| File Clerk – Legal | 39,500 | 43,750 | 51,250 |
| Time and Billing Clerk | 39,250 | 43,500 | 53,000 |
| Director, Compliance, 10+ Years' Experience | 96,000 | 132,750 | 154,750 |
| Manager, Compliance, 7-9 Years' Experience | 86,750 | 100,250 | 126,250 |
| Compliance Analyst, 4-6 Years' Experience | 68,750 | 83,250 | 101,500 |
| Compliance Analyst, 1-3 Years' Experience | 61,500 | 77,000 | 82,500 |
| Lease Manager | 67,000 | 82,750 | 97,250 |
| Lease Administrator | 56,000 | 66,250 | 83,750 |
| Lease Assistant | 44,750 | 53,000 | 59,000 |
| Title Closer | 35,000 | 44,500 | 49,250 |
| Director, Litigation Support/eDiscovery, 10+ Years' Experience | 112,250 | 137,750 | 169,500 |
| Manager, Litigation Support/eDiscovery, 7-9 Years' Experience | 98,500 | 119,250 | 137,000 |
| Manager, Litigation Support/eDiscovery, 3-6 Years' Experience | 71,000 | 96,500 | 117,750 |
| Litigation Support/eDiscovery Specialist/Analyst, Up to 2 Years' Experience | 55,000 | 67,250 | 84,250 |
| Document Coder | 36,750 | 41,250 | 51,500 |
| Legal Word Processor | 40,750 | 52,500 | 64,750 |
| Office Clerk | 34,500 | 36,250 | 42,000 |
| Legal Receptionist | 36,250 | 40,000 | 46,250 |

# Exhibit 12

## Maloof Letter (Aug. 8, 2022)

Dear Mike:

I read your email this weekend, and I was disheartened. I know every day that lingers with no resolution in site is unbearable. I want you to know you are a great friend. Your actions here have been invaluable and are altruistic to me and my firm.

If you decide to go turn into custody, I will respect that decision. I think the end of the case is approaching and I don't want you to have to fight this from the inside of the jail. You are a good man. You have suffered from a terrible injustice. I cannot say I know what it would be like, but I know what feeling hopeless feels like and I know its discomforts.

I thought about it all day yesterday. I could not think of the words that would be persuasive to prevent you from taking the action. The only thing I can say is I am your friend, and I will do what is in my power to help you.

If you want me to become counsel of record, I would do it. I don't want to watch you in the pain you find yourself in at the moment.

My hopelessness with Alcoholism is what I am going to draw from in this letter. The only way my life got better is when I took positive action to address the issue. Helping others makes one feel good and gets them outside themselves. The very prison you can find yourself sometimes.

Help my clients and we got a lot of distractions for the next couple of months. Let's help Ford out of his case. Let's help Alford (as you have) and Allen the next two weeks. Let's spend this weekend making a trial notebook and force ourselves to read that book I always show you.

You have a lot to give this world. Your decision to turn into custody would fuck up your mindset that must be sharp for the trial that will eventually happen. If none of this is persuasive, then I will respect you as a person and friend. I am trying to think of a sense of purpose I can provide you. Just let me know what I can do.

Your Friend and Colleague,

Mike Maloof, Jr.

# Exhibit 13

Sullivan Email (Aug. 14, 2022)

 Gmail

**Michael Sullivan <msullivanjrlaw@gmail.com>**

## Re: Last Day
1 message

**Mike Maloof** <malooflawfirm@gmail.com>                                    Mon, Aug 15, 2022 at 6:29 AM
To: Michael Sullivan <msullivanjrlaw@gmail.com>

Fair enough, let me know what I can do to help.  I will miss having you around and you know where to find me and if you
want to do the leave and getting ready don't hesitate to let me know.  You are my friend and I hate seeing you suffer.

Sincerely,

Mike Maloof
On Sun, Aug 14, 2022 at 10:32 PM Michael Sullivan <msullivanjrlaw@gmail.com> wrote:
  W be out of the office for an indeterminate period starting Monday.
  I need to focus on other stuff, thanks.


  --

  Sincerely,

  **Mike Sullivan** | Law Clerk | The Maloof Law Firm

  📱 (678) 372-3000 | 📞 (404) 373-8000 | ✉ msullivanjrlaw@gmail.com

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com


CONFIDENTIALITY NOTICE:  This e-mail and any attachments contain information from The Maloof Law Firm and are
intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client
communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is
prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any
attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be
created without an executed fee agreement or engagement letter. If you believe you have received this message in
error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and
destroy any printouts.

# Exhibit 14

## MyCase Email (Aug. 16, 2022)

 **Gmail**                                                                 Michael Sullivan <msullivanjrlaw@gmail.com>

## Recent activity in MyCase
1 message

**The Maloof Law Firm** <no-reply@mycase.com>                                    Tue, Aug 16, 2022 at 8:41 PM
Reply-To: No-Reply <no-reply@mycase.com>
To: Michael Sullivan <msullivanjrlaw@gmail.com>

 **mycase**             **Recent Activity Notifications**
                                                     **Prepared for Michael Sullivan**

### August 16, 2022  8:41pm

 **Alford, Clevon**

 Michael Maloof, Jr. (Attorney) completed task Modify Bond Conditions to Allow Clevon ALFORD to Attend College (must reside at).

