UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 2 8 2025

KEVIN P. WEIMER, Clerk
By: [signature] Deputy Clerk
```

MICHAEL E. SULLIVAN, JR.,

　Plaintiff,

　　v.

W. MICHAEL MALOOF, JR.,
d/b/a THE MALOOF LAW FIRM,

　Defendant.

Civil Action No.:

**1:25-cv-02006-JPB**

**JURY TRIAL DEMANDED**

### FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Michael E. Sullivan, Jr. ("Plaintiff" or "Sullivan") and brings this Complaint against Defendant W. Michael Maloof, Jr., d/b/a The Maloof Law Firm ("Defendant") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and related state law claims for non-payment of wages earned. In support thereof, Sullivan respectfully shows the following:

### PRELIMINARY STATEMENT

Plaintiff brings this action against Defendant W. Michael Maloof, Jr., his former attorney and employer, to recover wages wrongfully withheld in violation of federal and state law. Defendant leveraged confidential knowledge from a prior attorney-client relationship and Plaintiff's restrictive bond conditions to secure Plaintiff's valuable services from March 2022 through April 2024 without providing any compensation. Despite promising payment and repeatedly acknowledging the value of Plaintiff's work, Defendant refused to pay. When confronted, Defendant admitted in writing he was "guilty of

taking advantage of you" and was "just giving you stuff to add value to my cases for free." When Plaintiff sought his earned wages, Defendant engaged in a pattern of bad-faith tactics, including attempting to condition settlement on Plaintiff waiving his right to file disciplinary complaints, and later admitted he "did not follow the law." This action seeks to recover Plaintiff's earned wages, liquidated damages, and other appropriate relief for Defendant's willful violations of wage and hour laws.

## JURISDICTION AND VENUE

1.     This Court has original federal question jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

2.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same common nucleus of operative facts and form part of the same case or controversy as the federal claims.

3.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) because Defendant resides and operates his business in this district, a substantial part of the events giving rise to the claims occurred in this district, and Defendant's principal place of business is in Decatur, Georgia, which is within the Atlanta Division of this District.

## PARTIES

4.     Plaintiff Michael E. Sullivan, Jr. is a citizen of the United States and a resident of the State of Georgia.

5.     This Court has personal jurisdiction over Defendant because he resides and conducts business within this judicial district, and because the acts giving rise to this complaint occurred here.

6.     At all relevant times, Plaintiff was an "employee" of Defendant within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

7.     Defendant W. Michael Maloof, Jr. is an individual residing in Gwinnett County, Georgia.

8.     Defendant is an attorney licensed to practice law in the State of Georgia.

9.     Defendant conducts business as a sole proprietorship under the name The Maloof Law Firm.

10.     At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of the FLSA, 29 U.S.C. § 203(d).

11.     Defendant acted directly or indirectly in the interest of an employer in relation to Plaintiff.

12.     Defendant may be served with process at his principal place of business located at 215 N McDonough Street, Decatur, Georgia, 30030.

## FLSA COVERAGE

### I.     Enterprise Coverage

13.     On information and belief, at all relevant times, Defendant was an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 203(s)(1).

14.     On information and belief, Defendant's annual gross volume of sales made or business done met or exceeded $500,000.00, exclusive of certain excise taxes.

15.     On March 6, 2024, in a recorded phone conversation, Defendant stated: "we brought in 100k in January, which was without any civil shit, you know, just... So that's up there, right? Like, that's really up there. That, for me, is double... That's two times a good month. A good month is 50k." (Exhibit 54).

16.     On July 24, 2023, in a recorded phone conversation, Defendant stated: "I put $50,000 away in a savings account, you know, to figure out what I want to do with it for the firm. I put, you know, there's another ... At the end of this month, if we have a decent week this week, we're going to have $200,000 in the operating account." (Exhibit 54).

17.     On October 22, 2023, in a recorded phone conversation, Defendant stated: "those two cases, let's see, one hundred and three eighty one twenty and three eighty. So it's brought in half a million dollars in extra revenue in the last. And that's all my savings and extra paid for my the majority of my wedding." (Exhibit 54).

4

18.    As one example of Defendant's business volume, Defendant handled a case that resulted in a $1.87 million settlement in or around June 2023. (Exhibit 1).

19.    This settlement generated approximately $374,000 in attorney fees for Defendant.

20.    On information and belief, at all relevant times, Defendant employed at least two individuals who regularly engaged in commerce or handled goods or materials that have been moved in commerce.

21.    On information and belief, Defendant employs an individual whom Defendant refers to as a "law partner."

22.    Defendant's business, The Maloof Law Firm, is registered as a sole proprietorship.

23.    In a sole proprietorship, a true partnership is legally impossible without registration as a separate legal entity.

24.    On information and belief, this individual does not possess any equity ownership interest in Defendant's sole proprietorship.

25.    On information and belief, this individual receives regular compensation from Defendant.

26.    On information and belief, this individual performs his duties under Defendant's direction and control.

27.    As a matter of economic reality, the individual referred to as a "law partner" is an employee under the FLSA.

28.    This individual, together with Plaintiff, satisfies the FLSA's requirement of having at least two employees for enterprise coverage from the outset of Plaintiff's employment.

29.    On information and belief, from approximately August 2022 through August 2024, Defendant employed at least one other employee in addition to Plaintiff and the individual referred to as a "law partner."

30.    On information and belief, at certain times during this period, Defendant employed two other employees in addition to Plaintiff and the individual referred to as a "law partner."

31.    The group of individuals satisfying the two-employee minimum at all relevant times included Plaintiff and these other employees.

32.    The work of these employees included processing client payments through interstate credit card transactions.

33.    The work of these employees included communicating with out-of-state clients, courts, and counsel via telephone and email.

34.    The work of these employees included utilizing office equipment, supplies, and software that were moved in or produced for interstate commerce.

35. These additional employees regularly engaged in interstate commerce and/or handled goods or materials that have moved in interstate commerce.

## II.    Individual Coverage

36. Alternatively, at all relevant times, Plaintiff was individually engaged in commerce or in the production of goods for commerce. 29 U.S.C. §§ 206–207.

37. Plaintiff's engagement in interstate commerce was regular and recurrent. On a weekly basis, his work activities for Defendant involved the direct use of the instrumentalities of interstate commerce, including but not limited to the following:

38. As part of his job duties, Plaintiff utilized Westlaw, a subscription-based legal research platform operating across state lines.

39. As part of his job duties, Plaintiff utilized cloud storage platforms, including Dropbox and Google Drive, for file sharing and case management.

40. As part of his job duties, Plaintiff was assigned tasks in MyCase, a cloud-based practice management software operating across state lines.

41. As part of his job duties, Plaintiff used the Odyssey e-filing system for Georgia courts, an electronic filing platform that relies on interstate networks.

42. As part of his job duties, Plaintiff engaged in email communications that crossed state lines with clients, opposing counsel, and courts.

43. As part of his job duties, Plaintiff engaged in telephone communications that crossed state lines with clients, opposing counsel, and courts.

44. As part of his job duties, Plaintiff communicated with out-of-state clients and entities.

45. As part of his job duties, Plaintiff conducted financial transactions through interstate banking and payment systems.

46. These transactions included procuring and processing airline tickets via interstate banking systems.

47. These transactions included processing client payments through electronic payment systems, including credit card transactions, operating across state lines.

48. These transactions included creating, sending, and tracking electronic invoices through accounting software that transmits data across interstate servers.

49. These transactions included authorizing and processing payments to legal service vendors.

8

50.    As part of his job duties, Plaintiff handled and processed information through interstate commerce channels.

51.    This work included subpoenaing phone records from interstate telecommunication carriers.

52.    This work included using email services that transmit data across state lines through interstate servers and networks.

53.    This work included using telephone services that operate on national networks utilizing interstate infrastructure.

