# Exhibit 42

## Sullivan Email (Apr. 4, 2024)

 Gmail                                                                Michael Sullivan <msullivanjrlaw@gmail.com>

## Sutton CDR Analysis - Initial Draft Report
1 message

**Michael Sullivan** <msullivanjrlaw@gmail.com>                                    Thu, Apr 4, 2024 at 6:34 PM
To: Mike Maloof <malooflawfirm@gmail.com>

Hi Mike:

I hope this email finds you well. As promised, I have completed the initial draft of the report analyzing the Call Detail Records (CDRs) in the defense of Orpheus Sutton, Case No. 23-CR-1379.

Please find attached the .pdf document titled "SUTTON CDR Analysis-DRAFT.pdf" for your review.

The report includes a comprehensive analysis of the CDRs and text message metadata obtained through subpoenas, as well as a detailed examination of the communication patterns between Mr. Sutton and Ms. Eligon before and after the alleged incident. The findings presented in the report raise significant questions about the credibility of the prosecution's evidence and highlight several inconsistencies and discrepancies that support Mr. Sutton's defense.

Please take your time to review the report and provide any feedback, questions, or concerns you may have. I am available to discuss the findings in more detail and make any necessary revisions to ensure that the report effectively supports your defense strategy.

Additionally, I have compiled all the relevant supporting documents, such as subpoenas, business records, legal statutes, and discovery materials, in the Appendix section of the report.

Please let me know if you require any further information or assistance in relation to this report or any other aspects of Mr. Sutton's defense.

Best regards,

**Mike Sullivan**

 (678) 372-3000 | (678) 744-6028 | msullivanjr@gmail.com

_____

SUTTON CDR Analysis-DRAFT.pdf
576K

# disc🔏 hustlas

**Analyzing Call Detail Records
in the Defense of Orpheus Sutton,
Case No. 23-CR-1379**

## Prepared by

**Michael E. Sullivan, Jr.**

OG Disco Hustla

msullivanjr@gmail.com
(678) 372-3000

## Prepared for

**W. Michael Maloof, Jr., Esq.**

The Maloof Law Firm
215 North McDonough Street
Decatur, GA 30030-3319

malooflawfirm@gmail.com
(404) 803-5084

## Date (Revision)

April 3, 2024 (Initial Draft)

---

## I.    EXECUTIVE SUMMARY

This report presents a comprehensive analysis of call detail records (CDRs) and text message metadata in the defense of Orpheus Sutton, case number 23-CR-1379. The findings reveal significant discrepancies and inconsistencies in the prosecution's case, while providing crucial context regarding the relationship dynamics between Mr. Sutton and the alleged victim, Ms. Alicia Eligon.

Key findings include:

(1)    Escalating communication frequency and duration between Sutton and Eligon prior to the alleged incident, suggesting a growing connection.

(2)    No evidence of harassment in Sutton's post-incident communications, which were brief and spaced out attempts to check on Eligon's wellbeing.

(3)    Contradictions in Alicia Eligon's statements about her emotional state and ability to communicate, damaging her credibility.

# disc☻ hustlas

(4)   Absence of potentially exculpatory surveillance footage from the Knights Inn, raising questions about the thoroughness of the investigation.

(5)   Discrepancies in Detective Kelley's case notes and the absence of a recorded conversation with Eligon, undermining the detective's credibility.

(6)   Inconsistencies between Alicia and Joshua Eligon's accounts of what information was conveyed prior to Joshua's arrival at the hotel.

(7)   Strong evidence from CDRs that Sutton made genuine efforts to contact Detective Kelley, contradicting claims of evasiveness.

The evidence and arguments presented provide a solid foundation for Mr. Sutton's defense, demonstrating reasonable doubt about the allegations against him.

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................3
II.   METHODOLOGY ...............................................................................................4
      A.   Subpoena Process.......................................................................................4
           1.   Initial Subpoenas: July 1, 2020, to July 13, 2020......................................4
           2.   Supplemental Subpoenas: July 14, 2020, to July 31, 2020...........................4
           3.   Summary of Issued Subpoenas .........................................................5
      B.   Service of Subpoenas ..................................................................................6
           1.   Execution of Service ....................................................................6
           2.   Tracking and Documentation............................................................6
           3.   Response from Providers ................................................................6
      C.   Receipt of Records and Initial Review.............................................................7
           1.   Preliminary Analysis and Implications ..................................................7
           2.   Preparing to Introduce Business Records at Trial......................................7
           3.   CDRs as Business Records .............................................................8
           4.   Strategy for Three Remaining Subpoenas ..............................................9
III.  PREPARATION OF RECORDS .........................................................................10
      A.   Data Extraction.........................................................................................10
      B.   Standardization of Timestamps and Formats ..................................................10
      C.   Data Organization and Categorization ..........................................................10
      D.   Creation of Master Call and Text Logs..........................................................11
      E.   Data Validation and Error Checking..............................................................12
      F.   Preparation of Summary Charts and Graphs ..................................................12
IV.   ANALYSIS & FINDINGS....................................................................................12
      A.   Communication Patterns Before the Alleged Incident.......................................12
           1.   Initial Contact and Overview of Interaction .............................................12
      B.   Timeline Reconstruction .............................................................................14
      C.   Communication Patterns After the Alleged Incident .........................................15
      D.   Post-Alleged Incident Communication with Alicia Eligon ...................................16
           1.   Calls and Texts from AT&T CDRs .......................................................16

# disc🔴 hustlas

|   | 1. | No Evidence of Harassment in Post-Incident Calls | 17 |
| E. | | Sutton's Communication with Detective Kelley | 18 |
|   | 1. | Calls and Texts from AT&T CDRs | 18 |
|   | 2. | Orpheus Sutton's Attempts to Contact Detective Kelley are Genuine. | 19 |
| **V.** | | **ADDITIONAL FINDINGS** | **20** |
| A. | | Contradictory Statements Regarding Alicia Eligon's Emotional State | 20 |
|   | 1. | "Too Shaky to Even Talk" | 20 |
| B. | | Absence of Knights Inn Surveillance Footage | 21 |
| C. | | Discrepancies in Detective Kelley's Case Notes and Call Records | 21 |
| D. | | Inconsistencies in Alicia and Joshua Eligon's Accounts | 22 |
| E. | | Potential Implications and Consequences | 23 |
| **APPENDIX LINKS** | | | **25** |

## II.    INTRODUCTION

On the evening of July 12, 2020, amidst the global COVID-19 pandemic, Mr. Orpheus Sutton and Ms. Alicia Eligon met in person for the first time after a period of communicating solely through text messages and phone calls. Their encounter took a tragic turn when, following a shared meal and checking into a hotel, Ms. Eligon alleged that Mr. Sutton raped her around midnight, leading her to flee the room and seek help from her brother.

The loss of Mr. Sutton's mobile device and the associated direct message content poses a significant challenge in reconstructing the events leading up to and following the alleged incident. The absence of this potentially exculpatory evidence further emphasizes the importance of this investigation, which focuses on conducting a comprehensive examination of the relevant call detail records and text message metadata to gain insight into the dynamics of their relationship and the nature of their interactions. The report also highlights significant discrepancies and inconsistencies in the evidence that raise doubts about the credibility of the allegations against Mr. Sutton.

The analysis of the available communication records reveals several significant findings that provide context for understanding the relationship between Mr. Sutton and Ms. Eligon and the events surrounding the alleged incident. These key findings include:

**(1)    Escalating communication frequency and duration between Sutton and Eligon prior to the alleged incident.**

**(2)    Inconsistencies in Alicia and Joshua Eligon's accounts of the events.**

**(3)    Discrepancies between Detective Kelley's case notes and the call detail records.**

**(4)    Absence of potentially exculpatory surveillance footage from the Knights Inn.**

**(5)    Contradictory statements from Alicia Eligon regarding her emotional state and ability to communicate during the critical time frame.**

# disco hustlas

**(6)    Lack of evidence to support allegations of harassment or avoidance of law enforcement against Sutton.**

The analysis examines each of these areas in detail to shed light on the events surrounding the alleged incident. **The findings challenge the credibility of the prosecution's case and highlight the need for a thorough and impartial consideration of all available evidence, which may substantially impact the outcome of Mr. Sutton's trial.**

## III.    METHODOLOGY

### A.    *Subpoena Process*

1.    Initial Subpoenas: July 1, 2020, to July 13, 2020.

The initial subpoenas were drafted using the "Subpoena for the Production of Evidence" form provided by the Superior Court Clerks' Association of Georgia. The subpoenas were reviewed and signed by Attorney Maloof before being served.

The subpoenas targeted AT&T, Mr. Sutton's mobile carrier, and T-Mobile, Ms. Eligon's mobile carrier. The requested records included subscriber information, call detail records (CDRs), and text message metadata for the period from July 1, 2020, to July 12, 2020. The subpoenas were narrowly tailored to obtain the most relevant records while minimizing any unnecessary intrusion.