**Huq, Shagor**

 Michael Maloof, Jr. (Attorney) accepted a payment of $500.00 (Credit Card) for invoice #11139

 Michael Maloof, Jr. (Attorney) added 1 note

 Michael Maloof, Jr. (Attorney) emailed invoice #11139 to Ahmed Huq (Family Member)

 Michael Maloof, Jr. (Attorney) emailed invoice #11139 to Akash Huq (Family Member)

**Kidd, Mekkiah**                                                              New Case

 Michael Maloof, Jr. (Attorney) linked you to case Kidd, Mekkiah

 Michael Maloof, Jr. (Attorney) linked contact Branden Brooks to case Kidd, Mekkiah

Michael Maloof, Jr. (Attorney) linked contact Cookie Brooks to case Kidd, Mekkiah

 Michael Maloof, Jr. (Attorney) linked attorney Gunner Pak to case Kidd, Mekkiah

 Michael Maloof, Jr. (Attorney) linked business manager Kelly V Leuvan to case Kidd, Mekkiah

 Michael Maloof, Jr. (Attorney) linked business manager Sofia K Barnett to case Kidd, Mekkiah

 Michael Maloof, Jr. (Attorney) added invoice #11145



Michael Maloof, Jr. (Attorney) accepted a payment of $2,000.00 (Credit Card) for invoice #11145

Michael Maloof, Jr. (Attorney) emailed invoice #11145 to Cookie Brooks (Family Member)

## Nichols, Loree                                                    Case Closed

Michael Maloof, Jr. (Attorney) accepted a payment of $4,400.00 (Check) for invoice #11143

Michael Maloof, Jr. (Attorney) emailed invoice #11143 to Loree Nichols (Client)

## Firm Activity

Michael Maloof, Jr. (Attorney) added 2 contacts

Michael Maloof, Jr. (Attorney) added business manager Sofia K Barnett

Change the content and/or frequency of these emails – Edit your email settings

This email was sent to msullivanjrlaw@gmail.com. To ensure that you continue receiving our emails, please add us to your address book or safe list.

© 2022 MyCase, Inc. | 9201 Spectrum Center Blvd STE 100, San Diego, CA 92123

# Exhibit 15

Maloof Email (Aug. 22, 2022)

 Gmail

**Michael Sullivan <msullivanjrlaw@gmail.com>**

## Flights
1 message

**Mike Maloof** <malooflawfirm@gmail.com>
To: Mike Sullivan <msullivanjrlaw@gmail.com>

Mon, Aug 22, 2022 at 7:29 AM

Mike nancia and I decided we wanted to go to Jackson Hole Wyoming for our trip we would do it on the Columbus Day Weekend. We would love to fly out October 6th in the evening and come back Columbus day on the 10th. If you want to do it pull the trigger, but certainly don't feel any obligation. I hope you are hanging in there and as always you are my friend and I miss having you around.

Very Truly Yours,

Mike Maloof, Jr.

--
The Maloof Law Firm
215 N. McDonough Street
Decatur, GA 30030

Tel 404-373-8000
Fax 404-378-3656
malooflawfirm.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments contain information from The Maloof Law Firm and are intended solely for the use of the named recipient(s). This e-mail may contain privileged attorney/client communications and/or work product. Any dissemination of this e-mail by anyone other than an intended recipient is prohibited. If you are not a named recipient, you are prohibited from any further viewing or usage of this e-mail or any attachment, or relying on any legal advice or information contained herein. No attorney-client relationship shall be created without an executed fee agreement or engagement letter. If you believe you have received this message in error, notify the sender immediately and permanently delete the e-mail, any attachment, and all copies thereof and destroy any printouts.

# Exhibit 16

## Delta Email (Sep. 16, 2022)

 **Gmail**

Mike Sullivan <msullivanjr2@gmail.com>

---

**SkyMiles Award Redemption Confirmation**
1 message

---

**Delta Air Lines** <DeltaAirLines@t.delta.com>                                    Fri, Sep 16, 2022 at 7:53 AM
Reply-To: Transactional Email Reply Inbox <reply-233863-14_HTML-3861254-10982494-674736@t.delta.com>
To: MSULLIVANJR2@gmail.com



### Hello, Michael

#2394515130    |    SkyMiles® Member

# An Award Travel transaction has posted to your account.

Your SkyMiles account 2394515130 reflects 118,000 miles were used on September 16, 2022 for Award Travel.

If you did not authorize this transaction, please contact us immediately at 1-800-323-2323 for assistance. If you are currently outside of the United States, please contact the local reservations office where you are located.

This email is a transaction notice only. You will receive a separate email detailing your Award Travel reservation.

As always, we thank you for your loyalty.