54.    Plaintiff's regular and recurrent engagement in these activities was an integral and indispensable part of his job duties, thereby establishing individual coverage under the FLSA.

## STATEMENT OF FACTS

55.    The following Statement of Facts describes Defendant's failure to pay wages and his subsequent, independent wrongful acts committed during pre-suit dispute resolution. Pursuant to Federal Rule of Evidence 408(b), these communications are not offered to prove the validity or amount of the underlying wage dispute. Instead, they are included for permissible, alternative purposes as they constitute the operative facts of Defendant's unlawful retaliation, establish his willful state of mind for FLSA purposes, demonstrate bad faith supporting claims for litigation expenses, and form the factual basis for separate state law torts.

9

## III.  Initial Attorney-Client Relationship and Defendant's Unique Knowledge

56.    In 2014, Defendant W. Michael Maloof, Jr. ("Maloof") established an attorney-client relationship with Plaintiff Michael E. Sullivan, Jr. ("Sullivan") regarding a criminal matter.

57.    Through this relationship, Defendant gained access to Plaintiff's confidential personal and financial information.

58.    On October 15, 2015, Defendant wrote in his case notes regarding Plaintiff's matter: "This could be a big money case."

59.    Through the representation, Defendant became aware of Plaintiff's educational qualifications.

60.    On November 2, 2015, Defendant wrote in his case notes that Plaintiff "did undergraduate work at Emory University where he has two undergraduate degrees in economics."

61.    On November 2, 2015, Defendant also wrote in his case notes that Plaintiff "has two Masters degrees from Georgia State University."

62.    Through the representation, Defendant became aware of Plaintiff's prior earning capacity.

63.    On November 2, 2015, Defendant wrote in his case notes: "At the time of his arrest he was making about $120,000 a year plus bonuses."

10

64.    Through the representation, Defendant became aware of Plaintiff's work ethic.

65.    On November 2, 2015, Defendant wrote in his case notes that Plaintiff "was working an average of about 100 hours a week prior to the events complained of in this case."

66.    On September 30, 2016, the formal attorney-client relationship between Defendant and Plaintiff terminated.

67.    Defendant retained the confidential information he had gained during the representation, including his knowledge of Plaintiff's qualifications and financial background.

68.    Defendant also possessed the unique, confidential knowledge that from approximately late 2015 through early 2022, Plaintiff had been unable to secure employment due to the nature of the pending criminal charges.

69.    As an attorney practicing in the same legal community, Defendant was also aware that during this period of unemployment, Plaintiff had retained and was paying for high-priced legal counsel.

70.    When Defendant re-initiated contact in January 2022, he observed that despite the dual financial pressures of protracted unemployment and significant legal fees, Plaintiff was not destitute.

71.    On information and belief, Defendant leveraged this unique combination of confidential knowledge—Plaintiff's high earning potential from

11

the past and his apparent financial solvency in the present—to form a calculated assumption that Plaintiff possessed sufficient personal wealth that he would not be dependent on a paycheck for his livelihood.

72.    On information and belief, this assumption formed the basis of Defendant's subsequent actions, as Defendant believed he could secure Plaintiff's valuable services without providing compensation, knowing Plaintiff would not be forced by financial desperation to demand it.

73.    Defendant later admitted to making this precise assumption as the justification for his non-payment, stating in an email: "I assumed Mike has plenty of money and he likes doing this stuff so I don't need to pay him. It is like a hobby and he is a rich white guy." (Exhibit 2).

## IV.    Employment Relationship Formation (2022)

74.    Prior to January 2022, Plaintiff was subject to restrictive bond conditions, which confined him to house arrest and required him to obtain prior court approval for any departures from his home.

75.    Defendant knew Plaintiff was subject to these bond conditions.

76.    On January 20, 2022, Defendant texted Plaintiff, "I had an idea that could maybe get you out of this solitary confinement." (Exhibit 3).

77.    In response, Plaintiff jokingly texted a suggestion of an "unpaid internship at my fav place in Decatur? ;)" (Exhibit 3). This suggestion was a sarcastic reference to the fact that his restrictive bond conditions already

permitted him to leave his home for meetings with his legal counsel, and Defendant was his former attorney.

78.    Defendant rejected the suggestion of an "unpaid internship." Instead, on January 20, 2022, Defendant texted Plaintiff that the proposed work arrangement would be "Paid but underpaid." (Exhibit 3).

79.    Plaintiff informed his legal counsel of the employment offer, and his counsel subsequently requested that Defendant provide a formal offer letter for the purpose of supporting a motion to modify Plaintiff's bond conditions.

80.    At Defendant's request, Plaintiff prepared a draft of this letter.

81.    In the draft letter, Plaintiff included a placeholder annual salary of $14,500. This figure was not a negotiated salary but a good-faith calculation based on the federal minimum wage ($7.25 per hour multiplied by 2,000 annual hours), inserted solely to provide a necessary baseline for the bond motion. (Exhibit 4).

82.    On February 4, 2022, Plaintiff emailed the draft letter to Defendant. In the transmittal email, Plaintiff explicitly communicated his uneasiness with drafting his own offer and put Defendant on notice that its terms were merely assumptions requiring Defendant's final input. Plaintiff wrote: "I think it is what he [Plaintiff's counsel] is looking for, but also was not a party to that discussion … I made numerous assumptions that are explicitly

your call to make. Candidly, I feel as though I'm overstepping here … I'm happy to assist with amending as you see fit, e.g. if you are driving and want to dictate amendments, that works for me." (Exhibit 4).

83.   Plaintiff reasonably expected this placeholder salary and other assumptions would be finalized after a good-faith discussion with Defendant to determine the actual "underpaid" compensation. Defendant never initiated this discussion.

84.   On February 15, 2022, Defendant emailed Plaintiff with the instruction to "Keep track of any hours you do some work." (Exhibit 5).

85.   On February 18, 2022, Plaintiff's counsel filed a Motion to Modify Bond Conditions in Plaintiff's criminal case, stating, "Mr. Sullivan has obtained an offer of employment from a local law firm."

86.   The Motion attached the draft letter prepared by Plaintiff as evidence of the employment offer.

87.   On February 22, 2022, the Court held a hearing on the Motion to Modify Bond Conditions.

88.   Defendant appeared virtually at this hearing.

89.   During the hearing, Plaintiff's counsel stated to the Court, "And that's why Mr. Maloof is here. Mr. Maloof also provided a letter in writing stating that he would be Mr. Sullivan's employer."

90. Plaintiff's counsel further represented that Defendant "is aware of this case and his bond conditions and he said Mr. Sullivan would be coming to work in his office during the week."

91. Defendant, having previously served as Plaintiff's counsel of record in the same matter, was uniquely aware of the case history and the significance of these representations to the Court.

92. Defendant was present for these representations and did not object to or correct them.

93. Following these representations, the Court entered an Order Modifying Bond Conditions, permitting Plaintiff to leave his home for the purpose of working at Defendant's law firm.

94. More than a year later, Defendant made statements about the formation of the employment relationship that contradicted his initial "Paid but underpaid" promise.

95. On November 27, 2023, Defendant stated in an email, "I thought this was an unpaid internship." (Exhibit 6).

96. On June 10, 2024, Defendant stated in an email, "I offered a paid internship and you said you wouldn't take money." (Exhibit 7).

97. On August 15, 2023, in a recorded phone conversation, Defendant stated: "I have hired you, you know, as a law clerk, you know, unpaid law clerk." (Exhibit 54).

98.    On that same date, Defendant also stated in an email, "I offered payment of 10 dollars an hour at the outset." (Exhibit 7).

## V.    Initial Employment Period (March – August 2022)

99.    Plaintiff commenced employment at The Maloof Law Firm on or about March 9, 2022.

100.    On Plaintiff's first day of work, Defendant informed Plaintiff via email that his legal assistant was unexpectedly unavailable, stating, "My legal assistant is out with some kind of medical issue they are trying to figure out. It is a little scary." (Exhibit 8).