Documents: Issued.[1]

2.    Supplemental Subpoenas: July 14, 2020, to July 31, 2020.

Upon initial review of the records received from the first set of subpoenas, it became apparent that additional context was needed to fully understand the dynamics of the relationship between Mr. Sutton and Ms. Eligon. The decision was made to issue supplemental subpoenas covering the period from July 14, 2020, to July 31, 2020, to capture any relevant post-alleged incident communications.

---

[1]  Subpoena served to T-Mobile on March 7, 2024, for Alicia Eligon (470) 800-2360's mobile phone records from July 1 to July 13, 2020 (Appendix A): SUBP-TMO_Served-03-07-24_Eligon-07-01_to_07-13-20.pdf

Subpoena served to AT&T on March 7, 2024, for Orpheus Sutton (678) 447-4488's mobile phone records from July 1 to July 13, 2020 (Appendix A): SUBP-ATT_Served-03-07-24_Sutton-07-01_to_07-13-20.pdf

# disc🔴 hustlas

Documents: Issued.[2]

The supplemental subpoenas were intended to address allegations of harassment by Ms. Eligon and avoidance of law enforcement by Mr. Sutton following the alleged incident. By examining the communication patterns and frequency during this period, the defense aimed to contextualize these allegations and assess their credibility.

The primary objectives of obtaining the supplemental records were to:

(1)    Provide a more comprehensive picture of the relationship dynamics between Mr. Sutton and Ms. Eligon.

(2)    Identify any potential inconsistencies or discrepancies in the allegations made against Mr. Sutton.

(3)    Uncover any evidence that might support Mr. Sutton's version of events or mitigate the prosecution's claims.

### 3.    Summary of Issued Subpoenas

In total, four subpoenas were issued to obtain the necessary communication records:

| No. | Subpoena For | Served To | Served Date | Response Date | Tracking # |
|-----|-------------|-----------|-------------|---------------|------------|
| 1 | Eligon CDRs 07/01-07/13/20 | T-Mobile | 03/07/24 | 03/15/24 | 4932679 |
| 2 | Sutton CDRs 07/01-07/13/20 | AT&T | 03/07/24 | 03/21/24 | 3878825 |
| 3 | Eligon CDRs 07/14-07/31/20 | T-Mobile | 03/18/24 | 03/28/24 | 4955935 |
| 4 | Sutton CDRs 07/14-07/31/20 | AT&T | 03/18/24 | 03/26/24 | 3878825.001 |

This summary table allows for quick identification of key details related to each subpoena, including the targeted carriers, service dates, response dates, and tracking numbers.

---

[2] Subpoena served to T-Mobile on March 18, 2024, for Alicia Eligon (470) 800-2360's mobile phone records from July 14 to July 31, 2020 (Appendix A): SUBP-TMO_Served-03-18-24_Eligon-07-14_to_07-31-20.pdf

Subpoena served to AT&T on March 18, 2024, for Orpheus Sutton (678) 447-4488's mobile phone records from July 14 to July 31, 2020 (Appendix A): SUBP-ATT_Served-03-18-24_Sutton-07-14_to_07-31-20.pdf

# disc🎧 hustlas

### *B.    Service of Subpoenas*

#### 1.    Execution of Service

The fax transmission report documents the successful transmission of the subpoena to the recipient's fax number, including the date, time, and status of the transmission, along with the number of pages sent. This report, when combined with the affidavit of service, establishes that the service of the subpoena was completed in accordance with the law.

#### 2.    Tracking and Documentation

To ensure proper tracking and documentation of the subpoena process, a detailed log was maintained, recording the following information for each subpoena:

(1)    Subpoena description

(2)    Carrier served

(3)    Date of service

(4)    Method of service

(5)    Confirmation of receipt

(6)    Response due date

(7)    Actual response date

(8)    Tracking number for the response

This log allowed for efficient monitoring of the subpoena process and ensured that all necessary documentation was maintained for future reference.

#### 3.    Response from Providers

Both AT&T and T-Mobile provided timely responses to the subpoenas within the specified timeframes. The responses were delivered electronically to my email, msullivanjrlaw@gmail.com. Each response included the Records Custodian's business records certification.

Documents: Ready to be Filed with Clerk.[3]

---

[3] Return of Service for Subpoena served to AT&T on March 7, 2024, for Orpheus Sutton (678) 447-4488's mobile phone records from July 1 to July 13, 2020 (Appendix A): SUBP-ATT_RoS_Served-03-07-24_Sutton-07-01_to_07-13-20.pdf

Return of Service for Subpoena served to T-Mobile on March 18, 2024, for Alicia Eligon (470) 800-2360's mobile phone records from July 14 to July 31, 2020 (Appendix A): SUBP-TMO_RoS_Served-03-18-24_Eligon-07-14_to_07-31-20.pdf

# disc◉ hustlas

### C.   Receipt of Records and Initial Review

#### 1.   Preliminary Analysis and Implications

An initial review of the received records was conducted to assess their relevance and potential implications for Mr. Sutton's defense. Key findings from this preliminary analysis include:

(1)   Identification of communication patterns and frequency between Mr. Sutton and Ms. Eligon.

(2)   Timeframes of increased or decreased communication.

(3)   Potential inconsistencies or discrepancies in the alleged events.

(4)   Evidence of any post-incident communications that may provide context to the allegations.

These preliminary findings were used to guide further in-depth analysis and inform the overall defense strategy.

#### 2.   Preparing to Introduce Business Records at Trial

On March 18, 2024, I scheduled an informal meeting with Defense Attorney Maloof and presented my findings. Maloof agreed that introducing this evidence would benefit Sutton's defense and the decision was made to:

(1)   File the subpoena return of service with the Clerk;

(2)   Provide the records received responsive to the subpoena to the prosecution; and

(3)   File a Notice of Intent to Introduce Business Records.

These steps are crucial for ensuring the admissibility of the records as evidence at trial.

---

Return of Service for Subpoena served to AT&T on March 18, 2024, for Orpheus Sutton (678) 447-4488's mobile phone records from July 14 to July 31, 2020 (Appendix A): SUBP-ATT_RoS_Served-03-18-24_Sutton-07-14_to_07-31-20.pdf

[4] Return of Service for Subpoena served to T-Mobile on March 7, 2024, for Alicia Eligon (470) 800-2360's mobile phone records from July 1 to July 13, 2020 (Appendix A): SUBP-TMO_RoS_Served-03-07-24_Eligon-07-01_to_07-13-20.pdf



### 3.   CDRs as Business Records

O.C.G.A. § 24-9-902(11) and O.C.G.A. § 24-8-803(6) are two Georgia statutes that work together to establish the admissibility of business records as evidence in legal proceedings without the need for testimony from the records' custodian.

O.C.G.A. § 24-9-902(11) allows certain documents, such as records of regularly conducted business activity accompanied by a written declaration from the records' custodian, to be admitted into evidence without requiring additional proof of authenticity if certain conditions are met (Appendix B).

O.C.G.A. § 24-8-803(6) provides an exception to the hearsay rule for records of regularly conducted business activity, allowing their admission as evidence if specific criteria are satisfied.

When these statutes are combined, business records can be admitted into evidence without requiring testimony about their authenticity or the circumstances of their creation, provided the proper written declarations are furnished and the records meet the necessary conditions. This makes these statutes crucial for establishing the admissibility of the call detail records in Mr. Sutton's case.

Documents: Provided to Prosecution.[5]

Documents: Filed with Clerk.[6]

Document: Prepared, Ready to be Filed with Clerk.[7]

---

[5] Business Records & Custodian's Affidavit from T-Mobile received responsive to subpoena served on March 7, 2024, for Alicia Eligon (470) 800-2360's mobile phone records from July 1 to July 13, 2020: SUBP-TMO_BizRec_Served-03-07-24_Eligon-07-01_to_07-13-20

[6] Return of Service for Subpoena served to T-Mobile on March 7, 2024, for Alicia Eligon's mobile phone records from July 1 to July 13, 2020 (Appendix A): SUBP-TMO_RoS_Served-03-07-24_Eligon-07-01_to_07-13-20.pdf

Notice of Intent to Introduce Business Records from T-Mobile received responsive to subpoena served on March 7, 2024, for Alicia Eligon (470) 800-2360's mobile phone records from July 1 to July 13, 2020 (Appendix B): TMO_BizRecNotice_Served-03-07-24_Eligon-07-01_to_07-13-20.pdf

[7] Notice of Intent to Introduce Business Records from AT&T received responsive to subpoena served on March 7, 2024, for Orpheus Sutton (678) 447-4488's mobile phone records from July 1 to July 13, 2020 (Appendix B): SUBP-ATT_BizRecNotice_Served-03-07-24_Sutton-07-01_to_07-13-20.pdf

Notice of Intent to Introduce Business Records from T-Mobile received responsive to subpoena served on March 18, 2024, for Alicia Eligon (470) 800-2360's mobile phone records from July 14 to

# disc✺ hustlas

4. <u>Strategy for Three Remaining Subpoenas</u>

<u>Filing Proof of Service</u>
Georgia law does not specify a statutory timeline for filing the return of service after a subpoena duces tecum (for production of records) has been served and records received. The return of service simply serves to notify the court that the subpoena was properly served and the requested materials provided.