101.    The legal assistant resigned after that day, leaving the position vacant.

102.    Over two years later, on June 10, 2024, Defendant claimed in an email that he had known his prior legal assistant was leaving as early as January 2022. (Exhibit 7).

103.    Defendant made this claim only after Plaintiff had demanded his unpaid wages.

104.    On March 10, 2022, Plaintiff created a professional email address, msullivanjrlaw@gmail.com, and the email signature for this address identified Plaintiff as "Law Clerk | The Maloof Law Firm." (Exhibit 9).

105.    On that same day, Plaintiff requested access to the firm's Westlaw account for legal research.

106. Between approximately March 24, 2022, and April 1, 2022, Plaintiff's work on the Cooley v. Ashita, et al. case included conducting legal research, preparing exhibits for a court filing, and drafting portions of a response to a motion for summary judgment.

107. On April 1, 2022, Defendant's co-counsel, Andrew Lynch, emailed Plaintiff regarding his work on the Cooley case, stating, "You did good. Don't sweat the details. You were a real help." (Exhibit 10).

108. In or around June 2023, the Cooley case settled for $1.87 million. (Exhibit 1).

109. Upon information and belief, this settlement generated approximately $374,000 in attorney's fees for Defendant's law firm, based on a 40% contingency fee shared between two attorneys.

110. Plaintiff received no compensation from Defendant for his work on the Cooley case.

111. On May 18, 2022, after performing work for Defendant for approximately 70 days without receiving any wages, Plaintiff emailed Defendant information from the Robert Half 2022 Legal Salary Guide identifying market salary rates for legal support staff. (Exhibit 11).

112. On August 8, 2022, Defendant sent Plaintiff a letter stating, "Your actions here have been invaluable and are altruistic to me and my firm." (Exhibit 12).

113.  Defendant had not paid Plaintiff any wages at the time he described Plaintiff's actions as "invaluable."

114.  On August 18, 2023, in a recorded phone conversation, Defendant stated: "I got a pretty good law clerk for free." (Exhibit 54).

115.  Over two years later, on June 10, 2024, Defendant stated in an email that Plaintiff "missed a lot of days." (Exhibit 7).

116.  On August 14, 2022, after working for Defendant for 159 days without pay, Plaintiff emailed Defendant a notice of departure: "W be out of the office for an indeterminate period starting Monday. I need to focus on other stuff, thanks." (Exhibit 13).

117.  In response, Defendant sent Plaintiff a text message urging him not to leave.

118.  On August 16, 2022, less than 48 hours after receiving Plaintiff's notice of departure, Defendant hired Sofia Barnett to work for the firm. (Exhibit 14).

119.  Upon information and belief, Defendant hired Ms. Barnett as a paid employee at a starting salary of approximately $60,000 per year.

120.  Prior to Plaintiff's departure, a paralegal working in a nearby office had recommended her daughter, Sofia Barnett, to Defendant for the vacant position.

121. For approximately 5.2 months, while Plaintiff worked for Defendant without pay, Defendant did not hire Ms. Barnett or any other employee to fill the vacant position.

122. Throughout the initial 159-day period of his employment, from March 9, 2022, through August 14, 2022, Plaintiff received no compensation from Defendant.

## VI.   Defendant's False "Ghosting" Narrative and Immediate Retaliation

123. Years later, after Plaintiff demanded his earned wages, Defendant fabricated a narrative that Plaintiff had "vanished" or "ghosted" the firm immediately after giving his notice of departure on August 14, 2022.

124. On January 10, 2023, in a recorded phone conversation, Defendant stated: "I will lie. Um, that's a character defect." (Exhibit 54).

125. On April 24, 2024, Defendant emailed Plaintiff, stating, "You vanished a few times in there for a bit..." (Exhibit 2).

126. On June 10, 2024, Defendant emailed Plaintiff, stating, "The hire was made when you ghosted the firm." (Exhibit 7).

127. This post-hoc narrative, advanced only after Plaintiff demanded his earned wages, is contradicted by Defendant's own contemporaneous communications and actions.

128.  In stark contrast to Defendant's claims, Plaintiff continued to communicate with Defendant and provide services and financial assistance to Defendant and his firm immediately following his departure.

129.  On August 22, 2022, eight days after Plaintiff ceased working due to non-payment, Defendant requested that Plaintiff use his personal Delta SkyMiles to book first-class flights for Defendant and his fiancée. (Exhibit 15).

130.  On September 16, 2022, Plaintiff fulfilled this request, expending 118,000 of his personal miles for Defendant's benefit. (Exhibit 16).

131.  Defendant made this request despite possessing a sufficient SkyMiles balance (53,337) of his own at the time, as evidenced by a separate flight confirmation showing his account balance (SkyMiles # 9349039553). (Exhibit 17).

132.  On August 18, 2022, Plaintiff informed Defendant via email that he had personally paid a firm expense, a regular occurrence, "I was able to negotiate this down to $40.28 from $123.33 and sent a check." (Exhibit 18).

133.  Defendant replied, "Thank you Mike. Give me a call tomorrow. I miss having you around." (Exhibit 19).

134.  On August 22, 2022, Plaintiff sought to review the response to a third-party subpoena response he drafted and served, inquiring, "May I drop in and look at the response? I'm curious if business records contradict the victim's testimony." (Exhibit 20).

135. Defendant replied via text, "sure but not today," and never subsequently provided Plaintiff with access to the requested records, was unable to produce them in advance of Ford's trial, requiring Plaintiff to subpoena the records again. (Exhibits 20, 21, 22).

136. Defendant's refusal to facilitate Plaintiff's ongoing work effectively terminated the arrangement that served as the sole basis for Plaintiff's release from house arrest.

137. By creating this impasse, Defendant's retaliation for Plaintiff quitting over non-payment was to revoke the primary, non-monetary benefit of the employment relationship: Plaintiff's court-sanctioned liberty.

138. Despite being cut off from his work, Plaintiff continued to be available, corresponding with a paralegal in the Henry County District Attorney's Office regarding the Ford case as late as September 12, 2022. (Exhibit 22).

## VII. Continued Work and Case Developments (2023)

139. In early 2023, the State of Georgia offered Plaintiff a plea deal in his criminal matter that would have resulted in a felony conviction.

140. Plaintiff immediately rejected the offer.

141. On March 7, 2023, Plaintiff emailed his attorneys to confirm his rejection, stating: "I have received the State's offer to plea bargain, thoroughly

considered it, and desire to promptly inform the State of my decision and proceed to trial." (Exhibit 23).

142. That same evening, Plaintiff received a telephone call from Defendant regarding the State's plea offer.

143. At the time of this call, Defendant had not served as Plaintiff's attorney since 2016.

144. This call occurred seven months after Plaintiff had informed Defendant via an August 17, 2022 email that he would never accept such a plea deal, "even if Alford, 1-year probation, and time served." (Exhibit 24).

145. The State's plea offer was remarkably similar to the hypothetical terms Plaintiff had expressly rejected, as it included both probation and time served.

146. Defendant initiated the March 7, 2023 call at the request of Plaintiff's counsel to discuss the plea offer.

147. Despite his knowledge of Plaintiff's unequivocal position, Defendant advised Plaintiff to accept the plea.

148. Defendant later admitted in a June 10, 2024 email that at the time he gave this advice, he "did not review the discovery" and was only "told bits and pieces." (Exhibit 7).

149.   Plaintiff's trial was specially set for six days later, on March 13, 2023. Plaintiff appeared in court ready for voir dire, but instead the State of Georgia filed an Order for Nolle Prosequi, dismissing all charges against him.

150.   The State's order cited "severe evidentiary issues," the "loss of one of the victim's recorded statements," and insufficient evidence as the basis for the dismissal.

151.   Upon learning of the dismissal, Defendant sent Plaintiff a text message on March 13, 2023, stating, "Really you were right." (Exhibit 25).

152.   In a subsequent text message that day, Defendant stated, "Unbelievable I guess I was wrong on taking the deal." (Exhibit 25).