If the defendant intends to use documents received in response to the subpoena in their case-in-chief or rebuttal, they are required to allow the prosecuting attorney to inspect and potentially copy or photograph the material. This must be done no later than five days prior to the trial. The return of service filing can be delayed until closer to trial, but copies of the subpoenaed materials must still be provided to the prosecuting attorney.

If the opposing party requests or files a motion to compel production of the subpoenaed materials, those materials must be produced at that time along with filing the return of service.

If, after receiving the subpoena response, it is determined that the materials are not relevant and will not be used as evidence, there is generally no requirement to file the return of service, as the court does not need notice if the materials will not be admitted. However, maintaining documentation of compliance with the subpoena is still advisable.

<u>Comment</u>
To comply with <u>O.C.G.A. 17-16-4</u> and allow the state to inspect any subpoenaed records intended to be used as evidence, it is recommended that defense counsel produce the subpoenaed materials and file the return of service no later than five days before the trial.

<u>Documents: Notice of Intent Prepared, Not Filed</u>
These preliminary findings were used to guide further in-depth analysis and inform the overall defense strategy. The filing of the Return of Service, provision of responsive records to the prosecution, and filing of the Notice of Intent to Introduce Business Records were crucial steps in ensuring the admissibility and proper use of the obtained evidence in Mr. Sutton's defense.

---

July 31, 2020 (Appendix B): <u>SUBP-TMO_BizRecNotice_Served-03-18-24_Eligon-07-14_to_07-31-20.pdf</u>

Notice of Intent to Introduce Business Records from AT&T received responsive to subpoena served on March 18, 2024, for Orpheus Sutton (678) 447-4488's mobile phone records from July 14 to July 31, 2020 (Appendix B): <u>SUBP-ATT_BizRecNotice_Served-03-18-24_Sutton-07-14_to_07-31-20.pdf</u>

# disc⦿ hustlas

The defense team should strategically plan the submission of the returns of service and provision of materials to the prosecution based on their relevance and potential use in the trial.

## IV.    PREPARATION OF RECORDS

### A.    Data Extraction

To facilitate analysis, the call detail records and text message metadata needed to be extracted from the original formats provided by the carriers. The T-Mobile Bill Reprint is delivered as a .pdf and the records need to be extracted so they can be analyzed. The AT&T CDRs are delivered in both .txt and .pdf file formats and the records also need to be extracted. All records are extracted from the .pdf format using Adobe Acrobat's built-in data extraction tools and then imported into Microsoft Excel for further analysis. For each provider, there are two sets of data: (1) July 1, 2020 to July 13, 2020; and (2) July 14, 2020 to July 31, 2020. Once the data has been extracted, it is consolidated into one dataset per provider to facilitate a comprehensive analysis.

### B.    Standardization of Timestamps and Formats

The call detail records (CDRs) and text message metadata from different carriers often use different timestamp formats and time zones. Carriers typically use Coordinated Universal Time (UTC) in their CDRs to maintain a consistent global reference point, which must be converted to the local time zone for accurate analysis.

The T-Mobile Bill Reprint presents the timestamp for calls in Eastern Daylight Time (EDT) and no adjustment is necessary. However, the timestamp for texts in the T-Mobile Bill Reprint is in Pacific Daylight Time (PDT), so 3 hours need to be added to the timestamp to present it in EDT. The AT&T CDR is presented in UTC for both calls and texts. Converting the AT&T records to EDT requires subtracting 4 hours from the timestamps. Standardizing the timestamps to a single time zone (EDT) is crucial for accurate analysis and comparison of the records. This standardization enables the creation of a unified timeline and facilitates the identification of patterns and discrepancies across the different datasets.

### C.    Data Organization and Categorization

The raw data was then organized into a structured format for easier analysis. This involved categorizing the records by date, type of communication (call or text), direction (incoming or outgoing), and duration (for calls). Relevant metadata, such as phone numbers and timestamps, were extracted and tabulated for each communication event.

Additionally, a column was introduced to the dataset enabling the application of custom filters. Records of communications between Eligon and Sutton prior to the alleged incident were labeled as "Before-23CR1379". Those that occurred after were marked "After-

# disc🔘 hustlas

23CR1379". Moreover, records within the AT&T dataset indicating attempts by the Detective to reach Sutton, and vice versa, were tagged as "Inv-23CR1379."

The following tables present the datasets from each carrier, specifically focusing on communications between Eligon and Sutton after July 13, 2020:

*Figure 1. T-Mobile Bill Reprint (Eligon-Sutton calls/texts after July 13, 2020)*

| Call/ SMS | Item | Date & Time (EDT) | Phone Number Name | Direction | Type | Min |
|---|---|---|---|---|---|---|
| Call | 154 | 07-13-20 12:29 AM | Sutton | IN | - | 2 |
| SMS | 2963 | 07-13-20 1:59 AM | Sutton | IN | TXT | |
| SMS | 2965 | 07-13-20 2:00 AM | Sutton | OUT | TXT | |
| SMS | 348 | 07-15-20 12:32 AM | Sutton | IN | TXT | |

*Figure 2. AT&T Call Detail Records (Eligon-Sutton calls/texts after July 13, 2020)*

| Call/ SMS | Item | ConnDate Time (EDT) | ET_2 | Originating Number Name | Terminating Number Name | CT_Name/ Desc_Name | Direction |
|---|---|---|---|---|---|---|---|
| Call | 370 | 07-13-20 12:29 AM | 01:08 | Sutton | Eligon | Mobile Originating | OUT |
| Call | 371 | 07-13-20 1:47 AM | 02:43 | Sutton | Eligon | Mobile Originating | OUT |
| SMS | 843 | 07-13-20 1:59 AM | | Sutton | Eligon | SMS Originating | OUT |
| SMS | 844 | 07-13-20 1:59 AM | | Sutton | Eligon | SMS Originating | OUT |
| SMS | 845 | 07-13-20 2:00 AM | | Eligon | Sutton | SMS Terminating | IN |
| SMS | 846 | 07-13-20 2:00 AM | | Eligon | Sutton | SMS Terminating | IN |
| Call | 6 | 07-15-20 12:31 AM | 02:54 | Sutton | Eligon | Mobile Originating | OUT |
| SMS | 15 | 07-15-20 12:32 AM | | Sutton | Eligon | SMS Originating | OUT |
| SMS | 16 | 07-15-20 12:32 AM | | Sutton | Eligon | SMS Originating | OUT |
| Call | 12 | 07-15-20 1:00 AM | 00:00 | Eligon | Sutton | Mobile Terminating | IN |
| Call | 27 | 07-15-20 10:58 AM | 00:06 | Sutton | Eligon | Mobile Originating | OUT |
| Call | 47 | 07-16-20 11:28 PM | 00:17 | Sutton | Eligon | Mobile Originating | OUT |
| Call | 58 | 07-18-20 12:34 AM | 00:07 | Sutton | Eligon | Mobile Originating | OUT |
| Call | 151 | 07-19-20 8:44 PM | 00:46 | Sutton | Eligon | Mobile Originating | OUT |

## D.    Creation of Master Call and Text Logs

Master logs were created for both carriers, combining the standardized data from the call and text logs. These logs provided a comprehensive, chronological view of all communication events between the relevant parties. The master logs served as the foundation for further analysis and timeline reconstruction. These master logs serve as the foundation for the timeline reconstruction and communication pattern analysis presented in the subsequent sections of this report.

# disc🔎 hustlas

### E.    *Data Validation and Error Checking*

To ensure the accuracy of the prepared data, a thorough validation process was conducted. This involved cross-referencing the master logs against the original CDRs and text message metadata to identify and resolve any discrepancies, duplicates, or errors. Any anomalies or inconsistencies were investigated and documented. This validation process helps ensure the accuracy and credibility of the findings presented in the report.

### F.    *Preparation of Summary Charts and Graphs*

To enhance the clarity and visual impact of the findings, summary charts and graphs were prepared based on the validated datasets. These visual aids, such as line and column graphs depicting communication frequency over time, were designed to support the analysis and findings presented in this report, making the information more accessible and understandable for the reader. The charts and graphs will be referenced in the Analysis & Findings section to support the key insights and arguments.

## V.    ANALYSIS & FINDINGS

### A.    *Communication Patterns Before the Alleged Incident*

#### 1.    Initial Contact and Overview of Interaction

The subpoenaed records detail a communication trail initiated by Ms. Eligon with a text message on July 5. The final exchange before the alleged incident occurred with a phone call from Mr. Sutton to Ms. Eligon on July 12 at 6:59 PM. During the period from July 5 through July 12, 2020, Eligon and Sutton exchanged a total of 134 text messages and engaged in phone conversations amounting to 84 minutes.