153.   In his June 10, 2024 email, Defendant later claimed that Plaintiff told him afterward that "You told me given what I knew at the time it was the right recommendation after it was over." (Exhibit 7).

154.   This claim is directly contradicted by Defendant's own contemporaneous text messages from March 13, 2023.

155.   On June 20, 2023, months after Plaintiff had formally departed, Defendant assigned Plaintiff new work investigating a new premises liability case, stating: "Mike you are the guru at investigating all data. I want you to investigate the actual security measures used by the apartment complex." (Exhibit 26).

156.   This new case was a partnership with attorney Troy Hendrick. On July 19, 2023, Mr. Hendrick, having observed Plaintiff's work, sent an email to both Defendant and Plaintiff stating: "I'm unaware of the pay structure between Mike S and MMJ. But I suggest that Mike S charge the case on an hourly basis plus expenses, and invoice HandH Law Firm." (Exhibit 27).

157.   Following Mr. Hendrick's suggestion, Defendant instructed Plaintiff not to report his hours and reiterated his appreciation for Plaintiff's uncompensated work in a July 27, 2023 email: "I love having a brilliant law clerk that works for nachos and refuses to accept monetary payment." (Exhibit 28).

158.   On August 18, 2023, in a recorded phone conversation, stated "I got, I got a pretty good law clerk for free." (Exhibit 54).

159.   On information and belief, on March 13, 2025, Defendant subsequently filed a lawsuit in this potentially lucrative premises liability matter for which Plaintiff had performed the initial, uncompensated investigation.

160.   On November 16, 2023, Defendant emailed Plaintiff proposing an alternative to direct payment: "I would propose a hefty technology and legal drafting fee for the proceeds to come from any settlement." (Exhibit 29).

161. On November 19, 2023, Plaintiff emailed Defendant expressing his frustration regarding his uncompensated work on the Banda/Fuster case. (Exhibit 30).

162. On December 5, 2023, Plaintiff emailed Defendant stating: "I would like you to surrender your bar license so you cannot do this to anyone ever again." (Exhibit 31).

163. On December 6, 2023, Defendant made a settlement offer to Plaintiff via email.

164. The offer was explicitly conditioned on Plaintiff forfeiting his right to file a disciplinary grievance with the State Bar of Georgia.

165. Defendant wrote that the settlement release would "prevent all future claims and any grievances filed with the bar." (Exhibit 32).

166. On December 8, 2023, in an attempt to obscure his FLSA obligations, Defendant sent another email to Plaintiff, reframing the payment not as wages but as a "refund" and payment for "independent contractor" work: "a refund for 15K may be in order... and then I think [a sum certain] for work performed on Fuster and Banda as an independent contractor." (Exhibit 33).

167. On December 8, 2023, in a recorded phone conversation, Defendant stated: "Okay, but if I wrote you a refund, is that you pay taxes on a refund? A refund. You paid me, remember, you paid me $15,000 years ago on your case ... Because that way, you know, that was not, that was like buying a

25

service, right? You've gotten, you've refunded your service, right? ... and then I get to write off the $15,000 and then I get to pay, it's like, oh, I had to refund money. So, it's completely deductible and you get $15,000 back that you paid me that you'd already paid taxes on, right? And so, it's a refund to you and then you don't have to pay back." (Exhibit 54).

168. On that same day, Plaintiff notified Defendant via email that conditioning a settlement on preventing a bar grievance violated Georgia Rule of Professional Conduct 9.2. (Exhibit 34).

169. Also on December 8, 2023, Defendant emailed Plaintiff a promise regarding future work, stating: "Moving forward we can just work out an hourly or flat rate for projects." (Exhibit 33).

170. On December 15, 2023, Defendant sent an email to Plaintiff stating: "This is where I am guilty of taking advantage of you. I was just giving you stuff to add value to my cases for free and not billing the client for it." (Exhibit 35).

171. On October 22, 2023, in a recorded phone conversation, Defendant stated: "I don't go to other people and ask them to work for [expletive] free, except for you, for some [expletive] up reason. That's wrong." (Exhibit 54).

172. On December 18, 2023, three days after admitting he was "guilty of taking advantage," Defendant emailed Plaintiff again, stating: "I also want you to know I didn't mean to take advantage of you." (Exhibit 36).

173. On April 24, 2024, Defendant sent an email to Plaintiff placing a value on Plaintiff's work on the Sutton case: "I figured [a specific sum] more would be owed for the additional work you did this year" [for Sutton]. (Exhibit 2).

## VIII. Sutton Case Work and FLSA Claims (2024)

174. On February 26, 2024, Defendant requested Plaintiff's assistance with the Sutton case via text message, stating: "Let me get Liban on it just to teach him but pay you as well." (Exhibit 37).

175. Between February 26, 2024, and April 4, 2024, Plaintiff performed approximately 50 documented hours of work on the State v. Sutton case.

176. This work included analyzing call detail records (CDRs) and preparing a report.

177. At the time Plaintiff began this work, Defendant had represented Mr. Sutton for 1,303 days.

178. Plaintiff drafted and served the subpoenas for the evidentiary records just 25 days before the scheduled trial.

179. On February 28, 2024, Plaintiff filed Requests to Charge in the Sutton case. (Exhibit 38).

180. On the same day, Plaintiff served subpoenas for phone records via facsimile from Defendant's office. The notice of this service was subsequently filed with the court on March 21, 2024. (Exhibit 39).

181.    Also on February 28, 2024, Defendant offered Plaintiff a payment via text message for an unrelated matter for which no work had been performed. (Exhibit 40).

182.    Plaintiff declined this payment for the unrelated matter.

183.    In a June 10, 2024 email, Defendant characterized this specific refusal as a general refusal of all payment, stating: "I have tried to write you checks for work performed since. You have refused payment." (Exhibit 7).

184.    On March 21, 2024, Plaintiff filed a "Notice of Intent to Introduce Business Records" in the Sutton case. (Exhibit 41).

185.    On April 4, 2024, Plaintiff emailed Defendant a 26-page report detailing his analysis of the CDRs and outlining exculpatory findings. (Exhibit 42).

186.    Plaintiff scheduled a meeting to debrief Defendant on the report's findings, but Defendant departed from the meeting early, and the report was never discussed.

187.    After receiving no payment or discussion of payment, Plaintiff submitted an invoice to Defendant on April 30, 2024 for his approximately 50 hours of work on the Sutton case. (Exhibit 43).

188.    The invoice left the hourly rate at $0.00, thereby inviting Defendant to propose a reasonable rate and fulfill his December 8, 2023 promise to "work out an hourly or flatrate for projects." (Exhibits 33, 43).

28

189. Defendant ignored the invoice and did not respond.

190. Defendant's non-payment for Plaintiff's work on the Sutton case contrasted with his handling of other case expenses, such as a client-paid psychosexual evaluation costing approximately $3,000 to $4,000.

191. Defendant had informed Plaintiff that the request for the cell phone record analysis came directly from the client, Mr. Sutton.

192. Defendant never billed Mr. Sutton for Plaintiff's work.

193. Plaintiff suggested to Defendant that he bill Mr. Sutton for the work.

194. Defendant ignored this suggestion.

195. Plaintiff subsequently contacted Mr. Sutton directly to ensure the client was aware of the exculpatory findings, as Defendant had failed to review the report.

196. Mr. Sutton confirmed to Plaintiff that Defendant had never mentioned billing him for the analysis work.

197. Mr. Sutton expressed his appreciation for Plaintiff's work and offered to pay Plaintiff directly.

198. Plaintiff declined Mr. Sutton's offer, stating that his business relationship was with Defendant, not the client.

IX.    **FLSA Claims and Settlement Attempts (April – October 2024)**

199.   On April 15, 2024, having received no payment for his work on the Sutton case, Plaintiff engaged in protected activity by emailing Defendant. (Exhibit 44).