Detailed Account of Text Messaging
Ms. Eligon contributed 36% of the text exchanges, sending 48 messages, while Mr. Sutton sent the remaining 64%, amounting to 86 messages. Communication commenced robustly with 17 messages exchanged on July 5, followed by a peak in messaging activity on July 6, when 79 messages were sent. The subsequent days, July 7 to July 9, displayed a lull in activity, with no more than 4 messages exchanged per

*Figure 3. Comparison of Eligon-Sutton Communications in AT&T Call Detail Records and T-Mobile Bill Reprint*

| Date | AT&T Call Detail Records | | | T-Mobile Bill Reprint | | |
|---|---|---|---|---|---|---|
| | SMS Count | Call Count | Call Minutes | SMS Count | Call Count | Call Minutes |
| 7-5 | 17 | 7 | 10 | 17 | 4 | 6 |
| 7-6 | 79 | - | - | 81 | - | - |
| 7-7 | 4 | - | - | 4 | - | - |
| 7-8 | - | - | - | - | - | - |
| 7-9 | 3 | 1 | 26 | 3 | 1 | 27 |
| 7-10 | 3 | 2 | 1 | 3 | - | - |
| 7-11 | 11 | 3 | 29 | 12 | 3 | 32 |
| 7-12 | 17 | 6 | 17 | 17 | 4 | 20 |
| 7-13 | 2 | 2 | 4 | 2 | 1 | 2 |
| 7-14 | - | - | - | - | - | - |
| 7-15 | 1 | 2 | 3 | 1 | - | - |
| 7-16 | - | 1 | 0 | - | - | - |
| 7-17 | - | - | - | - | - | - |
| 7-18 | - | 1 | 0 | - | - | - |
| 7-19 | - | 1 | 1 | - | - | - |
| Total | 137 | 26 | 92 | 140 | 13 | 87 |

# disc🎧 hustlas

day. There was a noticeable uptick in communication between July 10 and July 11, with a combined total of 28 text messages.

Phone Call Dynamics
Similarly, the duration of their phone calls expanded as the days progressed. On July 5, the combined duration of multiple calls was approximately 10 minutes. There was a three-day hiatus in voice communication following this, which resumed with a 26-minute call from Sutton on July 9 --- the lengthiest single call recorded. July 11 featured the highest cumulative call duration with 29 minutes across three calls. The vertical dotted line on the chart indicates the time of the alleged incident. The peach shaded area is represented by communication that occurred after the alleged incident.

*Figure 4. Number of Text Messages Sent per Day*



*Figure 5. Minutes Spent on Phone per Day*



The patterns observed in the communication records suggest an escalating level of engagement and familiarity between the two parties leading up to their in-person meeting on July 12. The frequency and duration of their interactions, as evidenced by the text

# disc🔎 hustlas

messages and phone calls, indicate a growing connection and comfort level in their relationship.

These findings set the stage for a more in-depth examination of the specific content and timing of their communications, which will be crucial in contextualizing the events surrounding the alleged incident and assessing the credibility of the parties' accounts.

### B.    Timeline Reconstruction

Reconstructing the timeline of events using the available communication records and discovery materials is essential for establishing a clear sequence of events surrounding the alleged incident. The following timeline has been reconstructed based on the call detail records, text message metadata, and relevant quotes from the victim interview, BWC transcript, and defendant interview.

| July 13, 2020 | |
|---|---|
| 12:17 AM | 📞 Alicia Eligon makes a 1-minute call to Outcry No. 1 (404-729-2566) |
| 12:17 AM | 📞 Alicia Eligon makes a 1-minute call to Outcry No. 2 (404-202-2202) |
| 12:19 AM | 📞 Alicia Eligon makes a 1-minute call to Outcry No. 3 (754-235-4536) |
| 12:19 AM | 💬 Alicia Eligon receives a text from Outcry No. 2 (404-202-2202)<br>💬 Alicia Eligon sends a text to Outcry No. 2 (404-202-2202) |
| 12:20 AM | 📞 Alicia Eligon makes a 2-minute call to Outcry No. 4 (Joshua Eligon, Brother) |
|  | Discovery<br>• "I called, first person I called was my sister, dad, stepdad. I called him first. He didn't pick up because he always says, if I'm in trouble, you know, just call me." (Victim Interview, 07-13-20, p.8) |
| 12:20 AM | 💬 Alicia Eligon receives a text from Outcry No. 2 (404-202-2202)<br>💬 Alicia Eligon sends a text to Outcry No. 2 (404-202-2202) |
| 12:21 AM | 📞 Alicia Eligon makes a 6-minute call to Outcry No. 5 (Ashley Eligon, Sister) |
|  | Discovery<br>• "So then that's when I was like, you know what, I can just call my brother. And I called his girlfriend first. She didn't pick up." (Victim Interview, 07-13-20, p.3) |
| 12:22 AM | 💬 Alicia Eligon receives a text from Outcry No. 2 (404-202-2202) |
| 12:24 AM | 💬 Alicia Eligon sends a text to Outcry No. 2 (404-202-2202) |
| 12:27 AM | 📞 Alicia Eligon receives a 1-minute call from Outcry No. 4 (Joshua Eligon, Brother) |
|  | Discovery<br>• "He came and he pulled up, he got me." (Victim Interview, 07-13-20, p.4) |
| 12:28 AM | 💬 Alicia Eligon receives a text from Outcry No. 2 (404-202-2202) |

# disc⚇ hustlas

| July 13, 2020 | |
|---|---|
| 12:29 AM | 📞 Alicia Eligon receives a 2-minute call from Orpheus Sutton |
| | Discovery <br> • "I didn't pick up because I was too shaky to even talk to anybody. So my brother picked up and he threatened me and my brother." (Victim Interview, 07-13-20, p.4) <br> • "And then that's when he called my phone saying he was, he was threatening me. And then he threatened my brother." (BWC Transcript Butler, 07-13-20, p.5) |
| 12:33 AM | 📞 Outcry No. 4 (Joshua Eligon, Brother) makes a call to 9-1-1. (Incident Date: **07-13-20 00:33:02**) |
| | Discovery <br> • "So we left and my brother called 9-1-1 and he was like, he just, he just, he didn't want to see me in that pain. So he called 9-1-1, they answered and then a cop came out and talked to us." (Victim Interview, 07-13-20, p.8) |

The timeline reconstruction provides a detailed account of the alleged victim's outcry, corroborating key aspects of the parties' statements and highlighting potential inconsistencies or discrepancies. This timeline serves as a critical reference point for evaluating the consistency and credibility of the parties' statements and the available evidence.

### C.    Communication Patterns After the Alleged Incident

Analysis of the communication records following the alleged incident on July 12, 2020, reveals a significant shift in the frequency and duration of interactions between Mr. Sutton and Ms. Eligon. In the early hours of July 13, there were two phone calls: a 1-minute 8-second call at 12:29 AM and a 2-minute 43-second call at 1:47 AM. These calls were followed by an outgoing SMS from Mr. Sutton at 1:59 AM and an incoming SMS from Ms. Eligon at 2:00 AM.

Additionally, there was an outgoing SMS from Mr. Sutton on July 15 at 12:32 AM.

The notable changes in communication patterns post-incident include:

(1)    Reduced frequency of text messages

(2)    Shorter phone calls

(3)    Sporadic timing of communications

These changes in communication patterns suggest a shift in the relationship dynamics between Mr. Sutton and Ms. Eligon following the alleged incident. The reduced frequency and duration of their interactions could indicate a level of discomfort, uncertainty, or a desire to distance themselves from one another.



### D.    *Post-Alleged Incident Communication with Alicia Eligon*

1.    Calls and Texts from AT&T CDRs

| July 13, 2020 | |
|---|---|
| **12:29 AM** | 📞 Orpheus Sutton makes a 1 minute 8 second call to Alicia Eligon |
| | **Discovery** |
| | • "As soon as we were about to leave [Knights Inn], he calls me. I didn't pick up because I was too shaky to even talk to anybody. So my brother picked up and he threatened me and my brother. ... So we left and my brother called 9-1-1" (Victim Interview, 07-13-20, p.4) |
| | • "He called her phone, threatening her. But, see, he called her phone, threatening her and I picked up the phone and I'm like, hey, nigga, I'm her fucking brother. Don't fucking call this number again." (BWC Transcript, 07-13-20, p.2) |
| | • "And then he called my phone threatening me and then my brother is the one that picked up the phone. He threatened me and my brother." (BWC Transcript, 07-13-20, p.2) |
| | • "I started calling her phone to make sure that she got home ... So, I called her phone." (Defendant Subject Interview, 07-18-20, p.3) |
| **12:33 AM** | 📞 **Outcry No. 4 (Joshua Eligon, Brother)** makes a call to 9-1-1. (Incident Date: **07-13-20 00:33:02**) |
| | **Discovery** |
| | • "So we left and my brother called 9-1-1 and he was like, he just, he just, he didn't want to see me in that pain. So he called 9-1-1, they answered and then a cop came out and talked to us." (Victim Interview, 07-13-20, p.8) |
| **1:47 AM** | 📞 Orpheus Sutton makes a 2 minute 43 second call to Alicia Eligon |
| | **Discovery** |
| | • "The third time I called that phone, some dude was on there screaming and hollering, talking about he was going to hurt me. What did he say? Why? No, he said, I'm going to kill you." (Defendant Subject Interview, 07-18-20, p.4) |
| | • "I only called her twice since this. That's it. I didn't call nobody to harass them." (Defendant Subject Interview, 07-18-20, p.13) |
| **1:59 AM** | 💬 Orpheus Sutton sends a text to Alicia Eligon |
| | **Discovery** |
| | • "I texted her and said, why do you have these people calling me, threatening me?" |
| **2:00 AM** | 💬 Orpheus Sutton receives a text from Alicia Eligon |

| July 15, 2020 | |
|---|---|
| **12:31 AM** | 📞 Orpheus Sutton makes a 2-minute 54-second call to Alicia Eligon |