200.   In the email, Plaintiff stated the unpaid work "underscores the need for a clear understanding... and compensation" and again proposed "binding arbitration to settle the unpaid wages issue." (Exhibit 44).

201.   On April 22, 2024, Defendant proposed a structurally coercive payment plan to resolve the dispute via email, designed to disincentivize Plaintiff from filing a bar complaint by spreading payments over a long period. The proposed structure was detailed as follows: "I was thinking [a sum certain] [with 37.5% paid] within 30 days, another [37.5% paid] by the end of September and then [the final 25%] next year in the first quarter." (Exhibit 45).

202.   The plan proposed spreading payments over a 12- to 15-month period.

203.   On April 24, 2024, Defendant sent an email to Plaintiff, admitting: "I did not follow the law and had no idea I was breaking it or that you felt the way you did until after you brought it to my attention." (Exhibit 2).

204.   In the same email, Defendant provided a reason for his non-payment: "I assumed Mike has plenty of money and he likes doing this stuff so I don't need to pay him. It is like a hobby and he is a rich white guy." (Exhibit 2).

205. Defendant also claimed a lump-sum payment "a number much larger all at once could bankrupt me because insurance doesn't cover labor disputes just malpractice." (Exhibit 2).

206. This claim was made approximately ten months after Defendant's law firm received approximately $374,000 in fees from the Cooley settlement.

207. On April 30, 2024, Plaintiff again engaged in protected activity by emailing Defendant an invoice for his Sutton work and proposing they "agree upon a reasonable hourly rate." (Exhibit 43).

208. Defendant again took no action and ignored the invoice.

209. On May 2, 2024, the parties executed a Tolling Agreement to pause the statute of limitations on Plaintiff's claims during settlement negotiations. (Exhibit 46).

210. On May 13, 2024, Defendant sent an email to Plaintiff acknowledging the high quality of Plaintiff's skills, stating: "They don't hole a candle to what I thin you are able to do and it is starting to enter the market place." (Exhibit 47).

211. On May 31, 2024, Plaintiff sent Defendant a formal letter addressing his concerns and noting the upcoming expiration of the Tolling Agreement. (Exhibit 48).

212. On June 3, 2024, Defendant proposed resolving the dispute through an economically irrational "high-low" binding arbitration structure

and, on June 10, 2024, followed up with a formal offer: "I will make two different offers. We can do the binding arbitration with a high low or you can accept the [sum certain] in the three installments [37.5%] within 30 days of acceptance, [37.5%] by October 31, 2024, and [the final 25%] by the end of March of 2025." (Exhibit 7).

213.  The proposed "low" amount was below the savings Defendant realized by using Plaintiff's uncompensated labor.

214.  The proposed "high" amount was only marginally more than a separate cash settlement amount Defendant was offering.

215.  In December 2023, Defendant had proposed a "refund" of prior legal fees as a way to resolve the dispute. (Exhibit 33).

216.  After Plaintiff informed Defendant he intended to file a petition with the State Bar's fee arbitration program to recover this promised refund, Plaintiff filed the petition.

217.  On September 18, 2024, after Plaintiff filed the fee arbitration petition, Defendant emailed Plaintiff a retaliatory offer with a payment plan and an explicit threat of rescission: "The offer would be [a sum certain] in total. I could pay [33.3%] next week … [33.3%] by the end of October and [the final 33.3%] by the end of March 2025… If you go forward with the fee arbitration then the offer is rescinded. If you don't accept by the end of the month or go

forward with any fee dispute or other action about my character with the bar then it is off." (Exhibit 49).

218.  Plaintiff attempted to accept the monetary portion of the offer while reserving his right to proceed with the fee arbitration.

219.  In response, Defendant drafted a settlement agreement that included a clause prohibiting Plaintiff from presenting additional evidence at the fee arbitration hearing. (Exhibit 50).

220.  On October 1, 2024, Plaintiff warned Defendant via email that this proposed agreement structure violated Rule 9.2. (Exhibit 51).

221.  On October 7, 2024, Defendant sent a revised settlement proposal that continued to include terms restricting Plaintiff's ability to pursue his claims. (Exhibit 50).

222.  On October 8, 2024, after Plaintiff requested that Defendant obtain legal representation to assist with the negotiations, Defendant sent Plaintiff a series of emails. (Exhibit 52).

223.  In these emails, Defendant accused Plaintiff of "regretting the offer." (Exhibit 52).

## CAUSES OF ACTION

## COUNT I: VIOLATION OF THE FAIR LABOR STANDARDS ACT – MINIMUM WAGE (29 U.S.C. § 206)

224.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

225.    The FLSA requires employers to pay employees not less than the federal minimum wage for all hours worked. 29 U.S.C. § 206.

226.    The statute of limitations for an FLSA claim is two years, or three years if the violation was willful. 29 U.S.C. § 255(a).

227.    Pursuant to a Tolling Agreement executed by the parties, the limitations period was tolled for 30 days. (Exhibit 46).

228.    This claim is timely filed.

229.    At all relevant times, Plaintiff was Defendant's "employee" within the meaning of the FLSA.

230.    The economic realities of the relationship establish that Plaintiff was an employee of Defendant.

231.    Defendant controlled the means and manner of Plaintiff's work.

232.    Plaintiff's work was an integral part of Defendant's business.

233.    At all relevant times, Defendant was subject to the FLSA under either enterprise coverage or individual coverage.

234.    Plaintiff performed compensable work for Defendant from approximately March 9, 2022, through April 2024.

235.    Defendant failed to pay Plaintiff any wages for the hours he worked.

34

236. Defendant's failure to pay Plaintiff the required minimum wage was willful.

237. Defendant, an attorney, knew or showed reckless disregard for the matter of whether his conduct was prohibited by the FLSA.

238. Defendant's willfulness is established by his own admissions, including that he was "guilty of taking advantage of you," was "just giving you stuff to add value to my cases for free," and that he "did not follow the law." (Exhibits 2, 35).

239. Defendant acted willfully by leveraging confidential knowledge from a prior attorney-client relationship to assume Plaintiff did not need to be paid—an assumption Defendant later admitted in writing was the basis for his non-payment. (¶¶ 70-72; Exhibit 2).

240. Defendant's willfulness is further demonstrated by his pattern of making explicit promises of payment to induce Plaintiff to perform work and then breaking those promises. (Exhibits 3, 37).

241. Defendant's knowledge of his wrongdoing is evidenced by his providing shifting and contradictory narratives regarding the employment terms, alternately claiming it was an "unpaid internship" or that Plaintiff had "refused payment," directly contradicting his initial written offer. (Exhibits 3, 6, 7).

242. Defendant demonstrated further willfulness by instructing Plaintiff not to report his hours immediately after a third-party attorney suggested Plaintiff should be paid on an hourly basis. (Exhibit 27).

243. Further evidence of willfulness includes Defendant's attempt to disguise the owed compensation by proposing to structure it as a tax-advantaged "refund" of prior legal fees rather than as wages. (Exhibits 33, 54).

244. Finally, Defendant's reckless disregard for his legal obligations is established by his repeated attempts to condition settlement on Plaintiff waiving his right to file disciplinary complaints, a tactic he continued even after being notified it violated professional conduct rules. (Exhibits 32, 34, 50).

245. As a direct and proximate result of Defendant's willful violation of the FLSA, Plaintiff has suffered damages in the form of unpaid minimum wages.

## COUNT II: VIOLATION OF THE FAIR LABOR STANDARDS ACT – OVERTIME (29 U.S.C. § 207)

246. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

247. The FLSA requires employers to pay non-exempt employees compensation at a rate of one and one-half times their regular rate for all hours worked over 40 in a workweek. 29 U.S.C. § 207.

248. This claim is timely filed for the reasons stated in paragraphs 225-227.

249. At all relevant times, Plaintiff was a non-exempt employee under the FLSA.

250. Plaintiff's duties included non-exempt administrative tasks.

251. The Employment Offer Letter accepted by Defendant set Plaintiff's salary at $14,500 annually. (Exhibit 4).

252. The $14,500 salary was below the 2022 minimum salary threshold of $35,568 required for an employee to be classified as exempt.