# disc🌀 hustlas



| 12:32 AM | 💬 Orpheus Sutton sends a text to Alicia Eligon |
|---|---|
| 10:58 AM | 📞 Orpheus Sutton makes a 0:06 call to Alicia Eligon |

| **July 16, 2020** | |
|---|---|
| 11:28 PM | 📞 Orpheus Sutton makes a 0:17 call to Alicia Eligon |

| **July 18, 2020** | |
|---|---|
| 12:34 AM | 📞 Orpheus Sutton makes a 0:07 call to Alicia Eligon |

| **July 19, 2020** | |
|---|---|
| 8:44 PM | 📞 Orpheus Sutton makes a 0:46 call to Alicia Eligon |

| **Source: AT&T CDR** (Call / Text Records) | Green-shaded cells are found in the AT&T CDR and T-Mobile Bill Reprint | Orange-shaded cells are found in the AT&T CDR, but NOT the T-Mobile Bill Reprint |
|---|---|---|

### 1.   No Evidence of Harassment in Post-Incident Calls

The call detail records (CDRs) and the content of Sutton's post-incident communications with Alicia Eligon do not support the allegation that he was harassing her through repeated or threatening phone calls. Instead, the evidence suggests Sutton's calls were brief, infrequent, and motivated by concern for Eligon's well-being and a desire to understand the sudden hostility directed towards him.

With the exception of two calls on July 13 (1 min 8 sec and 2 min 43 sec) and one on July 15 (2 min 54 sec), all other calls Sutton made to Eligon were under a minute, with most lasting mere seconds (0:06, 0:17, 0:07, 0:46). Such short call durations are inconsistent with the characterization of harassment, as they would not allow sufficient time for threatening or abusive conversation. Over the span of a week (July 13-19), Sutton only called Eligon on five separate days, with no more than two calls on any given day. This relatively low frequency does not fit the pattern of incessant, harassing contact.

Sutton's 1:59 AM text on July 13 ("I texted her and said, why do you have these people calling me, threatening me?") and his interview statement ("I'm like, what the fuck is going on?") indicate he was confused and alarmed by the sudden threats and was reaching out to Eligon for an explanation, not to harass her.

In his interview, Sutton states his reason for calling Eligon was "to make sure that she got home ... I didn't want nobody to think. You know, you pick somebody up. You want to take them back home. You don't want to know if something happened to her, if he on me."

# disc☮ hustlas

(Defendant Subject Interview, 07-18-20, p.3). This suggests a genuine concern for her well-being, not an intent to harass.

The CDR evidence, when considered in the context of Sutton's own account, does not substantiate the allegations of harassment. Instead, it paints a picture of an individual who, confused and concerned in the aftermath of the incident, made a handful of brief, spaced-out attempts to check on Eligon's safety and understand the reason behind the threats against him. This casts doubt on the credibility of the harassment claims and supports a more innocuous interpretation of Sutton's post-incident communications.

### E.    *Sutton's Communication with Detective Kelley*

The call detail records provide valuable insights into Sutton's attempts to communicate with Detective Kelley following the alleged incident.

### 1.    Calls and Texts from AT&T CDRs

| July 13, 2020 | |
|---|---|
| 6:02 AM | 📞 Orpheus Sutton misses Detective Kelley's call from the DeKalb County Courthouse trunk line (404- 687-8648). Kelley leaves a voicemail requesting that Sutton contact him. |

| July 18, 2020 | |
|---|---|
| 3:55 PM | 📞 Orpheus Sutton misses Detective Kelley's call from the DeKalb County Courthouse trunk line (404- 687-8648). Kelley leaves a voicemail requesting that Sutton contact him. |
| | Discovery<br>• "Today is the 18th of July, 2020 ... That's the second call that's been placed to Mr. Sutton." (Defendant Subject Interview, 07-18-20, at 0:00 - 0:21)<br>• "I called the suspect and left a second voicemail message." (Case Notes for Case Number 20-053515, 07-18-20 4:02:47 PM) |
| 8:47 PM | 📞 Orpheus Sutton makes a 0:12 call to DeKalb County Courthouse trunk line (404-687-8648). This is the caller ID displayed when he misses calls from the DeKalb County Police Department. |

| July 19, 2020 | |
|---|---|
| 1:12 PM | Detective Kelley applies for and obtains a warrant for Orpheus Sutton's arrest just 21-hours and 17-minutes after leaving the second message for Sutton the prior day (3:55 PM). |

| July 20, 2020 | |
|---|---|

# disc🔴 hustlas

| 11:28 PM | 📞 Orpheus Sutton makes a 0:12 call to DeKalb County Courthouse trunk line (404-687-8648). This is the caller ID displayed when he misses calls from the DeKalb County Police Department. |
|---|---|
| 11:52 AM | 📞 Orpheus Sutton makes a 0:25 call to Detective Kelly (770-724-7522) |
| 12:03 PM | 📞 Orpheus Sutton makes a 0:30 call to Detective Kelly (770-724-7522) |

| **July 21, 2020** | |
|---|---|
| 11:10 AM | 📞 Orpheus Sutton makes a 0:26 call to Detective Kelly (770-724-7522) |
| 11:19 AM | 📞 Orpheus Sutton makes a 0:31 call to Detective Kelly (770-724-7522) |
| 11:45 AM | 📞 Orpheus Sutton makes a 0:28 call to Detective Kelly (770-724-7522) |

| **July 22, 2020** | |
|---|---|
| 11:54 AM | 📞 Orpheus Sutton makes a 0:44 call to Detective Kelly (770-724-7522) |

### 2.   Orpheus Sutton's Attempts to Contact Detective Kelley are Genuine.

The call detail records (CDRs) and Sutton's own statements during his interview with Detective Kelley provide strong evidence that Sutton was indeed making genuine efforts to return Kelley's calls and cooperate with the investigation, contrary to the detective's assertions. This evidence supports Sutton's credibility and undermines the narrative that he was deliberately avoiding law enforcement.

Detective Kelley called Sutton twice, leaving voicemails on July 13 and July 18, 2020, requesting that Sutton contact him (Defendant Subject Interview, 07-18-20, at 0:00 - 0:21; Case Notes for Case Number 20-053515, 07-18-20 4:02:47 PM). On the evening of July 18, just hours after Kelley's second call, the CDRs show Sutton making a 12-second call to the DeKalb County Courthouse trunk line (404-687-8648), the number displayed when he missed Kelley's calls. This supports Sutton's claim that he initially thought the calls might be a prank but then realized their seriousness and tried to return the detective's call. Despite Sutton's prompt attempt to return his call on July 18, Detective Kelley applied for an arrest warrant a mere 21 hours later on July 19, without waiting for or acknowledging Sutton's effort to make contact.

Over the next few days, the CDRs show a clear pattern of Sutton making multiple calls to both the courthouse trunk line and Detective Kelley's direct number (770-724-7522), demonstrating persistent attempts to connect with the detective and address the situation. During his interview, Sutton states, "I've been calling you every, like, at least..." and "If you go check your answering machine, you can see that I'm telling the truth. I got no reason to lie about this." (Defendant Subject Interview, 07-18-20). These statements, corroborated by the CDRs, underscore Sutton's genuine efforts to communicate with Detective Kelley.

# disc⌖ hustlas

The CDR evidence and Sutton's own statements paint a picture of an individual who, once he realized the gravity of the situation, made repeated, good-faith attempts to contact the detective and cooperate with the investigation. This supports Sutton's credibility and challenges the characterization that he was evasive or uncooperative, a crucial point in assessing the reliability of the allegations against him.