253. Because Plaintiff was not paid on a salary basis meeting the FLSA's requirements, he could not qualify for an "exempt" status.

254. Upon information and belief, Plaintiff worked more than 40 hours in one or more workweeks during his employment, including but not limited to workweeks involving intensive efforts on the Cooley v. Ashita case (¶¶ 105-106) and the multi-week, time-sensitive analysis of call detail records in the State v. Sutton case (¶¶ 174-175, 184).

255. Defendant failed to pay Plaintiff any overtime premium for hours worked in excess of 40 in a workweek.

256. Defendant's failure to pay Plaintiff required overtime wages was willful.

37

257.   Defendant, an attorney, knew or showed reckless disregard for the matter of whether his failure to pay overtime was prohibited by the FLSA.

258.   Defendant knew that Plaintiff worked substantial hours.

259.   Defendant knew or recklessly disregarded that Plaintiff was a non-exempt employee, as the salary specified in the Offer Letter he accepted was facially insufficient to meet the FLSA's salary basis test for exemption. (Exhibit 4).

260.   Defendant's willfulness is further established by the facts alleged in paragraphs 237 through 243 of this Complaint, which are incorporated herein by reference.

261.   As a direct and proximate result of Defendant's willful violation of the FLSA, Plaintiff has suffered damages in the form of unpaid overtime wages.

## COUNT III: VIOLATION OF THE FAIR LABOR STANDARDS ACT – RETALIATION (29 U.S.C. § 215(a)(3))

262.   Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

263.   The FLSA prohibits employers from discharging or in any other manner discriminating against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. 29 U.S.C. § 215(a)(3).

264. This claim is timely filed for the reasons stated in paragraphs 225-227.

265. Plaintiff engaged in protected activity under the FLSA by complaining about Defendant's failure to pay him lawful wages.

266. Plaintiff's protected activities include, but are not a limited to, the following:

267. On May 18, 2022, Plaintiff emailed Defendant legal salary guide information, constituting an informal complaint for market-rate wages. (Exhibit 11).

268. On August 14, 2022, Plaintiff ceased working for Defendant as a protest against the non-payment of his wages. (Exhibit 13).

269. On December 7, 2023, Plaintiff emailed Defendant formally proposing binding arbitration to resolve the dispute over nonpayment of his wages.

270. On April 15, 2024, Plaintiff again emailed Defendant proposing binding arbitration, expressly referencing his unpaid work on the Sutton case and the need for compensation. (Exhibit 44).

271. On April 30, 2024, Plaintiff submitted an invoice to Defendant for work performed on the Sutton case and proposed they agree on a reasonable hourly rate. (Exhibit 43).

272. In response to and because of Plaintiff's protected activities, Defendant took adverse employment actions against Plaintiff.

273. Defendant's adverse actions were such that they would dissuade a reasonable worker from making or supporting a charge of discrimination.

274. Defendant's adverse actions include, but are not limited to, the following:

275. After sponsoring an employment relationship that served as the sole basis for Plaintiff's court-ordered release from house arrest, Defendant retaliated against Plaintiff for quitting in protest of non-payment by immediately obstructing his ability to continue work, thereby revoking the primary benefit of the employment and effectively returning Plaintiff to a state of confinement. (Exhibit 20).

276. Within 48 hours of Plaintiff quitting in protest of non-payment, Defendant hired a paid replacement, an action he had failed to take for the preceding five months while Plaintiff worked for free. (Exhibits 13, 14).

277. Defendant refused to pay Plaintiff for his significant work on the Sutton case after explicitly promising he would be paid. (Exhibit 37).

278. Long after the events in question, Defendant fabricated and advanced a false narrative that Plaintiff had "ghosted" the firm, a pretext designed to undermine Plaintiff's credibility and his wage claims. (Exhibits 2, 7).

279. In retaliation for Plaintiff's protected activities, Defendant leveraged his position of trust as Plaintiff's former attorney to pressure Plaintiff to accept a felony plea deal in his unrelated criminal case.

280. Defendant's action was retaliatory because a felony conviction would have severely undermined Plaintiff's credibility as a witness, destroyed his future earning capacity, and reasonably dissuaded or chilled him from pursuing his wage claims against Defendant. (See supra ¶¶ 146-153).

281. Defendant repeatedly conditioned settlement offers on Plaintiff's agreement to waive his right to file disciplinary or fee dispute complaints with the State Bar of Georgia. (Exhibits 32, 50).

282. A causal connection exists between Plaintiff's protected activity and Defendant's adverse actions.

283. Causation is established by the close temporal proximity between Plaintiff's complaints and Defendant's adverse actions.

284. Causation is further established by Defendant's own statements explicitly linking settlement offers to the cessation of Plaintiff's protected activities. (Exhibit 49).

285. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered damages.

286. These damages include, but are not limited to, lost wages for the Sutton case.

287.  These damages also include the loss of personal liberty resulting from Defendant's obstruction of the court-sanctioned work arrangement that was the basis for Plaintiff's release from house arrest.

288.  Plaintiff also suffered significant emotional distress arising from Defendant's actions, including the stress of unwarranted confinement and the humiliation caused by Defendant's false narratives and coercive tactics.

## PLEADING IN THE ALTERNATIVE

289.  Plaintiff realleges the preceding paragraphs. Counts IV through IX are pleaded in the alternative to Plaintiff's FLSA claims in Counts I–III. To the extent Plaintiff is determined not to be an "employee" entitled to relief under the FLSA, he is entitled to relief under the following state law theories.

## COUNT IV: BREACH OF CONTRACT

290.  Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

291.  A valid and enforceable contract was formed between Plaintiff and Defendant for the initial employment period ("Initial Contract").

292.  On or about January 20, 2022, Defendant offered to employ Plaintiff. (Exhibit 3).

293.  Defendant's offer specified that the employment would be "Paid but underpaid." (Exhibit 3).

294.  Plaintiff accepted Defendant's offer of employment.

295. The terms of the Initial Contract were further memorialized in an offer letter dated February 4, 2022. (Exhibit 4).

296. The offer letter specified the role of "Legal Clerk" and an annual salary of $14,500. (Exhibit 4).

297. Defendant reviewed and accepted the terms set forth in the offer letter. (Exhibit 53).

298. Consideration for the Initial Contract consisted of Plaintiff's promise to perform services and Defendant's promise to provide compensation.

299. Plaintiff fully performed his obligations under the Initial Contract by rendering services to Defendant from March 2022 through August 2022.

300. Alternatively, a separate, valid, and enforceable contract was formed between Plaintiff and Defendant for work on the Sutton case ("Sutton Contract").

301. On February 26, 2024, Defendant promised to pay Plaintiff for work on the Sutton case, stating in a text message, "pay you as well." (Exhibit 37).

302. In reliance on Defendant's promise of payment, Plaintiff performed approximately 50 hours of work on the Sutton case.

303. Plaintiff fully performed his obligations under the Sutton Contract.

304. Defendant breached both the Initial Contract and the Sutton Contract.

305. Defendant breached the contracts by failing to pay Plaintiff any of the promised compensation for his services.

306. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages in the form of unpaid compensation.

## COUNT V: QUANTUM MERUIT

307. In the alternative to Count IV (Breach of Contract), and only if no enforceable express contract is found to govern Plaintiff's services, Plaintiff is entitled to recover the reasonable value of his services under the theory of quantum meruit as follows.

308. From March 2022 through April 2024, Plaintiff performed services for Defendant.

309. These services included, but were not limited to, legal research, drafting legal documents, case management, factual investigation, and data analysis.