## VI.    ADDITIONAL FINDINGS

### A.    Contradictory Statements Regarding Alicia Eligon's Emotional State

#### 1.    "Too Shaky to Even Talk"

The contradictory statement from Alicia Eligon that raises significant doubts about her credibility is: "I didn't pick up because I was too shaky to even talk to anybody" (Victim Interview, 07-13-20, p.4) (in reference to Orpheus Sutton's 12:29 AM call on July 13th)

However, the call log evidence directly contradicts this claim. In the minutes before 12:29 AM, the logs show Alicia was actively engaged in a flurry of communication:

(1)    📞 12:17 AM: Alicia Eligon makes a 1-minute call to Outcry No. 1 (404-729-2566)

(2)    📞 12:17 AM: Alicia Eligon makes a 1-minute call to Outcry No. 2 (404-202-2202)

(3)    📞 12:19 AM: Alicia Eligon makes a 1-minute call to Outcry No. 3 (754-235-4536)

(4)    ○ 12:19 AM: Alicia Eligon receives a text from Outcry No. 2 (404-202-2202)
        ○ 12:19 AM: Alicia Eligon sends a text to Outcry No. 2 (404-202-2202)

(5)    📞 12:20 AM: Alicia Eligon makes a 2-minute call to Outcry No. 4 (Joshua Eligon, Brother)

(6)    ○ 12:20 AM: Alicia Eligon receives a text from Outcry No. 2 (404-202-2202)
        ○ 12:20 AM: Alicia Eligon sends a text to Outcry No. 2 (404-202-2202)

(7)    📞 12:21 AM: Alicia Eligon makes a 6-minute call to Outcry No. 5 (Ashley Eligon, Sister)

(8)    ○ 12:22 AM: Alicia Eligon receives a text from Outcry No. 2 (404-202-2202)
        ○ 12:24 AM: Alicia Eligon sends a text to Outcry No. 2 (404-202-2202)

(9)    📞 12:27 AM: Alicia Eligon receives a 1-minute call from Outcry No. 4 (Joshua Eligon, Brother)

Engaging in this level of active call and text communication in the minutes immediately preceding 12:29 AM directly contradicts Alicia's statement that she didn't answer Sutton's call because she was "too shaky to even talk to anybody." This blatant contradiction between Alicia Eligon's statement and the evidence from the call logs raises significant questions about the reliability of her accounting of events and reasoning surrounding this critical 12:29 AM call from Orpheus Sutton. Her credibility is severely damaged based on

# disc🔘 hustlas

this glaring discrepancy that cannot be reasonably explained away by the available evidence and documentation.

### B.    Absence of Knights Inn Surveillance Footage

Detective Kelley's case notes entry dated 07/18/2020 recounts his visit to the Knights Inn at 2859 Panola Rd. Lithonia, GA to follow up on the case. During this visit, Kelley claims to have spoken with the lobby manager, obtained information about the suspect (Orpheus Sutton) registering under the name "Alexander Sutton" on 07/12/2020, and collected details about Sutton's stay in room 205. Notably, there is no mention of Kelley obtaining surveillance video during this visit.

During his interview, Sutton directly challenges the detective to check the video footage from the Knights Inn. Sutton states:

> "I hope y'all watched them cameras. There was no forcibly pulling somebody upstairs. And there was no forcibly running out." (Defendant Subject Interview, 07-18-20, at 12:00 - 12:05)

This statement from Sutton implies that video footage from the Knights Inn should corroborate his version of events and refute any potential allegations of misconduct or improper behavior. However, no such video footage has been provided as part of the discovery materials, raising concerns about the completeness and transparency of the evidence disclosure.

If video footage from the Knights Inn did exist and was reviewed by Detective Kelley, it should have been preserved and included in discovery. The absence of this potentially exculpatory or contradictory evidence casts doubts on the credibility of Kelley's account and the thoroughness of the investigation. Moreover, the potential existence of exculpatory or contradictory evidence, coupled with the lack of transparency in providing all relevant materials, undermines the integrity of the investigation and the prosecution's adherence to their obligation to disclose all available evidence. Withholding such evidence could have severe consequences on the fairness of the legal proceedings against Orpheus Sutton and the ability of the defense to present a comprehensive case. The defense should request an explanation for the absence of this potentially critical evidence and, if necessary, seek a court order compelling its production.

### C.    Discrepancies in Detective Kelley's Case Notes and Call Records

A close examination of Detective Kelley's case notes and the available call detail records reveals significant discrepancies that raise doubts about the detective's credibility and the integrity of the investigation.

During the interview with Orpheus Sutton, Detective Kelley stated, "She called me last week and said you kept calling her and harassing her." (Defendant Subject Interview, 07-18-20,

# disc◉ hustlas

p.12) This assertion, coupled with Kelley's note in the case file timestamped 7/19/2020 1:22:04 PM which reads, "I talked to the victim on 07/18/2020, and she said the suspect continues to call her from the same number," (Case Notes, 7/19/2020 1:22:04 PM) suggests that Kelley spoke with the alleged victim, Alicia Eligon, on July 18, 2020.

However, the call detail records (CDRs) provided paint a different picture. A thorough examination of the CDRs fails to corroborate any telephonic communication between Detective Kelley and Alicia Eligon on the date in question. In fact, the records lack any entries that would substantiate Kelley's claim of speaking with the alleged victim, directly contradicting his statements and case notes. Furthermore, the absence of a recorded conversation between Kelley and Eligon in the discovery materials provided casts significant doubt on whether such a discussion ever took place. Given the critical importance of preserving and documenting witness statements, especially from the alleged victim in a case of this nature, it would be expected that any conversation between Kelley and Eligon would have been recorded and included in the evidence.

The lack of a recording not only contradicts Kelley's assertions but also raises concerns about potential evidence mishandling or concealment. If such a conversation did occur, the failure to record and produce it in discovery could constitute a violation of the prosecution's obligations, undermining the integrity of the evidence-gathering process. Alternatively, if no conversation took place, it would suggest that Kelley's statements to Sutton and the corresponding case notes were either fabricated or based on unsubstantiated information, casting doubt on the credibility of Kelley's account and the prosecution's case.

Regardless of the underlying reason, the absence of corroborating evidence in the CDRs and the lack of a recorded conversation severely undermine the validity of Kelley's claims about speaking with Eligon on July 18, 2020. This discrepancy not only contradicts the detective's assertions but also raises broader concerns about the transparency and reliability of the evidence-gathering process in this case.

To ensure a fair and impartial administration of justice, it is imperative that the prosecution provide a satisfactory explanation for this apparent contradiction or produce the recorded conversation in question. Failure to do so could significantly impair the prosecution's case and cast doubt on the credibility of the evidence presented against Orpheus Sutton.

### D.    *Inconsistencies in Alicia and Joshua Eligon's Accounts*

The body-worn camera footage from the initial officer responses contains contradictory statements from Alicia Eligon and her brother Joshua regarding how much information was provided to Joshua about the alleged incident involving Orpheus Sutton before he arrived at the hotel to pick up Alicia.

According to Alicia's statement, when she called Joshua at 12:20 AM, she merely said "Can you please come get me?" without explaining what had happened. Her words were: "I just said, can you please come get me? He was like, where you at?" (Victim Interview, 07-13-20,

# disc◉ hustlas

p.8) This suggests Joshua was not informed about any incident with Sutton during that phone call. However, Alicia then describes Joshua's demeanor upon arrival as aggressive and confrontational, stating: "He came and he pulled up, he got me. He was like, and then my brother was like, where this nigga at?" (Victim Interview, 07-13-20, p.8) Joshua's behavior implies prior knowledge about an altercation with Sutton that prompted him to angrily look for the "nigga" upon arriving.

This apparent contradiction is compounded by Joshua's own subsequent statement when an officer asked why they didn't call from the hotel. Joshua responded: "When I asked her when we got away from the hotel, I asked her what happened. She wouldn't talk to me. She was so quiet." (BWC Transcript, 07-13-20, p.4) So while Alicia's account claims she did not inform Joshua about the incident initially, Joshua's statements and confrontational conduct suggest he had been made aware of some incident with Sutton that precipitated his heated arrival. Yet Joshua then confirms Alicia did not actually explain what happened until after leaving the area.

The conflicting statements from Alicia and Joshua about what information was conveyed over the phone call create a glaring inconsistency in their recounting of the timeline and sequence of events that evening. Their narratives directly contradict each other regarding Joshua's knowledge and Alicia's disclosures prior to his arrival. This lack of congruence between their accounts substantially undermines their credibility as narrators and eyewitnesses. If they cannot cohesively align their statements about the basic matter of what was communicated between them surrounding the initial response, it raises doubts about the reliability of their broader testimony recapitulating the alleged events involving Sutton.

The discrepancy exposes a critical flaw or lack of transparency in how they have recounted the incident's progression and what was known at which points in time based on Alicia's contemporaneous narratives. This contradiction alone does not prove or disprove the allegations against Sutton, but it does present a significant issue that merits scrutiny to ensure the full facts and reliability of their overall accounts are properly assessed as the case proceeds. Resolving these discrepancies is crucial to ensuring a fair trial and preventing any miscarriage of justice based on incomplete or inconsistent evidence.

### E.    Potential Implications and Consequences

The various contradictions, inconsistencies, and discrepancies identified throughout the analysis raise significant concerns about the credibility of the parties involved and the reliability of the evidence presented in this case. These issues have the potential to impact the overall strength and viability of the prosecution's case against Orpheus Sutton.

From a legal standpoint, the defense could potentially argue that the identified issues constitute grounds for dismissal of the charges. For instance, if it can be demonstrated that the prosecution withheld or failed to disclose exculpatory evidence, such as the requested video footage from the Knights Inn, this could be considered a violation of the defendant's

# disc⊕ hustlas

due process rights and constitute grounds for dismissal or a new trial. Similarly, if it can be proven that Detective Kelley or other law enforcement officials deliberately misrepresented or fabricated evidence, such as the discrepancies in the case notes or the lack of a recorded conversation with the alleged victim, this could also potentially lead to dismissal or other legal consequences, including potential charges of perjury or misconduct.