310. These services were valuable.

311. The value of these services is evidenced by Plaintiff's advanced degrees and professional background.

312. The value of these services is further evidenced by Defendant's own characterizations of Plaintiff's work.

313. On August 8, 2022, Defendant described Plaintiff's actions as "invaluable." (Exhibit 12).

314. On June 20, 2023, Defendant described Plaintiff as "the guru at investigating all data." (Exhibit 26).

315. On July 27, 2023, Defendant described Plaintiff as a "brilliant law clerk." (Exhibit 28).

316. Defendant accepted Plaintiff's services.

317. Defendant received a substantial benefit from Plaintiff's services.

318. Defendant benefited by having Plaintiff fill a vacant legal assistant/clerk position for over five months without cost.

319. Defendant benefited from Plaintiff's work on cases that generated significant legal fees for his firm. (Exhibit 1).

320. Defendant benefited by avoiding the expense of hiring a paid employee to perform the work done by Plaintiff.

321. Plaintiff performed these services with the reasonable expectation of being compensated for their value.

322. Defendant knew or should have known that Plaintiff expected compensation for his professional services.

323. This knowledge is evidenced by Defendant's own promises to pay Plaintiff. (Exhibits 4, 37).

324. This knowledge is further evidenced by Plaintiff's inquiries and actions related to compensation. (Exhibits 11, 43, 44).

325. In equity and good conscience, Plaintiff is entitled to recover the reasonable value of the services rendered to Defendant.

326. As a direct result of Defendant's failure to pay, Plaintiff has been damaged in an amount equal to the reasonable value of his uncompensated services.

## COUNT VI: UNJUST ENRICHMENT

327. In the alternative to Count IV (Breach of Contract), and only if no enforceable express contract is found, Plaintiff asserts this claim for unjust enrichment.

328. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

329. Plaintiff conferred a substantial financial benefit upon Defendant by providing valuable professional services from March 2022 through April 2024 without receiving any compensation.

330. Defendant appreciated the benefit conferred by Plaintiff.

331. Defendant's appreciation of the benefit is evidenced by his assigning Plaintiff important work on firm cases.

332. Defendant's appreciation of the benefit is further evidenced by his express statements regarding the high quality and value of Plaintiff's work. (Exhibits 12, 26, 28).

333. Defendant accepted and retained this benefit.

334. It is inequitable for Defendant to retain this benefit without paying for its value.

335. The inequity of Defendant's retention of the benefit arises from his use of confidential knowledge of Plaintiff's finances and background to secure the services. (¶¶ 66-72).

336. The inequity of Defendant's retention of the benefit arises from his use of Plaintiff's vulnerability due to restrictive bond conditions to secure the services. (Exhibit 3).

337. The inequity of Defendant's retention of the benefit arises from Defendant's own promises to pay Plaintiff for his services. (Exhibits 4, 37).

338. The inequity of Defendant's retention of the benefit arises from Defendant's own admissions of wrongdoing.

339. On December 15, 2023, Defendant admitted in an email, "This is where I am guilty of taking advantage of you." (Exhibit 35).

340. On April 24, 2024, Defendant admitted in an email, "I did not follow the law." (Exhibit 2).

341. Defendant has been unjustly enriched at Plaintiff's expense.

342. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff has suffered damages in an amount equal to the value of the benefit conferred upon Defendant.

## COUNT VII: PROMISSORY ESTOPPEL

343. In the alternative to Count IV (Breach of Contract), and only if no enforceable express contract is found, Plaintiff asserts this claim for promissory estoppel.

344. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

345. Under O.C.G.A. § 13-3-44(a), a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

346. The statute of limitations for this claim is four years. O.C.G.A. § 9-3-26.

347. Pursuant to a Tolling Agreement between the parties, the limitations period was tolled for 30 days (Exhibit 46).

348. This claim is timely.

349. Defendant made a promise of payment to Plaintiff to induce Plaintiff to work for him.

350.   Specifically, on January 20, 2022, Defendant promised Plaintiff's employment would be "Paid but underpaid." (Exhibit 3).

351.   Defendant made another promise of payment to Plaintiff to induce Plaintiff to perform work on the Sutton case.

352.   Specifically, on February 26, 2024, Defendant promised to "pay you as well" for work on the Sutton case (Exhibit 37).

353.   Defendant knew or should have reasonably expected that Plaintiff would rely on these promises of payment.

354.   Plaintiff did, in fact, reasonably rely on Defendant's promises.

355.   In reliance on Defendant's initial promise of payment, Plaintiff accepted the employment position.

356.   In reliance on Defendant's employment offer, Plaintiff sought and obtained a modification of his bond conditions, which was predicated on his employment with Defendant.

357.   In reliance on Defendant's promises of payment, Plaintiff performed substantial legal and administrative work for Defendant from March 2022 through April 2024.

358.   In reliance on Defendant's promises, Plaintiff incurred personal, unreimbursed expenses for the benefit of Defendant's law firm.

359.   In reliance on Defendant's promises, Plaintiff forewent other opportunities for paid employment.

360.   Plaintiff's reliance on Defendant's promises was to his detriment.

361.   As a result of his reliance, Plaintiff suffered damages, including the value of his uncompensated labor, unreimbursed expenses, and lost wages from other opportunities.

362.   Injustice can be avoided only by enforcement of Defendant's promises.

363.   Enforcement is necessary due to the significant benefit Defendant received from Plaintiff's labor.

364.   Enforcement is necessary due to the significant detriment Plaintiff suffered in reliance on Defendant's promises.

365.   Enforcement is necessary given Defendant's own admissions that he was "guilty of taking advantage" of Plaintiff (Exhibit 35).

366.   Enforcement is necessary given Defendant's admission that he "did not follow the law" (Exhibit 2).

367.   As a direct and proximate result of his detrimental reliance on Defendant's promises, Plaintiff has suffered damages.

### COUNT VIII: BREACH OF FIDUCIARY DUTY

368.   In the alternative to Counts IV-VII, and only if no enforceable contract is found to govern Plaintiff's services, Plaintiff asserts this claim for breach of fiduciary duty.

369. Plaintiff restates and incorporates by reference all preceding paragraphs as if fully stated herein.

370. A fiduciary or confidential relationship exists where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith. O.C.G.A. § 23-2-58.

371. A fiduciary relationship existed between Plaintiff and Defendant arising from their prior attorney-client relationship (2015-2016).

372. During this prior relationship, Defendant gained access to Plaintiff's confidential personal, professional, and financial information.

373. This confidential information included Plaintiff's educational qualifications, professional skills, and earning history.

374. This confidential information included Defendant's unique knowledge of Plaintiff's financial circumstances, including his multi-year unemployment and his ability to sustain significant legal expenses during that time (¶¶ 67-69).

375. An attorney's fiduciary duties to a former client regarding confidential information survive the termination of the attorney-client relationship. See Georgia Rules of Professional Conduct 1.6, 1.9.

376. Defendant owed Plaintiff a continuing fiduciary duty of loyalty and utmost good faith with respect to the confidential information gained during the prior representation.

377. Defendant breached this fiduciary duty.

378. Defendant breached his duty by using confidential knowledge of Plaintiff's financial background to form a calculated belief that Plaintiff would not demand payment for his labor, an assumption Defendant later confirmed in writing. (¶¶ 70-72).

379. Defendant breached his duty by using confidential knowledge of Plaintiff's skills, work ethic, and qualifications to solicit and benefit from Plaintiff's high-value labor without compensation.

380. Defendant breached his duty by using knowledge of Plaintiff's restrictive bond conditions—knowledge gained in his capacity as a former and prospective legal counselor—to induce Plaintiff into an uncompensated employment relationship (Exhibit 3).

381. Defendant breached his duty by exploiting the residual trust and confidence from the prior attorney-client relationship to induce and maintain a subsequent, uncompensated employment relationship, thereby securing a financial benefit for himself at Plaintiff's direct financial detriment.

382. Defendant further breached his fiduciary duties by acting contrary to the interests of the person who had placed trust in him.