Additionally, the contradictions and credibility issues surrounding the statements and accounts of the alleged victim, Alicia Eligon, and her brother, Joshua Eligon, could significantly undermine the weight and persuasiveness of their testimony, potentially weakening the prosecution's case. Conversely, if the identified issues can be adequately explained or resolved through further investigation or the presentation of additional evidence, the impact on the prosecution's case may be mitigated.

Ultimately, the extent to which these potential implications and consequences materialize will depend on the specific legal arguments and strategies employed by both parties, as well as the judgment and rulings of the presiding court. It is crucial for both the prosecution and the defense to thoroughly address and account for these identified issues, as they could have far-reaching implications for the fairness and outcome of the legal proceedings. The defense should vigorously pursue these issues through pretrial motions, evidentiary hearings, and cross-examination at trial to ensure that Mr. Sutton receives a fair and just adjudication of the charges against him.

# disc🔎 hustlas

## APPENDIX LINKS

The following appendices contain the full text of referenced materials, including subpoenas, business records, legal statutes, discovery documents, and call detail records. To view an appendix, click on its title to open the associated document in Google Drive.

### SECTION A. Subpoenas and Related Documents

A.1. SUBP-TMO_Served-03-07-24_Eligon-07-01_to_07-13-20
https://drive.google.com/file/d/1IbyJvuCRdBD1Ufx2FOlNAt380Ro0etlC/view?usp=drive_link

A.2. SUBP-ATT_Served-03-07-24_Sutton-07-01_to_07-13-20
https://drive.google.com/file/d/1qkulas3BAWz63CsRdtTTg2CodwnDRzj8/view?usp=drive_link

A.3. SUBP-TMO_Served-03-18-24_Eligon-07-14_to_07-31-20
https://drive.google.com/file/d/1RYYFFTUYgae-BB63tS3ySxtnR5nv1aq9/view?usp=drive_link

A.4. SUBP-ATT_Served-03-18-24_Sutton-07-14_to_07-31-20
https://drive.google.com/file/d/1dUZzjznND-U7m5ieGyf3OVLecVhSY8Gy/view?usp=drive_link

A.5. SUBP-TMO_RoS_Served-03-07-24_Eligon-07-01_to_07-13-20
https://drive.google.com/file/d/1btjaOGk6wBak9sCrpR3VamP1tyl84bk1/view?usp=drive_link

A.6. SUBP-ATT_RoS_Served-03-07-24_Sutton-07-01_to_07-13-20
https://drive.google.com/file/d/1QIKx88hcYCcUNYEOth9FtpkaODWEZlfp/view?usp=drive_link

A.7. SUBP-TMO_RoS_Served-03-18-24_Eligon-07-14_to_07-31-20
https://drive.google.com/file/d/150QVthzUGcWeZ0vuGgOv3Js3vcT5LRgV/view?usp=drive_link

A.8. SUBP-ATT_RoS_Served-03-18-24_Sutton-07-14_to_07-31-20
https://drive.google.com/file/d/13k_3WvvIbu21YE5ftnAi1AdRUNQyHgHG/view?usp=drive_link

### SECTION B. Business Records and Notices

B.1. SUBP-TMO_BizRecNotice_Served-03-07-24_Eligon-07-01_to_07-13-20
https://drive.google.com/file/d/1NA2Lz4lTH_iQANiAvom5y38iH38XndR8/view?usp=drive_link

B.2. SUBP-ATT_BizRecNotice_Served-03-07-24_Sutton-07-01_to_07-13-20
https://drive.google.com/file/d/1pAm2l1GJ7x6D3C2Ml9htbed-5oCG5Pbq/view?usp=drive_link

B.3. SUBP-TMO_BizRecNotice_Served-03-18-24_Eligon-07-14_to_07-31-20
https://drive.google.com/file/d/15tDD7Lin1OW22q986fvE97R4fNRKqeuP/view?usp=drive_link

B.4. SUBP-ATT_BizRecNotice_Served-03-18-24_Sutton-07-14_to_07-31-20
https://drive.google.com/file/d/1vFvixeEcSikOdd-DLPEZ7gTl-6oazBkR/view?usp=drive_link

### SECTION C. Relevant Legal Statutes

C.1. O.C.G.A. § 24-9-902(11) Self-authentication of Business Records
https://drive.google.com/file/d/1S8Io2HtSii71lELrf0ii_V33ogSRotmH/view?usp=drive_link

C.2. O.C.G.A. § 24-8-803(6) Hearsay Exception for Business Records
https://drive.google.com/file/d/1y5XOzWO54D2NCXhjc7BH3-D2ixmkEhIQ/view?usp=drive_link

# disc🔍 hustlas

## SECTION D. Discovery Materials

### D.1. Victim Interview Transcript, 07-13-20
https://drive.google.com/file/d/1iRNns9awFBg-HHL0hFmWUH3GBH3LPG1K/view?usp=drive_link

### D.2. BWC Transcript Butler, 07-13-20
https://drive.google.com/file/d/1_sLpOwrd9M8iE_DlQI-RrZBEHT557xlu/view?usp=drive_link

### D.3. Defendant Subject Interview Transcript, 07-18-20
https://drive.google.com/file/d/1v8msyUGG850apB6o1iHilxOe4MSCEaeG/view?usp=drive_link

### D.4. Case Notes for Case Number 20-053515
https://drive.google.com/file/d/1jSZ2kz5RwEehXW0upb3Mp9R22P-sAw0m/view?usp=drive_link

## SECTION E. Call Detail Records (CDRs) and Communication Analysis

### E.1. AT&T Call Detail Records (CDRs) for Orpheus Sutton
https://drive.google.com/file/d/1wWCC7jQULLe1XrhOHswtN4l-Pb7FzUA8/view?usp=drive_link

### E.2. T-Mobile Bill Reprint for Alicia Eligon
https://drive.google.com/file/d/1wy1D_paeh0Xc8l1sLpVkWBf7u5gpDHK8/view?usp=drive_link

### E.3. Communication Analysis Tables and Charts
https://drive.google.com/file/d/1CK5X3WgzD8ina4xfaVHJJ4lz4EEQLJCT/view?usp=drive_link



# Exhibit 43

## Sullivan Email (Apr. 30, 2024)



Michael Sullivan <msullivanjrlaw@gmail.com>

---

## Sutton CDR Analysis - Third-Party Expense Invoiced to Your Client - PROPOSAL
1 message

**Michael Sullivan** <msullivanjrlaw@gmail.com>                                                Tue, Apr 30, 2024 at 6:45 PM
To: Mike Maloof <malooflawfirm@gmail.com>

Hi Mike,

I hope you're well. Regarding our ongoing discussion about compensation adjustments, I've given further thought to a potential approach to reduce the figure that you previously suggested.

As the 2024 call detail record analysis was necessitated by Mr. Sutton's prior inactions, I propose that I directly invoice you for the 50 hours of work, and you would then invoice Mr. Sutton. This method not only ensures that expenses are allocated fairly but also capitalizes on the favorable evidence obtained. This recoupment effectively adjusts the total adjustment you proposed downwards by the invoiced amount which is the hourly fee x 50 hours spent on this. Mr. Sutton needs only consent to the expense pursuant to the terms of the employment agreement, if one has been executed.

**This approach would address the 50 hours of work completed (and knocks all of 2024 out of consideration) and not pursuing this suggestion would be akin to leaving money on the table for no reason, right? Am I missing something?**

**Context.** On April 4, 2024, I delivered a comprehensive report based on my analysis of the call records, which uncovered pivotal exculpatory evidence. The metadata analysis proved invaluable, providing clear insights that:

- Directly contradict the alleged victim's statements.
- Raise issues about the integrity of the detective's investigation.
- Refute claims regarding Mr. Sutton's behavior post-incident.

**Billing.** The necessity for this extensive analysis arose from Mr. Sutton's failure to act proactively, making it reasonable for him to bear the related costs. This extensive work could have been avoided if Mr. Sutton had taken timely responsibility for his defense. I propose to bill you for these expenses, which you can then pass along to Mr. Sutton. This aligns with your fee agreement structures that anticipate third-party expenses and is consistent with the practice of client responsibility for expert and investigative costs. Please confirm the details of your fee agreement with Mr. Sutton to ensure it allows for passing along these expenses.

**Collateral.** There seems to be no obstacle to passing these costs directly to Mr. Sutton, which could favorably adjust the total amount currently under discussion. Alternatively, we could keep this expense grouped with other items in our broader discussions. If you choose not to bill Mr. Sutton for these costs, it can be included in our ongoing discussions regarding compensation.