383. Specifically, after facilitating an employment relationship that was the basis for Plaintiff's release from house arrest, Defendant pressured Plaintiff to accept a felony plea deal.

384. A felony conviction would have destroyed Plaintiff's future earning capacity and negated the entire benefit of the court-approved employment that Defendant himself had sponsored.

385. Defendant applied this pressure despite admitting he had not reviewed the evidence in Plaintiff's criminal case (Exhibit 7).

386. Defendant's breaches were willful and demonstrated a profound lack of good faith and loyalty. This willfulness is established by the same pre-litigation pattern of conduct demonstrating his reckless disregard for his legal and ethical obligations as alleged in paragraphs 237 through 243.

387. As a direct and proximate result of Defendant's breaches of his fiduciary duties, Plaintiff has suffered damages.

388. These damages include the value of his unpaid labor, financial losses, and emotional distress.

389. Defendant's conduct showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, thereby entitling Plaintiff to punitive damages under O.C.G.A. § 51-12-5.1.

## COUNT IX: EXPENSES OF LITIGATION (O.C.G.A. § 13-6-11)

390. Plaintiff incorporates by reference all preceding paragraphs as if fully stated herein.

391. Pursuant to O.C.G.A. § 13-6-11, Plaintiff is entitled to recover the expenses of this litigation, including attorneys' fees, from Defendant.

392. This claim is timely.

393. Defendant Has Acted in Bad Faith and Caused Unnecessary Trouble: Plaintiff is entitled to recover litigation expenses pursuant to O.C.G.A. § 13-6-11 because Defendant has acted in bad faith, has been stubbornly litigious, and has caused Plaintiff unnecessary trouble and expense.

394. Defendant has acted in bad faith.

395. Defendant's bad faith is established by his conduct in the formation of the employment relationship, where he exploited confidential information from a prior attorney-client relationship to induce Plaintiff into performing uncompensated labor.

396. Defendant's bad faith is further established by his pattern of making and then breaking promises of payment.

397. Defendant's bad faith is also established by his fabricating false narratives after the dispute arose to undermine Plaintiff's claims.

398. Defendant has also been stubbornly litigious.

399.    Defendant's stubborn litigiousness is established by his refusal to resolve this matter despite his own written admissions regarding the employment relationship, the value of Plaintiff's work, and his own wrongdoing, leaving no genuine factual or legal dispute as to his underlying liability and thereby forcing this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael E. Sullivan, Jr. respectfully prays for judgment against Defendant W. Michael Maloof, Jr. granting the following relief:

(1)    All unpaid minimum wages due under the FLSA;

(2)    All unpaid overtime wages due under the FLSA;

(3)    Liquidated damages equal to the amount of unpaid minimum and overtime wages pursuant to 29 U.S.C. § 216(b);

(4)    Compensatory damages for FLSA retaliation, including but not limited to damages for emotional distress;

(5)    Damages for breach of contract, quantum meruit, unjust enrichment, promissory estoppel, and breach of fiduciary duty under state law;

(6)    Punitive damages for breach of fiduciary duty, if applicable under O.C.G.A. § 51-12-5.1;

(7)    Pre-judgment and post-judgment interest at the applicable legal rates;

(8)    Reasonable attorneys' fees and expenses of litigation pursuant to 29 U.S.C. § 216(b);

(9)    Expenses of litigation, including attorneys' fees where permitted, pursuant to O.C.G.A. § 13-6-11;

(10) Equitable relief as appropriate, including but not limited to an accounting of profits derived from Plaintiff's uncompensated labor, a constructive trust over such funds, and any necessary declaratory or injunctive relief; and

(11) Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

## EXHIBIT LIST

Exhibit 1: $1.87M Settlement (Jun. 21, 2023)

Exhibit 2: Maloof Email (Apr. 24, 2024)

Exhibit 3: Maloof SMS (Jan. 20, 2022)

Exhibit 4: Sullivan Email (Feb. 4, 2022)

Exhibit 5: Maloof Email (Feb. 15, 2022)

Exhibit 6: Maloof Email (Nov. 27, 2023)

Exhibit 7: Maloof Email (Jun. 10, 2024)

Exhibit 8: Maloof Email (Mar. 9, 2022)

Exhibit 9: Sullivan Email (Mar. 10, 2022)

Exhibit 10: Lynch Email (Apr. 1, 2022)

Exhibit 11: Sullivan Email (May 18, 2022)

Exhibit 12: Maloof Letter (Aug. 8, 2022)

Exhibit 13: Sullivan Email (Aug. 14, 2022)

Exhibit 14: MyCase Email (Aug. 16, 2022)

Exhibit 15: Maloof Email (Aug. 22, 2022)

Exhibit 16: Delta Email (Sep. 16, 2022)

Exhibit 17: Delta Email (Oct. 3, 2022)

Exhibit 18: Sullivan Email (Aug. 18, 2022)

Exhibit 19: Maloof Email (Aug. 18, 2022)

Exhibit 20: Maloof SMS (Aug. 22, 2022)

Exhibit 21: Sullivan Email (Jun. 6, 2023)

Exhibit 22: Matson Email (Sep. 12, 2022)

Exhibit 23: Sullivan Email (Mar. 7, 2023)

Exhibit 24: Sullivan Email (Aug. 17, 2022)

Exhibit 25: Maloof SMS (Mar. 13, 2023, 9:46 AM)

Exhibit 26: Maloof Email (Jun. 20, 2023)

Exhibit 27: Hendrick Email (Jul. 19, 2023)

Exhibit 28: Maloof Email (Jul. 27, 2023)

Exhibit 29: Maloof Email (Nov. 16, 2023)

Exhibit 30: Sullivan Email (Nov. 19, 2023)

Exhibit 31: Sullivan Email (Dec. 5, 2023)

Exhibit 32: Maloof Email (Dec. 6, 2023)

Exhibit 33: Maloof Email (Dec. 8, 2023)

Exhibit 34: Sullivan Email (Dec. 8, 2023)

Exhibit 35: Maloof Email (Dec. 15, 2023)

Exhibit 36: Maloof Email (Dec. 18, 2023)

Exhibit 37: Maloof SMS (Feb. 26, 2024, 4:59 PM)

Exhibit 38: Odyssey (Feb. 28, 2024)

Exhibit 39: Odyssey Email, Subpoena (Mar. 21, 2024)

Exhibit 40: Maloof SMS (Feb. 28, 2024, 7:39 AM)

Exhibit 41: Odyssey Email, Notice of Intent (Mar. 21, 2024)

Exhibit 42: Sullivan Email (Apr. 4, 2024)

Exhibit 43: Sullivan Email (Apr. 30, 2024)

Exhibit 44: Sullivan Email (Apr. 15, 2024)

Exhibit 45: Maloof Email (Apr. 22, 2024)

Exhibit 46: Tolling Agreement (May 2, 2024)

Exhibit 47: Maloof Email (May 13, 2024)

Exhibit 48: Sullivan Email & Letter (May 31, 2024)

Exhibit 49: Maloof Email (Sep. 18, 2024)

Exhibit 50: Proposed Settlement Agreement (Oct. 7, 2024)

Exhibit 51: Sullivan Email (Oct. 1, 2024)

Exhibit 52: Maloof Email (Oct. 8, 2024)

Exhibit 53: Maloof Email (Feb. 4, 2022)

Exhibit 54: Recorded Call Excerpts

Respectfully submitted this 28th day of August, 2025.

Michael E. Sullivan, Jr.,
Plaintiff *pro se*

3324 Peachtree Road NE, Unit 1405
Atlanta, GA 30326
(678) 372-3000
msullivanjr@gmail.com

## FONT AND POINT CERTIFICATION

The undersigned Plaintiff hereby certifies that the within and foregoing

**FIRST AMENDED COMPLAINT FOR DAMAGES** was prepared using

Century Schoolbook, 13-point font in accordance with LR 5.1(C).