**Consent.** This proposal presupposes Mr. Sutton's consent and understanding to bear these expenses. Given your expressed frustrations with Mr. Sutton's previous indifference towards his defense, it stands to reason that he is aware of this too and may be eager to regain your trust by assuming financial responsibility for his previous oversights. Mr. Sutton's failure to agree to the expense could create a potentially fatal unforced error, especially given the potential consequences of the case. Nonetheless, if he opts out, I respect his decision, as I trust you would, and would share in the disappointment given the ramifications of not using the evidence.

**Invoicing.** Today marks an opportune moment to finalize and issue this invoice, coinciding with the end of the month when the comprehensive report was provided. While immediate attention to this isn't necessary, timely handling would be ideal.

**Next.** If you agree with the proposal, I recommend we arrange a short discussion to finalize the billing details. During this discussion, we will:

- Review a detailed accounting of the services provided in preparing the CDR analysis and report;
- Discuss GPT-produced assessments (x 3 for objective sample) of the report's quality (attempt to objectively provide some confidence to you of the report being on par with those from experts);
- Examine GPT-produced estimated cost (x 3 for objective sample) of the report and compare it to market hourly rates;

- Agree upon a reasonable hourly rate that includes a substantial discount due to my non-expert status and acknowledging that reproducing this report for trial would require additional expert review.

Best regards,

**Mike Sullivan**

📱 (678) 372-3000 | 📞 (678) 744-6028 | ✉ msullivanjr@gmail.com

---------- Forwarded message ----------
From: **Michael Sullivan** <msullivanjrlaw@gmail.com>
Date: Thu, Apr 4, 2024 at 6:34 PM
Subject: Sutton CDR Analysis - Initial Draft Report
To: Mike Maloof <malooflawfirm@gmail.com>

Hi Mike:

I hope this email finds you well. As promised, I have completed the initial draft of the report analyzing the Call Detail Records (CDRs) in the defense of Orpheus Sutton, Case No. 23-CR-1379.

Please find attached the .pdf document titled "SUTTON CDR Analysis-DRAFT.pdf" for your review.

The report includes a comprehensive analysis of the CDRs and text message metadata obtained through subpoenas, as well as a detailed examination of the communication patterns between Mr. Sutton and Ms. Eligon before and after the alleged incident. The findings presented in the report raise significant questions about the credibility of the prosecution's evidence and highlight several inconsistencies and discrepancies that support Mr. Sutton's defense.

Please take your time to review the report and provide any feedback, questions, or concerns you may have. I am available to discuss the findings in more detail and make any necessary revisions to ensure that the report effectively supports your defense strategy.

Additionally, I have compiled all the relevant supporting documents, such as subpoenas, business records, legal statutes, and discovery materials, in the Appendix section of the report.

Please let me know if you require any further information or assistance in relation to this report or any other aspects of Mr. Sutton's defense.

Best regards,

**Mike Sullivan**

📱 (678) 372-3000 | 📞 (678) 744-6028 | ✉ msullivanjr@gmail.com

---

**2 attachments**

📄 **SUTTON CDR Analysis-DRAFT.pdf**
   576K

📄 **msullivanjr-invoice-0001.pdf**
   53K

# Mike Sullivan

3324 Peachtree Road NE Unit 1405
Atlanta, GA 30326

Email: msullivanjr@gmail.com
Phone: (678) 372-3000

# INVOICE

| | |
|---|---|
| DATE | 04/30/24 |
| INVOICE # | 0001 |
| CUSTOMER ID | SNAX |
| DUE DATE | 05/30/24 |

| BILL TO |
|---|
| Mike Maloof, Jr.<br>The Maloof Law Firm<br>215 N McDonough St<br>Decatur, GA 30030<br><br>Email: malooflawfirm@gmail.com<br>Phone: (404) 803-5084 |

| DELIVERABLES |
|---|
| Call Detail Record (CDR) Analysis and Report<br>for State v. Sutton; Case No. 23-CR-1379<br>1. Comprehensive CDR Analysis Report<br>2. Data Exhibits & Supporting Documentation |

| Hourly Rate Schedule | |
|---|---|
| Legal Tasks<br>CDR Analysis | |

| DATE | SERVICE DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|---|
| | **Defendant's Requests to Charge** | | | |
| 02/28/24 | Draft and serve | 0.50 | 0.00 | 0.00 |
| | | | | |
| | **Defendant's Proposed Voir Dire** | | | |
| 02/28/24 | Draft and serve | 0.50 | 0.00 | 0.00 |
| | | | | |
| | **Initial Subpoena to T-Mobile - 1st Attempt (Eligon 07/01-07/13/20)** | | | |
| 02/28/24 | Draft and serve | 0.63 | 0.00 | 0.00 |
| | | | | |
| | **Initial Subpoena to AT&T - 1st Attempt (Sutton 07/01-07/13/20)** | | | |
| 02/28/24 | Draft and serve | 0.63 | 0.00 | 0.00 |
| | | | | |
| | **Initial Subpoena to T-Mobile (Eligon 07/01-07/13/20)** | | | |
| 03/07/24 | Draft and serve | 0.25 | 0.00 | 0.00 |
| 03/21/24 | Return of Service - Draft and serve | 0.33 | 0.00 | 0.00 |
| 03/21/24 | Notice of Intent to Introduce Business Records - Draft and serve | 0.50 | 0.00 | 0.00 |
| | | | | |
| | **Initial Subpoena to AT&T (Sutton 07/01-07/13/20)** | | | |
| 03/07/24 | Draft and serve | 0.25 | 0.00 | 0.00 |
| 04/01/24 | Return of Service - Drafted / Not Filed | 0.33 | 0.00 | 0.00 |
| 04/01/24 | Notice of Intent to Introduce Business Records - Drafted / Not Filed | 0.50 | 0.00 | 0.00 |
| | | | | |
| | **Supplemental Subpoena to T-Mobile (Eligon 07/14-07/31/20)** | | | |
| 03/18/24 | Draft and serve | 0.50 | 0.00 | 0.00 |
| 04/01/24 | Return of Service - Drafted / Not Filed | 0.33 | 0.00 | 0.00 |
| 04/01/24 | Notice of Intent to Introduce Business Records - Drafted / Not Filed | 0.50 | 0.00 | 0.00 |
| | | | | |
| | **Supplemental Subpoena to AT&T (Sutton 07/14-07/31/20)** | | | |
| 03/18/24 | Draft and serve | 0.50 | 0.00 | 0.00 |
| 04/01/24 | Return of Service - Drafted / Not Filed | 0.33 | 0.00 | 0.00 |
| 04/01/24 | Notice of Intent to Introduce Business Records - Drafted / Not Filed | 0.50 | 0.00 | 0.00 |
| | | | | |
| | **Preliminary Analysis** | | | |
| 03/15/24 | Review data for completeness and integrity | 2.00 | 0.00 | 0.00 |
| 03/16/24 | Identify relevant data fields and patterns | 2.00 | 0.00 | 0.00 |
| 03/17/24 | Develop initial hypotheses and analysis plan | 2.00 | 0.00 | 0.00 |
| | | | | |
| | **Preliminary Review with Attorney** | | | |
| 03/18/24 | Preliminary Review with Attorney | 1.00 | 0.00 | 0.00 |

| | | | | |
|---|---|---|---|---|
| | **Data Extraction, Standardization, and Analysis** | | | |
| 03/28/24 | Extract CDRs and text message metadata | 4.00 | 0.00 | 0.00 |
| 03/29/24 | Standardize data format and categorize records | 4.00 | 0.00 | 0.00 |
| 03/30/24 | Analyze call patterns, durations, and frequencies | 4.00 | 0.00 | 0.00 |
| 03/31/24 | Identify key discrepancies and inconsistencies | 4.00 | 0.00 | 0.00 |
| | | | | |
| | **Preparing Detailed Expert Report** | | | |
| 04/01/24 | Draft detailed methodology and analysis sections | 8.00 | 0.00 | 0.00 |
| 04/02/24 | Create visualizations and summary exhibits | 4.00 | 0.00 | 0.00 |
| 04/03/24 | Highlight key findings and implications for the case | 4.00 | 0.00 | 0.00 |
| 04/04/24 | Revise and finalize report | 4.00 | 0.00 | 0.00 |

| | | |
|---|---|---|
| **50.07** | Subtotal | 0.00 |
| | Taxable | 0.00 |
| | Tax rate | 0.09 |
| | Tax due | 0.00 |
| | Other | 0.00 |
| | **TOTAL** | 0.00 |

**OTHER COMMENTS**

1. Total payment due in 30 days
2. Please include the invoice number on your check

Make all checks payable to
**Michael E. Sullivan, Jr.**

| SERVICE CATEGORY | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Subpoenas and Notices | 7.07 | | 0.00 |
| Preliminary Analysis | 6.00 | | 0.00 |
| Preliminary Review with Attorney | 1.00 | | 0.00 |
| Data Extraction, Standardization, and Analysis | 16.00 | | 0.00 |
| Preparing Detailed Expert Report | 20.00 | | 0.00 |
| **TOTAL** | **50.07** | | **0.00** |

If you have any questions about this invoice, please contact
Michael E. Sullivan, Jr.  •  (678) 372-3000  •  msullivanjrlaw@gmail.com